# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

**IVAN R. FREITES C.,**

*Plaintiff,*

v.

**HORACIO MEDINA, et al.,**

*Defendants.*                                    **CASE NO.: 1:25-CV-20465-BB**

FILED BY _____ D.C.

MAR 19 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**IVAN FREITES, MIGUEL ENRIQUE OTERO,**

 **and JORGE ALEJANDRO RODRIGUEZ,**

**Plaintiffs,**

v.

**HORACIO MEDINA, ORLANDO VIERA-BLANCO, GUSTAVO**

**LAINETTE, JOSE VICENTE CARRASQUERO, ALEXIS ORTIZ,**

**FEDERICO MEDINA, THAELMAN URGELLES, LUIS JOSE**

CHACON-PACHECO, YON GOICOECHEA, LINO CARRILLO, CENTER FOR LIBERAL DEMOCRACY DEVELOPMENT, INC., RESISTENCIA VENEZOLANA CORP., ASM INVESTING LLC, FREEDOM FOR VENEZUELA, INC., TEZCUA INVESTMENTS LLC, VENEZUELAN AMERICAN ENGAGEMENT FOUNDATION, INC., VENEZOLANOS Y AMERICANOS, INC. (VenAmerica), VENEZUELAN AMERICAN PETROLEUM ASSOCIATION (VAPA), LATINO COMMUNICATIONS LLC, and ALTAMIRA CINEMA CORP.,

Defendants.

CASE NO.: CASE NO.: 1:25-CV-20465-BB

## AMENDED COMPLAINT

INCORPORATION OF COMPLETE AMENDED COMPLAINT BY REFERENCE

*Plaintiffs hereby file this summarized document for procedural clarity and convenience. Attached hereto, and incorporated by reference in its entirety, is Plaintiffs' full and detailed First Amended Complaint (121 pages), which sets forth comprehensively the factual allegations, legal claims, and relief requested against each Defendant. Plaintiffs respectfully direct the Court and all parties to*

*that attached complete document for a full recitation and description of their*

*claims and allegations.*

Plaintiffs Ivan Freites, Miguel Enrique Otero, and Jorge Alejandro Rodriguez (collectively, "Plaintiffs"), appearing pro se, pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure, hereby file their Amended Complaint against all named Defendants, and state:

1. Plaintiffs fully incorporate and reallege all allegations, facts, claims, and causes of action set forth in the original Complaint, as if fully restated herein.

2. This Amended Complaint is timely filed within the 21-day period following service of Defendants' Motion to Dismiss under Rule 12(b), filed on February 26, 2025.

3. Plaintiffs incorporate additional factual allegations, revised and clarified claims, jurisdictional arguments, and all previously identified relief requests.

**COUNTS ALLEGED:**

Count I: Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962 et seq.

Count II: Civil Conspiracy (Florida Common Law)

Count III: Defamation (Libel and Slander)

Count IV: Invasion of Privacy – Public Disclosure of Private Facts

Count V: Intentional Infliction of Emotional Distress (IIED)

Count VI: Negligence

Count VII: Conspiracy to Interfere with Civil Rights, 42 U.S.C. §§ 1985(2)-(3)

Count VIII: Neglect to Prevent Civil Rights Violations, 42 U.S.C. § 1986

Count IX: Aiding and Abetting (Common Law) (Against All Defendants)

Count X: Violation of the Law of Nations and Alien Tort Statute (28 U.S.C. § 1350)

**PRAYER FOR RELIEF:**

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Award compensatory damages for reputational harm, emotional distress, financial losses, and other consequential damages; b. Award treble damages as allowed by statute; c. Award punitive damages due to Defendants' malicious and intentional misconduct; d. Grant injunctive relief prohibiting Defendants from further defamatory or retaliatory actions; e. Award reasonable attorneys' fees and costs, as permitted by applicable statutes; f. Grant declaratory relief affirming the wrongful nature of Defendants' actions; g. Provide pre- and post-judgment interest as permitted by law; h. Order any other relief deemed just and proper by this Court.

**DEMAND FOR JURY TRIAL:**

Plaintiffs hereby demand a jury trial on all issues so triable.

**CERTIFICATION AND CLOSING:**

Under Federal Rule of Civil Procedure 11, Plaintiffs certify that this Amended

Complaint is:

1. Not presented for any improper purpose;

2. Supported by existing law or nonfrivolous argument;

3. Factually supported or likely to have evidentiary support upon reasonable

   investigation and discovery;

4. Compliant with Rule 11 requirements.

Plaintiffs will promptly inform the Clerk's Office of any address changes.

Respectfully submitted,

**/s/ Ivan R. Freites C.**

**Ivan R. Freites C., Pro Se**

℅ Villasana

4370 NW 107 Ave, Apt. 102

Doral, FL 33178

Email: freites.usdcsf.1.25.cv.20465.bb@gmail.com

---

**Miguel Enrique Otero (Plaintiff, Pro Se)**   

**March 10th, 2025 In Madrid, Spain.**

**Mailing address:** % RODRIGUEZ, Eichholzstrasse 2, 6312-Steinhausen, CH

---

**Jorge Alejandro Rodriguez (Plaintiff, Pro Se)**

**March 12th, 2025 In Zürich, Switzerland.**

**Mailing address:** Eichholzstrasse 2, 6312-Steinhausen, CH

**CERTIFICATE OF SERVICE**

I hereby certify that on this **19th day of March, 2025**, I electronically filed the foregoing

**Document** with the Clerk of the Court using the **CM/ECF system**, which will send a

notice of electronic filing to all counsel of record.

Dated: **On this same same as above of 2025**

**Respectfully submitted,**

/s/ Ivan R. Freites C.
**Ivan R. Freites C., Pro Se**
℅ Villasana
4370 NW 107 Ave, Apt. 102
Doral, FL 33178
Email:   freites.usdcsf.1.25.cv.20465.bb@gmail.com

## <u>TABLE OF AUTHORITIES</u>

**CASES**

Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639 (2008)

Haddle v. Garrison, 525 U.S. 121 (1998)

H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229 (1989)

New York Times Co. v. Sullivan, 376 U.S. 254 (1964)

Robertson v. Wegmann, 436 U.S. 584 (1978)

Sosa v. Alvarez-Machain, 542 U.S. 692 (2004)

**STATUTES AND REGULATIONS**

Alien Tort Statute, 28 U.S.C. § 1350

Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988

Civil Rights Conspiracy, 42 U.S.C. §§ 1985(2), (3)

Neglect to Prevent Conspiracy, 42 U.S.C. § 1986

Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968

RICO Civil Remedies Provision, 18 U.S.C. § 1964(c)

Wire Fraud, 18 U.S.C. § 1343

Obstruction of Justice, 18 U.S.C. § 1503

Witness Tampering and Retaliation, 18 U.S.C. §§ 1512, 1513

Hobbs Act Extortion, 18 U.S.C. § 1951

Money Laundering, 18 U.S.C. §§ 1956, 1957

Foreign Corrupt Practices Act (FCPA), 15 U.S.C. §§ 78dd-1, et seq.

Internal Revenue Code, Tax Fraud and False Statements, 26 U.S.C. § 7206

## JURISDICTIONAL AND PROCEDURAL RULES

Federal Question Jurisdiction, 28 U.S.C. § 1331

Civil Rights Jurisdiction, 28 U.S.C. § 1343

Supplemental Jurisdiction, 28 U.S.C. § 1367

Venue Statute, 28 U.S.C. § 1391

Florida Long-Arm Statute, Fla. Stat. § 48.193

Federal Rule of Civil Procedure 11

Federal Rule of Civil Procedure 38

**LOCAL RULES**

Local Rule 5.1(a)(4) – Formatting

Local Rule 5.1(a)(5) – Attorney Signature

Local Rule 5.2(a) – Certificate of Service

Local Rule 7.1(a)(3) – Compliance Certification

**AMENDED COMPLAINT TABLE OF CONTENTS............. 1**

AMENDED COMPLAINT....................................................4

1. I. INTRODUCTION.................................................4

11. II. PARTIES..................................................... 8

    12. Plaintiffs:.................................................... 8

    16. Defendants:................................................ 10

38. III. JURISDICTION AND VENUE.............................. 19

    39. Subject Matter Jurisdiction:..............................19

    42. Personal Jurisdiction:.................................... 21

    45. Venue:..................................................... 22

    48. Intradistrict Assignment:................................ 24

    50. Summary of Jurisdiction and Venue Grounds:.......... 24

59. IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS... 25

    60. A. Background of Defendants' Coordinated Campaign........... 25

    90. B. Impact on Plaintiffs (Damages and Injuries)......................34

112. V. CAUSES OF ACTION................................................................44

114. Count I: Violation of Racketeer Influenced and Corrupt
Organizations Act (RICO), 18 U.S.C. § 1962(c).............................. 44

140. Count II: Civil Conspiracy (Under Florida Common Law)....55

159. Count III: Defamation (Libel and Slander)............................ 60

189. Count IV: Invasion of Privacy – Public Disclosure of Private
Facts................................................................................................68

225. Count V: Intentional Infliction of Emotional Distress (IIED)...
78

246. Count VI: Negligence................................................................ 84

267. Count VII: Violation of 42 U.S.C. § 1985(2) and (3) –
Conspiracy to Interfere with Civil Rights........................................89

288. Counts VIII, IX and X: Violation of 42 U.S.C. § 1986 – Neglect
to Prevent Conspiracy, Violation to Law of Nations and other..... 95

339. VI. PRAYER FOR RELIEF..........................................................108

351.8 VII. DEMAND FOR JURY TRIAL............................................116

351.9 VIII. CERTIFICATION AND CLOSING.................................116

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

Ivan R. FREITES C.

Miguel Enrique Otero C.

Jorge Alejandro Rodriguez,

*Plaintiffs,*

v.

Horacio MEDINA (a private person); Orlando VIERA-BLANCO (a private person); Gustavo LAINETTE (a private person); Jose CARRASQUERO (a private person); Alexis ORTIZ (a private person); Federico MEDINA a.k.a. @lucioquincioc (a private person); Thaelman URGELLES (a private person); Luis Jose CHACON-PACHECO a.k.a. El Gocho del Whatsapp (a private person), Yon GOICOECHEA (a private person), Lino CARRILLO (a private person) ; Center for Liberal Democracy Development, Inc. (a Florida Corporation); Resistencia Venezolana Corp. (a Florida Corporation); ASM Investing LLC (a Florida Corporation); Freedom for Venezuela Inc. (a Florida Corporation); TEZCUA Investments LLC (a Florida Corporation); AMERICAN VENEZUELAN ENGAGEMENT FOUNDATION, INC (a Florida Corporation) ; Venezolanos y Americanos Inc a.k.a VENAMERICA (a Florida

4

Corporation); ALTAMIRA CINEMA CORP (a Florida Corporation) ; LATINO COMMUNICATIONS LLC (a Florida Corporation) ; LEMURE HOLDINGS LLC (a Florida Corporation) ; Venezuelan American Petroleum Association a.k.a. VAPA (a Texas Corporation). *Defendants.*

Defendants,

CASE NO.: 1:25-CV-20465-BB

# AMENDED COMPLAINT

1. I. INTRODUCTION

2. **Nature of the Action:** This action arises from Defendants' coordinated and malicious campaign involving defamation, intimidation, obstruction of justice, witness tampering, and racketeering against Plaintiffs Ivan Freites, Miguel Enrique Otero, and Jorge Alejandro Rodriguez. Plaintiffs are known Venezuelan dissidents in exile actively involved in significant legal proceedings related to the Venezuelan state-owned oil company, **PDVSA**, and its U.S. subsidiary, **CITGO**.

3. **Obstruction of Justice by means of Orchestrated Smear Campaign:** Defendants orchestrated a sophisticated, targeted, and sustained campaign of malicious communications, defamatory social

media posts, and videos falsely labeling Plaintiffs as "traitors," "false opposition," and corrupt conspirators. These actions were deliberately intended to intimidate Plaintiffs, retaliate against their participation in legal proceedings, destroy their reputations, silence their advocacy, and obstruct judicial processes, in violation of federal laws prohibiting obstruction of justice and witness intimidation (18 U.S.C. §§ 1503, 1512, 1513).

4.   **Extortionate Threats:** Defendants also employed extortionate threats in violation of the **Hobbs Act** (18 U.S.C. § 1951) and corresponding state statutes, seeking to coerce Plaintiffs into abandoning their legal claims and advocacy. By threatening Plaintiffs' safety and livelihoods, Defendants attempted to influence the outcome of ongoing court proceedings and silence Plaintiffs' opposition to corruption.

5.   **Fraudulent   Misrepresentations   and   Tax   Violations:**   In furtherance of their scheme, Defendants fraudulently induced public donations by misrepresenting their organizations as charitable - 503(c) - or educational nonprofits under IRS regulations. Defendants' entities misused tax-exempt status and made false statements to the IRS, financing politically motivated defamatory and retaliatory activities against Plaintiffs in violation of 26 U.S.C. § 7206 (tax fraud/false statements).

6.   **Money Laundering and FCPA Violations:** Defendants engaged in money laundering and financial fraud (18 U.S.C. §§ 1956, 1957), utilizing illicitly obtained funds from Venezuelan government-owned entities to bankroll their defamatory and retaliatory operations. These unlawful financial activities also implicate the **Foreign Corrupt Practices Act (FCPA)**, 15 U.S.C. §§ 78dd-1, *et seq.*, as funds derived from foreign state-controlled entities were improperly diverted to Defendants' illicit purposes.

7.   **Harm to Newly Added Plaintiffs:** Plaintiffs **Miguel Enrique Otero** and **Jorge Alejandro Rodriguez** (in addition to original Plaintiff **Ivan Freites**) have each experienced direct and substantial harm from Defendants' smear campaigns, retaliation, and intimidation. Each Plaintiff has suffered severe reputational damage, emotional distress, financial losses, threats to personal safety, and interference with their rights to pursue legal claims and engage in protected advocacy on matters of public concern.

8.   **Pattern of Racketeering:** Collectively, Defendants' actions constitute a pattern of racketeering activity actionable under the **Racketeer Influenced and Corrupt Organizations Act (RICO)**, 18 U.S.C. §§ 1961–1968. Defendants violated multiple federal laws, including

those prohibiting obstruction of justice, witness intimidation, extortion, fraudulent solicitation of funds, misuse of nonprofit organizations, and money laundering. These predicate acts form a continuous pattern of illegal activity orchestrated by Defendants.

9. **Enterprise and Conspiracy:** Defendants acted as a unified enterprise with the common objective to intimidate Plaintiffs, obstruct justice, and silence legitimate political advocacy. In doing so, they engaged in a transnational campaign of persecution against political dissidents, deliberately suppressing Plaintiffs' voices through fear and defamation. Defendants operated collectively and in concert, each contributing to and furthering the unlawful scheme.

10. **Relief Sought:** As a result of Defendants' egregious conduct, Plaintiffs seek to hold them accountable under federal statutes and state law. Plaintiffs request compensatory and punitive damages, injunctive and declaratory relief, and any other appropriate relief to redress their injuries and to prevent future unlawful conduct by Defendants. Plaintiffs also seek an award of costs and attorneys' fees as permitted by law, and hereby demand a trial by jury on all issues so triable.

11.  **II. PARTIES**

12.  **Plaintiffs:**

13.  **Ivan R. Freites** is a Venezuelan union leader and human rights advocate who resides in the United States. He is renowned for his outspoken opposition to **Petróleos de Venezuela, S.A. (PDVSA)** and associated Venezuelan government entities, citing their corruption, human rights abuses, and mistreatment of oil-sector workers and their families. Mr. Freites publicly opposed corrupt practices during the PDVSA administrations of Rafael Ramírez, Nelson Martínez, and Tarek El-Aissami, as well as malfeasance involving PDVSA's foreign subsidiaries overseen by Venezuelan opposition figures abroad. Due to Defendants' coordinated defamatory campaign, Mr. Freites has suffered severe reputational harm, economic damages, threats to his and his family's safety, extreme emotional distress, and interference with his participation in ongoing legal actions. Notably, Defendants publicly disseminated identities and information protected by a court seal in **Delaware federal Case No. 1:23-cv-00989**, directly harming Mr. Freites and compromising his role in joint legal efforts.

14.  **Miguel Enrique Otero** is a dual Venezuelan-Spanish citizen residing

in exile in Madrid, Spain. He is a prominent journalist and the Editor/President of *El Nacional*, formerly a leading independent newspaper in Venezuela. Mr. Otero is an outspoken critic of the Venezuelan regime and has actively pursued transparency and accountability regarding PDVSA and CITGO. As a result of Defendants' defamatory and retaliatory actions, Mr. Otero has suffered significant reputational damage internationally, has been subjected to threats, and has faced obstacles in his journalistic and advocacy work.

15.   **Jorge Alejandro Rodriguez** is a Venezuelan political activist and an elected member of the Venezuelan National Assembly (2020), now residing in exile in Switzerland. Mr. Rodriguez is actively involved in efforts to reclaim assets for the Venezuelan people from PDVSA and CITGO. Defendants targeted him with smear campaigns, false accusations, and threats, and even disclosed court-sealed information pertaining to his identity. Defendants' actions have caused Mr. Rodriguez substantial harm, including threats to his safety, reputational damage, and interference with his efforts to pursue legal remedies and advocacy on behalf of Venezuelan citizens.

## 16.   Defendants:

17.   **Horacio Medina ("Medina" from hereon)**, residing in Broward

10

County, Florida (last known address in Hollywood, FL), is a former PDVSA official and prominent activist who initiated, financed, and directed the ongoing defamatory campaign against Plaintiffs. Mr. Medina leveraged his roles as President of an oil-sector NGO ("UNAPETROL") and former director of VenAmerica to give credibility to the smear campaign. Despite receiving cease-and-desist warnings, he orchestrated and intensified the campaign through subordinates and affiliated organizations, including funding the production and dissemination of defamatory media content targeting Plaintiffs.

18. **Orlando Viera-Blanco**, residing in Miami-Dade County, Florida (Doral, FL), is an attorney and former Venezuelan diplomat. Mr. Viera-Blanco used his public platform and legal credentials to amplify the defamatory campaign. He unlawfully disclosed Plaintiffs' confidential and court-sealed information (including immigration/asylum details and sealed identities) on social media and in public forums, significantly compounding the harm to Plaintiffs. His actions lent an appearance of legitimacy to the false allegations due to his status as an attorney.

19. **Gustavo Lainette**, residing in Miami-Dade County, Florida (North

Miami Beach, FL), produced and disseminated at least four professionally edited defamatory videos targeting Plaintiffs. Mr. Lainette is known to have engaged in morally questionable smear tactics previously, and in this scheme he worked closely with other Defendants to create multimedia content maligning Plaintiffs. These videos were widely circulated online (YouTube, Facebook, Twitter), falsely portraying Plaintiffs as conspirators and corrupt actors, and Mr. Lainette actively promoted and refused to retract this content.

20.   **Jose Vicente Carrasquero**, residing in Broward County, Florida (Hollywood, FL), actively coordinated and propagated the defamatory campaign via social media. Mr. Carrasquero managed several anonymous accounts (including the Twitter handle "@LucioQuincioc") and distributed defamatory posts and videos. Financial records indicate that partnerships of Defendant Carrasquero received substantial payments (over $240,000 from co-Defendant Medina) during 2024 to support these activities. He served as a central hub for disseminating false information, ensuring a continuous flow of malicious content.

21.   **Alexis Ortiz**, residing in Broward County, Florida (Pembroke Pines, FL), is a political commentator and close associate to Medina and

Carrasquero who joined the conspiracy by using various social media accounts and platforms to spread the defamatory videos and messages. Mr. Ortiz's background as an international political consultant underscores that his involvement was deliberate. He helped translate and circulate the false narratives to both Spanish- and English-speaking audiences, thereby expanding the reach of the smear campaign.

22.    **Federico Medina** (a/k/a "@LucioQuincioc"; not "Medina" in this document), residing in Orange County, Florida (Orlando, FL), operated anonymous online personas instrumental to the smear campaign. He initially ran the "@LucioQuincioc" Twitter account that published defamatory threads revealing confidential information about Plaintiffs. Mr. Medina later transferred or "sold" control of that account to co-Defendant Carrasquero to continue the propaganda. He knowingly created and circulated false content and failed to stop its spread, actively facilitating the conspiracy.

23.    **Thaelman Urgelles**, residing in Miami-Dade County, Florida (Doral, FL), is a media personality who amplified defamatory narratives via social media and possibly radio/TV programs. Mr. Urgelles used his

influence to further spread Defendants' false accusations about Plaintiffs. Despite having the ability to question or halt the spread of unverified claims, he instead reinforced and repeated the defamatory messages, contributing to the breadth of the campaign.

24. **Luis José Chacón-Pacheco** (widely known by the pseudonym "El Gocho del Whatsapp"), residing in Miami-Dade County, Florida (Miami, FL), created and distributed defamatory audio content and messages targeting Plaintiffs. Through popular WhatsApp groups and podcasts with thousands of followers, Mr. Chacón-Pacheco spread false and threatening statements about Plaintiffs to a broad audience. He collaborated with Carrasquero and others to ensure the defamatory content reached and mobilized Venezuelan diaspora communities, thereby significantly amplifying the harm.

25. **Yon Goicoechea**, with a principal address in Doral, Florida, is a Venezuelan attorney and political figure who helped finance and strategize the smear campaign. Mr. Goicoechea contracted and paid Defendant Lainette to produce defamatory video content, evidencing his leadership role in the conspiracy. His substantial legal and political experience indicates he understood the wrongful nature of the campaign. Nonetheless, he provided resources and guidance to continue

it, and failed to use his influence to stop the ongoing defamation.

26.   **Lino Carrillo**, based in The Woodlands, Texas (Montgomery County),
is the Director of the **Venezuelan American Petroleum Association
(VAPA)** and activist of Gente del Petroleo and UNAPETROL.
Although located in Texas, Mr. Carrillo participated in disseminating
defamatory content against Plaintiffs and leveraged VAPA's platform to
lend credence to the attacks. He collaborated with Florida-based
Defendants to share false claims through industry networks and
events, thus extending the conspiracy's reach into the oil industry
community.

27.   **Center for Liberal Democracy Development, Inc.**, a Florida
non-profit corporation (headquartered in Coral Gables, FL), was
managed by Defendants Viera-Blanco and Carrasquero, as well as by
attorney Carlos Sardi (not a party to this case and Counsel to several
Defendants). This entity was used to promote and disseminate
defamatory misinformation targeting Plaintiffs under the guise of
think-tank or educational materials. By using the cover of a civic
organization, Defendants were able to spread false allegations about
Plaintiffs to donors and the public, giving the campaign an appearance
of legitimacy. This entity either holds or has held for all times relevant

a 503(c) charitable organization exemption.

28. **Resistencia Venezolana Corp.**, a Florida corporation (Hialeah, FL) managed by Defendant Lainette, functioned as a platform to spread defamatory materials. Under the banner of "resistance" against the Venezuelan regime, this organization's channels and resources were exploited to circulate the false narratives about Plaintiffs, misleading supporters into believing the smears were part of a patriotic cause. This entity either holds or has held for all times relevant a 503(c) charitable organization exemption.

29. **ASM Investing LLC**, a Florida limited liability company (Hialeah, FL) managed by Defendant Carrasquero, was financially instrumental in the campaign. ASM's funds and assets were directed toward the production and distribution of defamatory content. By routing money through ASM, Defendants obscured the financing of their smear campaign while ensuring the necessary resources (equipment, advertising, etc.) were available to defame Plaintiffs.

30. **Freedom for Venezuela, Inc.**, a Florida corporation (Miami, FL) managed by Defendants Carrasquero and Chacón-Pacheco, facilitated the distribution of defamatory content. Under the pretense of a

non-profit advocating for Venezuela's freedom, this entity's mailing lists, social media, and events were used to spread Defendants' false narratives about Plaintiffs, thereby broadening the audience and bolstering the pretext that the information came from reputable activist sources. This entity either holds or has held for all times relevant a 503(c) charitable organization exemption.

31. **Tezcua Investments LLC**, a Florida limited liability company (Coral Gables, FL) managed by Defendant Viera-Blanco (through his law firm's address), provided technological and financial infrastructure for the campaign. Tezcua's resources were used to host websites, mass-email services, or other digital means that Defendants employed to disseminate defamatory content. Despite knowledge of the misconduct, those controlling Tezcua failed to halt its resources from being used for the smear campaign.

32. **American Venezuelan Engagement Foundation, Inc.** (also referred to as AVE or AVEF), a Florida non-profit organization founded by and associated with Defendant Viera-Blanco, contributed to the conspiracy by allowing its platforms and donor networks to circulate false accusations against Plaintiffs. By neglecting to intervene or

distance the organization from the defamatory content, its managers effectively endorsed and propagated the smear campaign under an official-sounding organization name. This entity either holds or has held for all times relevant a 503(c) charitable organization exemption.

33. **Venezolanos y Americanos, Inc.** (also known as **VenAmerica**), a Florida non-profit corporation historically directed by Defendant Medina and later presided over by Defendant Viera-Blanco, actively promoted defamatory content about Plaintiffs. VenAmerica's influential community network was misused to validate and amplify Defendants' narratives, causing Plaintiffs greater reputational harm within the Venezuelan-American community. This entity either holds or has held for all times relevant a 503(c) charitable organization exemption.

34. **Venezuelan American Petroleum Association (VAPA)**, although not separately listed as a corporation in the original style, is referenced as an entity of which Defendant Carrillo is a Director (based in Texas). To the extent VAPA or its resources were involved, this association helped disseminate false claims within professional circles related to the petroleum industry, thereby injuring Plaintiffs' reputations in those circles. (VAPA is referenced here for clarity, as it was named in the

original Complaint's caption.) This entity either holds or has held for all times relevant a 503(c) charitable organization exemption.

35. **ALTAMIRA Cinema Corp.** (sometimes referred to as "ALTAMIRA Cinema Corp."), a Florida corporation (Doral, FL) presided over by Defendant Urgelles, provided logistical and technical support for the production of defamatory video content. This company's facilities, staff, or equipment were used to create and edit videos that were later published to attack Plaintiffs. ALT Cinema Corp. knowingly allowed its resources to be used in this unlawful manner and took no steps to prevent or mitigate the harm once the content was released.

36. **Latino Communications LLC**, a Florida limited liability company (Pembroke Pines, FL) presided over by Defendant Ortiz, similarly supported the production and dissemination of defamatory multimedia content. This company was a vehicle through which Defendants coordinated communications (such as possibly funding internet ads or managing social media campaigns) to spread the false allegations. It failed to exercise any editorial control or responsibility to stop the misuse of its communication platforms for defamation.

37. **All Defendants** acted individually and in concert as part of the conspiracy alleged herein. Each Defendant intentionally coordinated their actions to inflict harm upon Plaintiffs. All Defendants are jointly and severally liable for the acts of their co-conspirators undertaken in furtherance of the conspiracy, under well-established principles of law. Each Defendant, whether an individual or entity, substantially participated in or enabled the wrongful conduct described, and each had knowledge of the overall scheme and its unlawful objectives.

38. ## III. JURISDICTION AND VENUE

39. **Subject Matter Jurisdiction:**

40. This Court has subject matter jurisdiction over this action under **28 U.S.C. § 1331** because Plaintiffs' claims arise under federal law, including the **Racketeer Influenced and Corrupt Organizations Act (RICO)**, 18 U.S.C. §§ 1961–1968, and the civil rights conspiracy statutes, **42 U.S.C. §§ 1985 and 1986** (the Ku Klux Klan Act). Specifically, Count I (RICO) and Counts VII & VIII (42 U.S.C. §§ 1985 and 1986) present substantial federal questions that require interpretation and application of federal statutes.

41. Additionally, RICO's jurisdictional provision, 18 U.S.C. § 1964(c),

explicitly authorizes this Court to adjudicate civil claims brought by persons injured in their business or property by reason of racketeering activity. Here, Plaintiffs allege such injury from Defendants' acts of defamation, threats, intimidation, and unlawful disclosures as part of a racketeering enterprise, thereby invoking § 1964(c). Further, 42 U.S.C. § 1985(2) and (3) and § 1986 provide federal causes of action for conspiracies to deprive rights and for neglecting to prevent such conspiracies; jurisdiction over these claims is also conferred by **28 U.S.C. § 1343**, which provides original jurisdiction for civil rights claims (including claims under § 1985 and § 1986).   To the extent Plaintiffs assert additional claims arising under Florida state law — including **defamation**, **civil conspiracy**, **invasion of privacy**, **intentional infliction of emotional distress**, and **negligence** — this Court has supplemental jurisdiction pursuant to **28 U.S.C. § 1367(a)**. All state-law claims derive from the common nucleus of operative fact that underlies the federal claims: namely, Defendants' coordinated campaign of defamation, intimidation, harassment, and obstruction directed at Plaintiffs. Resolving all related claims in one federal proceeding promotes judicial economy, avoids inconsistent outcomes, and fairly allows all injuries stemming from Defendants' conduct to be addressed together.

**42.**   **Personal Jurisdiction:**

**43.**   This Court may exercise personal jurisdiction over each Defendant
consistent with the U.S. Constitution and Florida's Long-Arm Statute.
Many individual Defendants reside in Florida or maintain continuous
and systematic contacts with Florida (particularly in the Southern
District), including personal residences and business operations. All
Defendants, whether located in Florida, elsewhere in the United States,
or abroad, **purposefully directed** their tortious conduct at Plaintiffs
within the United States and Florida.Specifically, Defendants
intentionally published defamatory communications and disseminated
confidential, court-sealed information via the internet and other
interstate channels, knowing and intending that the brunt of the harm
would be felt by Plaintiffs in Florida (where Plaintiff Freites resides
and where much of the relevant legal proceedings are centered) and in
the U.S. generally. Defendants' acts were not random or attenuated;
rather, they were aimed at undermining Plaintiffs' U.S.-based litigation
and reputation. Under Florida's long-arm statute, Fla. Stat.
§ 48.193(1)(a)(2) and (6), Defendants committed tortious acts within
Florida (by causing injury here through out-of-state acts) and engaged

in a conspiracy carried out in part in Florida, thus subjecting themselves to personal jurisdiction.

44. Moreover, RICO provides for nationwide service of process and jurisdiction under 18 U.S.C. § 1965(b) for participants in a RICO conspiracy when the ends of justice require all defendants to be brought before one court. Given that this RICO enterprise and conspiracy involve multiple Florida residents and significant acts in Florida, the "ends of justice" justify haling all co-conspirators into this Court. Additionally, 42 U.S.C. § 1986 (through 28 U.S.C. § 1343) supports personal jurisdiction over those who conspire or neglect to prevent conspiracies to deprive equal protection, as alleged here, since much of the impact and conduct occurred in this forum. Exercise of personal jurisdiction over all Defendants is proper because they had more than sufficient minimum contacts with Florida and because doing so comports with traditional notions of fair play and substantial justice given the intentional targeting of this forum.

45. **Venue:**

46. Venue is proper in the **Southern District of Florida** under **28 U.S.C. § 1391(b)(2)** because a substantial part of the events or omissions giving rise to the claims occurred in this District. The core wrongful

acts — including the creation, funding, and dissemination of defamatory content, as well as the unauthorized disclosure of protected information — were orchestrated and executed largely by Defendants in South Florida (Miami-Dade and Broward Counties). Many defamatory videos were produced in or transmitted from this District, and defamatory social media postings were made by Defendants while present in this District. Plaintiffs' injuries (reputational harm, emotional distress, and interference with legal proceedings) were also acutely felt within this District, where Plaintiff Freites resides and where the judicial proceedings that Defendants aimed to influence are underway.

47. Venue is further supported under **28 U.S.C. § 1391(b)(1)** and **(c)** because multiple Defendants reside in this District. At least one Defendant (and in fact, many) is domiciled in Florida and in the Southern District, making venue proper as to all Defendants in an action with multiple defendants. Additionally, for any Defendant who may be considered an alien (non-U.S. resident), **28 U.S.C. § 1391(c)(3)** and **§ 1391(f)** permit suit in any district; thus, inclusion of any foreign defendants does not defeat venue in this District.

## 48.   Intradistrict Assignment:

49.   Pursuant to Local Rules of the Southern District of Florida, intradistrict assignment to the **Miami Division** is appropriate. A significant portion of Defendants' activities occurred in and around Miami (Miami-Dade County), and Plaintiff Freites' injuries were centered there. Key Defendants (Viera-Blanco, Urgelles, Chacón-Pacheco, etc.) reside or acted in Miami-Dade County, and many defamatory broadcasts or meetings took place in Miami. Therefore, the Miami Division is the most fitting and convenient forum within this District for this case.

## 50.   Summary of Jurisdiction and Venue Grounds:

51.   In summary, the bases for jurisdiction and venue include:

52.   **Federal Question Jurisdiction (28 U.S.C. § 1331):** Claims arising under RICO and 42 U.S.C. §§ 1985 & 1986.

53.   **Civil RICO Jurisdiction (18 U.S.C. § 1964(c)):** Express jurisdiction for RICO claims by affected individuals.

54.   **Civil Rights Jurisdiction (28 U.S.C. § 1343):** Jurisdiction over claims to redress deprivations of civil rights (applicable to 42 U.S.C.

25

1985/1986 claims).

55. **Supplemental Jurisdiction (28 U.S.C. § 1367):** Over all state-law claims (defamation, etc.) sharing a common nucleus of facts with the federal claims.

56. **Personal Jurisdiction:** Satisfied via Florida's long-arm statute and Defendants' deliberate targeting of Florida, as well as RICO's nationwide service provisions.

57. **Venue (28 U.S.C. § 1391):** Proper in the S.D. Fla., Miami Division, because Defendants' actions and Plaintiffs' injuries are centered in this District, and multiple Defendants reside or conduct business here.

58. Accordingly, this Court has full authority to hear this matter and is the appropriate venue for adjudication of all claims.

59. # IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

60. ## A. Background of Defendants' Coordinated Campaign

61. **Plaintiffs' Advocacy and Defendants' Motives:** Plaintiffs Freites, Otero, and Rodriguez have been involved in exposing corruption and

pursuing legal action related to PDVSA and CITGO assets. Their advocacy threatens the interests of individuals aligned with both the Nicolás Maduro regime in Venezuela and certain factions of the U.S.-recognized Venezuelan interim government. In retaliation, Defendants — including Medina, Viera-Blanco, Goicoechea, Lainette, and others — sought to neutralize Plaintiffs' influence by orchestrating a coordinated defamatory campaign. The timing and content of Defendants' actions indicate their intent was to retaliate against Plaintiffs for their participation in legal proceedings and to preemptively discredit them.

62.   **Initiation of the Smear Campaign:** Beginning in or around late 2023, Defendants launched a systematic and malicious campaign to defame and intimidate Plaintiffs. This campaign was marked by the production and dissemination of false narratives through various media:

63.   In August and September 2023, **Defendant Horacio Medina**, using NGOs he controls (such as "Gente del Petróleo" and UNAPETROL), recorded and circulated audio messages accusing Plaintiffs of betraying Venezuela. These audio clips were widely shared among Venezuelan

expatriate networks. **Defendants Lino Carrillo and Jose Carrasquero** amplified Medina's messages by reposting them on social media and forwarding them through WhatsApp groups. Defendant Medina ordered subordinates in Gente del Petroleo and UNAPETROL to amplify said messages labeling Plaintiffs as "estafadores" (fraudsters) and other false and damaging statements with the purpose of harming their advocacy in favor of Venezuelan oil workers

64. On September 29, 2023, Plaintiffs (through counsel or otherwise) sent formal **cease-and-desist letters** to certain Defendants including Defendant Medina, demanding an end to the false statements. Defendants ignored these warnings. In fact, rather than retract, they escalated their efforts.

65. During the following months and to this date defendants Medina, Carrillo, Carrasquero, Viera-Blanco, and the corporate entities they control constantly and frequently disseminated damaging information against Plaintiffs in a coordinated manner, including but not limited to the use of dozens of "bot" accounts managed and controlled by Defendants Carrasquero and Ortiz.

66. In or about March-April 2024, **Defendant Gustavo Lainette** produced a series of professionally edited video segments that were published on YouTube, Facebook, and Twitter. Defendant Lainette was

specifically instructed by Defendant Goicoechea - after a meeting with Defendant Medina - to produce these videos in order to sabotage the ongoing litigation in Delaware against CITGO and PDVSA by Plaintiffs. These videos falsely labeled Plaintiffs as **"falsos opositores"** (false opposition) engaged in conspiracies to enrich themselves at the expense of Venezuela. One such video contained egregious falsehoods—for example, accusing Plaintiff Otero of having colluded with the late President Hugo Chávez's regime, and insinuating Plaintiff Rodriguez received illicit funds from ex-PDVSA official Rafael Ramírez who would be "a close friend" of Plaintiff Rodriguez while the truth is that on the contrary Rodriguez filed criminal claims against Ramirez as early as 2004 for Ramirez' political persecution campaign against workers in the energy sector in Venezuela. These fabricated allegations are false and had no basis in fact.

67. Throughout this period, Plaintiffs were consistently depicted by Defendants as traitors, frauds, and corrupt opportunists. This portrayal was achieved through repetition across multiple platforms and by multiple actors, giving the false impression of a broad consensus against Plaintiffs when, in truth, it was an orchestrated narrative.

68. **Use of Social Media and Public Platforms:** Defendants further coordinated their defamatory campaign by exploiting social media and

other public channels in tandem:

69.   **Defendant Alexis Ortiz** repeatedly shared and commented on the defamatory videos and statements via Twitter (now known as X) and WhatsApp broadcasts, translating or summarizing the false accusations to ensure they reached diverse audiences.

70.   **Defendant Federico Medina ("@LucioQuincioc")** used his anonymous Twitter account to publish threads that not only defamed Plaintiffs but also **revealed confidential information** (discussed further in the privacy claim below). These threads were designed to appear as insider exposés, thus attracting significant attention and being retweeted by others in Defendants' network. Defendant Federico Medina has stated that he "sold" the X account of @lucioquincioc to Defendant Carrasquero and another individual, allegedly under the name of Enrique Alvarado.

71.   **Defendant Orlando Viera-Blanco** took to Twitter on May 24, 2024, to publicly expose the fact that Plaintiff Rodriguez was an anonymous litigant under court seal in a U.S. case. By "outing" Rodriguez's identity and asylum-related details, Viera-Blanco significantly magnified the danger and backlash against Plaintiffs. This disclosure violated a court order but was done to reinforce the narrative that Plaintiffs were engaged in secret, nefarious legal schemes.  Defendant Viera-Blanco

also exposed the identities of several other persecuted individuals who are co-plaintiffs with Plaintiffs in this case in other proceedings against CITGO and PDVSA.

72.   Defendants also utilized email newsletters and blog posts. For instance, emails purporting to be from community or advocacy groups (controlled by Defendants) such as Gente del Petroleo with a mailing list of several thousands members were sent to Venezuelan communities in the U.S., Europe, and Latin America, repeating the false claims and urging recipients to distrust and shun Plaintiffs.

73.   **Financial Support and Organizational Collaboration:** The smear campaign was not a series of isolated acts, but a coordinated operation:

74.   **Funding:** As noted, Defendant Medina provided substantial funding to Defendant Carrasquero (over $240,000 and perhaps up to 1,000,000 USD according to official filings in the Department of Justice) during the relevant period, which corresponds with the production of videos and social media campaigns. These funds were funneled through entities like ASM Investing LLC (under control of Defendant Carrasquero) and possibly others, under the pretense of "consulting" or "media" services, but in reality to bankroll the defamation.

75.   **Organizational Platforms:** Defendants utilized the platforms of the corporate and non-profit entities they control (VenAmerica, Center for

Liberal Democracy Development, Resistencia Venezolana, etc.) to spread the defamatory content. For example, websites or social pages associated with these organizations posted articles or statements mirroring the false allegations. This gave the public the impression that independent civic groups were corroborating the claims, when in truth those groups were just alter-egos of the individual Defendants.

76. **Personnel and Agents:** Several Defendants acted in concert: Carrasquero and Federico Medina jointly or separately managed the "LucioQuincioc" account at different times, Carrasquero managed the @botellazo X account and several dozens of mirroring accounts, Chacón-Pacheco and Carrasquero co-hosted WhatsApp forums discussing the videos, and Viera-Blanco and Goicoechea shared information gleaned from legal proceedings, obtained by his position in the Venezuelan National Assembly appointed body known as CAPA, to incorporate into the defamatory narrative. They communicated frequently to align their messages, timing posts and releases for maximum impact (for instance, releasing a new defamatory video just days before an important court filing pending by Plaintiffs).

77. **International Reach of Defamation:** The campaign deliberately transcended borders:

78. Defendants targeted not only U.S.-based audiences but also Venezuelan

and international audiences. They subtitled videos in English, Spanish, and sometimes French, ensuring that allegations would circulate globally. This was intended to damage Plaintiffs' reputations in any forum where they might seek support or asylum.

79.   Defamatory content was shared with media outlets sympathetic to the Maduro regime in Venezuela, which then broadcast the false accusations on state-controlled television and news sites. Defendants knew this would happen and in fact coordinated with regime-linked journalists to maximize the negative press against Plaintiffs. By doing so, Defendants effectively weaponized both exile communities and the regime's propagandists against Plaintiffs.

80.   The result was that Plaintiffs faced distrust and hostility not just in the U.S., but among Venezuelan diaspora communities in Spain, the U.K., and elsewhere. For example, Plaintiff Otero's professional contacts in Spain received links to the defamatory YouTube videos, and Plaintiff Rodriguez observed that Venezuelan government officials began citing Defendants' smears in official communications to discredit him.

81.   **Impact on Plaintiffs' Daily Lives:** Defendants' actions had immediate and devastating effects on Plaintiffs:

82.   Plaintiffs began receiving a surge of **online harassment and threats** from individuals who had seen the videos or posts. Some messages

33

threatened violence, referencing Plaintiffs as "traitors" who would be dealt with "like others in the past."

83. In response, Plaintiffs had to take **security precautions**. Mr. Freites, for example, temporarily relocated his family when unknown individuals were seen surveilling his residence after his sealed information on his asylum status was leaked and had to relocate himself due to threats received due to the hate content disseminated by Defendants. Mr. Rodriguez, already abroad, had to enhance personal security measures due to fear of extraterritorial retaliation by regime operatives alerted to his location. Mr. Otero faced additional threats from private individuals spurred by false beliefs that he was corrupt as well as a renovated attack by the Maduro regime fueled by the damaging narrative promoted by Defendants.

84. Professionally, Plaintiffs experienced **ostracization**. Invitations for Mr. Freites to speak at labor organization conferences were rescinded once the organizers learned of the controversy stirred by Defendants. Mr. Otero encountered hesitancy from international press organizations that previously supported him, as Defendants' narrative cast him as partisan or tainted. Mr. Rodriguez's business colleagues in the finance and energy sector as well as in his human-rights advocacy had to distance themselves to avoid being tarred by the same accusations,

hampering collaborative efforts.

85. **Summary of Wrongful Conduct:** In sum, Defendants executed a comprehensive and malicious plan to destroy Plaintiffs' reputations and to instill fear, thereby impeding Plaintiffs' participation in legal processes and advocacy:

86. They fabricated scandalous allegations and repeated them relentlessly across multiple platforms.

87. They unlawfully leaked and publicized private information to lend credence to their false claims.

88. They coordinated timing and messaging to maximize Plaintiffs' discomfort — for example, releasing defamatory content when Plaintiffs were scheduled to take important steps in their legal proceedings against PDVSA and CITGO, in order to undercut their credibility.

89. All the while, Defendants acted with actual knowledge of the falsity of their statements or, at minimum, reckless disregard for the truth, demonstrating actual malice and intent to cause harm.

## 90.   B. Impact on Plaintiffs (Damages and Injuries)

91. As a direct result of Defendants' concerted actions, Plaintiffs have suffered extensive and multifaceted damages, including but not limited to:

92.  **Reputational Harm:** Plaintiffs' longstanding reputations, built over years of professional and activist work, have been severely tarnished. Within Venezuelan opposition and exile circles (as well as more broadly in their professional communities), Plaintiffs have been viewed with suspicion or outright distrust due to the pervasive false narratives. This loss of **good name and credibility** is incalculable and ongoing.

93.  **Emotional Distress:** The campaign inflicted severe psychological trauma on each Plaintiff. They have suffered anxiety, insomnia, and symptoms of **stress-related health conditions** (for example, Plaintiff Freites has experienced hypertension and stress-induced chest pains requiring medical attention). Plaintiffs and their families have needed to seek counseling or psychiatric support to cope with the relentless personal attacks and fear for their safety. This suffering extended to the immediate family of each of Plaintiffs in extremely severe way.

94.  **Threats to Personal Safety:** Defendants' rhetoric and disclosure of personal details exposed Plaintiffs to danger. Plaintiffs received death threats and had genuine reason to fear physical harm. They were compelled to implement precautionary measures such as relocating

residences (sometimes on an emergency, temporary basis), avoiding public appearances, and hiring personal security when feasible. The sense of being unsafe — looking over one's shoulder or worrying about family members being targeted — has been a constant for Plaintiffs since Defendants began their attacks. Plaintiffs Otero and Rodriguez had to report incidents to the FBI liason offices in Spain and Switzerland respectively as well as to the local authorities in their respective countries of residence.

95. **Economic Losses:** Plaintiffs have incurred substantial economic harm. Professional opportunities have been rescinded or lost because of the controversy Defendants manufactured. This includes loss of consulting contracts, speaking fees, and employment prospects. In addition, Plaintiffs have spent significant sums on protective measures (security systems, travel costs for safer locations), on legal fees to address the defamatory content and leaks, and on efforts to counteract damage (such as public relations or online reputation management). These are **concrete financial damages** directly caused by Defendants' conduct.

96. **Interference with Legal Rights and Advocacy:** Defendants' actions

have impeded Plaintiffs' ability to fully participate in and benefit from judicial proceedings. For instance, by leaking sealed information, Defendants undermined the integrity of a court process and potentially prejudiced Plaintiffs' position in that case. The intimidation and reputational smears had a chilling effect on Plaintiffs' willingness to testify or assert claims, effectively **obstructing justice**. Additionally, Plaintiffs' advocacy efforts for transparency and accountability in Venezuelan affairs have been curtailed because their voice has been diminished by the cloud of false allegations.

97. **Suppression of Advocacy:** By undermining Plaintiffs' credibility, Defendants effectively silenced or reduced the impact of Plaintiffs' work in advocating against corruption. Where Plaintiffs once could rally support and media attention to issues of Venezuelan corruption, they now struggle to be heard or believed, as adversaries can point to Defendants' accusations to question Plaintiffs' integrity. This was an intended effect of Defendants' campaign: to **neutralize Plaintiffs as effective advocates**.

98. **Each Defendant's Knowledge and Role:** Defendants were not bystanders; each played an active role in causing these harms and had

knowledge of the broader conspiracy's goals. By way of example (and as will be further detailed in the counts below):

99. **Horacio Medina** was a principal architect of the conspiracy. He had full knowledge of, and indeed orchestrated, the campaign. He provided strategic direction (deciding what messages to push and when), gave operational instructions to others (such as instructing Lainette to produce videos or Carrasquero to circulate content), and financed much of the activity through confirmed payments from monies under his control in the Venezuelan government entity Junta Administradora ad hoc de Petroleos de Venezuela S.A. ("PDVSA ad hoc") to Defendants. Medina had the power and influence to stop or scale back the attacks at any time, especially after receiving legal warnings from Plaintiffs, yet he knowingly chose to continue and escalate them. His failure to act to prevent harm — in fact his active encouragement of harm — makes him directly liable for all resulting damage.

100. **Orlando Viera-Blanco** similarly was deeply involved and aware. As an attorney, he understood the significance of court seals and confidentiality, yet he willfully breached them to further the conspiracy. He gave an air of legitimacy to the false claims by pontificating on them as legal "analysis" in media appearances. Viera-Blanco had sufficient influence and knowledge that he could have prevented some of the

wrongful acts (for instance, by advising others to refrain from illegal disclosures or defamation), but instead he joined in. His actions in revealing Plaintiff Rodriguez's sealed identity and of several other private individuals demonstrate a deliberate choice to cause harm despite knowing better.

101. **Gustavo Lainette** was central as the video propaganda content creator. He knowingly produced videos filled with lies and incendiary material. Owning the editing process meant he had control over what was published; he could have chosen accuracy or moderation, but instead chose deceit and sensationalism. Even after seeing the turmoil and threats these videos caused, Lainette refused to retract or correct them. His continued publication was intentional, showing reckless indifference to Plaintiffs' rights and a direct enabling of ongoing harm.

102. **Jose Vicente Carrasquero** was the communications hub. He had intimate knowledge of the falsehoods he was spreading (having often been involved in concocting them), and he had the means to stop at least his part in it. Instead, he actively amplified everything, ensuring maximum reach. His persistent reposting and managing of troll accounts indicate not negligence, but a determined effort to cause as much damage as possible while also benefitting financially.

103. **Alexis Ortiz** contributed by lending his voice and social media

following. He recognized the falsity of the content (as an experienced commentator, he would understand the need for verification), yet he embraced the role of amplifier. His failure to verify or question the narrative — and his choice to instead embellish and spread it — was a breach of any reasonable duty of care and an intentional furtherance of the scheme.

104. **Federico Medina ("@LucioQuincioc")** had early direct involvement by starting the anonymous account that seeded many defamatory and private revelations. He clearly knew the information he posted was sensitive or false (given it had to be done anonymously). His later hand-off, which he has represented as a "sale", of the account to Carrasquero shows a continued conspiracy: rather than shut it down, he allowed another to continue the harmful postings. Federico Medina's actions and inactions both furthered the conspiracy.

105. **Thaelman Urgelles** used his public stature to validate defamatory claims. Knowing the influence he wielded, Urgelles allowed himself to be used as a mouthpiece. He had enough connection to the others to be aware the claims were suspect, yet he still propagated them. Thaelman Urgeelles had direct personal contact and knowledge of the righteous civic behaviour of Plaintiffs, and had referred to them as law abiding citizens in the past. By doing so, he endorsed the conspiracy and failed

to exercise any moral or professional restraint that could have blunted the harm.

106. **Luis José Chacón-Pacheco ("El Gocho del Whatsapp")** had a unique platform via WhatsApp voice notes and podcasts. He and Carrasquero co-created content laden with false accusations and spread it to groups numbering in the thousands. Chacón-Pacheco saw directly the alarm and chaos his messages caused among listeners (some of whom likely responded with threats or extreme reactions), yet he continued without pause. He too had enough knowledge to know the allegations were defamatory, but chose to ignore truth for the sake of the conspiracy.

107. **Yon Goicoechea** provided behind-the-scenes support. With his political connections and resources, he helped sustain the conspiracy's momentum (financially and strategically). Goicoechea is an attorney and seasoned politician; he knew the lines that were being crossed. His failure to intervene or withdraw support — and indeed his active encouragement (financing Lainette, etc.) — directly resulted in the continuation of defamatory broadcasts that harmed Plaintiffs. Defendant Goicoechea directly instructed Defendant Lainette to produce a complete campaign to destroy Plaintiffs' moral standing in the proceedings against PDVSA and CITGO. Defendant Goicoechea is

a full member of the Comision para la Administracion y Proteccion de Activos (CAPA), the highest executive body enabled by the Asamblea Nacional (Venezuela) elected in 2015.

108. **Lino Carrillo** worked closely with others (like Medina and Carrasquero) to distribute content especially within industry groups. He had full information about the campaign's falsehoods but used his credibility in the oil sector to reinforce the lies. By not objecting or distancing VAPA from the smears, he contributed substantially to Plaintiffs' harm.

109. **Corporate Defendants (Organizations):** Each organizational Defendant, through its principals, had the capacity to halt the misuse of its resources. For example, the **Center for Liberal Democracy Development, Inc., and VENAMERICA,** could have refused to publish defamatory pieces, but it did not. **Resistencia Venezolana Corp.** could have stopped hosting Lainette's video links on its pages, but it did not. **VAPA** could avoid Carrillos' use of its data and platform to disseminate damaging content and failed to do so. Each organization, Center for Liberal Democracy Development, Inc. ; Resistencia Venezolana Corp. ; ASM Investing LLC; Freedom for Venezuela Inc.; TEZCUA Investments LLC ; AMERICAN VENEZUELAN ENGAGEMENT FOUNDATION, INC; Venezolanos y Americanos Inc

a.k.a VENAMERICA; ALTAMIRA CINEMA CORP; LATINO COMMUNICATIONS LLC; LEMURE HOLDINGS LLC ; Venezuelan American Petroleum Association a.k.a. VAPA (a Texas Corporation) acting through individuals, effectively ratified the wrongful acts. Their failure to enforce basic oversight or ethical standards allowed the defamation to proliferate under their banners.

110. In every instance, whether through active commission or knowing omission, Defendants furthered the conspiracy's aims. At no point did any Defendant use their knowledge or position to warn Plaintiffs, alert authorities, or even internally object to the extreme methods being used. This collective inaction in the face of known wrongdoing is a hallmark of the conspiracy's agreement and is especially relevant to Plaintiffs' claims under 42 U.S.C. § 1986 (neglect to prevent).

111. **Ongoing Nature of Harm:** The injuries to Plaintiffs are ongoing. The defamatory content remains accessible online to this day, continuing to poison public opinion against Plaintiffs every time it is viewed or shared as it continiuously occurs. Plaintiffs continue to receive echoes of the defamation (questions from colleagues, hesitance from potential partners, etc.), showing that the impact is not a one-time event but a continuing state created by Defendants. Plaintiffs have a compelling need for judicial intervention to remedy the situation and prevent

further harm, as detailed in the Prayer for Relief.

## 112. V. CAUSES OF ACTION

113.   Each of the following counts realleges and incorporates by reference all preceding paragraphs of this Complaint, as though fully set forth in each count.

## 114. Count I: Violation of Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c)

**115.   (Against All Defendants)**

116.   **A. RICO Enterprise and Participants:** Defendants formed an **association-in-fact enterprise** for purposes of RICO. The enterprise consists of the network of individuals (Medina, Viera-Blanco, Lainette, Carrasquero, Ortiz, F. Medina, Urgelles, Chacón-Pacheco, Goicoechea, Carrillo) and entities (the corporate and nonprofit defendants) acting in concert. This enterprise, which lacked a formal legal structure but functioned as a continuing unit, shared the common purpose of defaming, intimidating, and silencing Plaintiffs to obstruct justice and retaliate against Plaintiffs' legal activities. The enterprise had an ongoing organization with roles (directors, financiers, content creators,

disseminators) and remained in existence beyond the commission of individual predicate acts, continuing its campaign into at least early 2025.

117. **B. Conduct of Enterprise:** Each Defendant participated in the operation and management of the enterprise. Defendants did not merely operate in parallel; they coordinated strategy and shared roles such that their actions were mutually reinforcing:

118. Medina and Goicoechea provided leadership and funding.

119. Viera-Blanco provided strategic insight and legal advise in order to make the greatest possible harm to Plaintiffs vis-a-vis the proceedings against CITGO and PDVSA.

120. Lainette, Carrasquero, F. Medina, and Chacón-Pacheco managed day-to-day content production and dissemination.

121. Ortiz, Urgelles, and Carrillo lent their names, networks, or platforms to amplify the enterprise's impact.

122. The organizational defendants were tools through which the individuals conducted enterprise affairs (e.g., bank accounts, social media pages, email lists). All actions described in the Factual Allegations were undertaken as part of the affairs of this association-in-fact enterprise, rather than as isolated, personal endeavors of the individuals.

46

123.   **C. Pattern of Racketeering Activity:** Defendants engaged in a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), consisting of multiple predicate criminal acts that were related to each other and extended over a substantial period (from at least mid-2023 through 2024). These predicate acts include:

124.   **Wire Fraud (18 U.S.C. § 1343):** Defendants devised a scheme to defraud the public (and various donors and supporters) by means of false pretenses and representations concerning Plaintiffs, and transmitted those falsehoods by wire (internet and telephone communications). Specifically, Defendants repeatedly disseminated false statements about Plaintiffs via emails, social media postings, and online videos (all of which are wire transmissions). For example, on **May 16, 2024**, a Twitter account historically associated with Defendants (using the pseudonym "@DouglasArrecho," believed to be controlled by Defendants Urgelles and Ortiz) posted a thread that falsely accused Plaintiffs of criminal misconduct and, critically, **unlawfully disclosed sealed identities of Plaintiffs** from the Delaware case. This interstate communication was made via Twitter's servers (a wire communication) and was part of Defendants' scheme to defraud the public into believing Plaintiffs were criminals. Additionally, on **May 24, 2024** and **June 11, 2024**, Defendant Viera-Blanco used

Twitter to publish detailed accusations and confidential information about Plaintiffs, which he knew to be false or unlawfully obtained. These posts were retweeted and echoed by other Defendants on the internet, demonstrating a coordinated use of wire communications to further the fraudulent smear campaign. Every video upload to YouTube and post to Facebook by Defendants containing lies about Plaintiffs similarly constitutes wire fraud, as Defendants intended to deceive viewers and induce actions (such as withdrawal of support from Plaintiffs or support for Defendants' organizations) based on those lies.

125.   **Witness Tampering (18 U.S.C. § 1512):** Defendants knowingly engaged in intimidation and threats to hinder Plaintiffs' participation in official proceedings. Plaintiffs Freites and Rodriguez were involved (and are involved) in federal judicial proceedings (e.g., the Delaware cases concerning PDVSA/CITGO). Defendants' campaign of harassment — including explicit threats of harm and implicit threats by labeling them traitors (which in the Venezuelan context invites violent retribution) — was done with the intent to dissuade Plaintiffs from attending or testifying truthfully in those proceedings. Moreover, after Plaintiffs had given certain testimony or filed certain claims, Defendants intensified defamatory attacks as retaliation, which also violates 18 U.S.C. § 1513 (Retaliation against witnesses). For instance,

in relation to **Delaware Case No. 1:23-cv-00989 ("the Delaware case")**, shortly after Plaintiff Freites's involvement became known to Defendants, they publicized his asylum status and branded him a fraud to intimidate him from further participation.   In the same way Defendants - in a twitter thread by Viera-Blanco- revealed the identity of Plaintiff Rodriguez (Lead Plaintiff in the Delaware case), whose name was protected (sealed) by specific Court Order and could not be known to Viera-Blanco if not by his association in the illegal enterprise. In adition, Viera-Blanco threatened to weaponize justice by suggesting legal actions against Plaintiffs for their involvement in legal proceedings related to CITGO and PDVSA.

126.   These acts qualify as witness tampering and retaliation, predicate offenses under RICO.

127.   **Obstruction of Justice (18 U.S.C. § 1503):** Defendants corruptly endeavored to influence, obstruct, and impede the due administration of justice in U.S. courts by interfering with Plaintiffs' rights as litigants. By disclosing confidential court-protected information (in violation of court orders) and by spreading false accusations related to ongoing cases, Defendants sought to improperly affect the proceedings' outcomes. There is evidence suggesting Defendants acted in concert with or at the behest of individuals associated with **PDVSA Ad Hoc**

**Board or its counsel**, who had interest in undermining Plaintiffs' case. This collusion further indicates that Defendants' defamatory campaign was partly an extension of efforts by those entities to obstruct justice. The predicate act of obstruction is shown by, inter alia, Viera-Blanco's intentional breach of a court seal and the subsequent chilling effect on Plaintiff Rodriguez's pursuit of his claims.

128. **Extortion (Hobbs Act, 18 U.S.C. § 1951):** While Defendants' primary means were defamation, they also used extortionate threats. Communications from Defendants or their associates to Plaintiffs included threats like "drop your lawsuit or face consequences" and menacing references to harm. These acts, intended to coerce Plaintiffs into abandoning their legal claims, amount to attempted extortion affecting commerce (as PDVSA/CITGO litigation involves international commerce). This too is a predicate act under RICO.

129. *(Each of the above predicate acts was related in that each was committed as part of the overall campaign against Plaintiffs, sharing the common goal of silencing Plaintiffs and protecting Defendants' and their allies' interests. The acts also amount to continued criminal activity, having occurred over many months and potentially ongoing.)*

50

130.  **D. Relatedness and Continuity:** The predicate acts are interrelated (each involving misinformation and threats regarding Plaintiffs) and amount to or pose a threat of continued criminal activity. Defendants indicated that they would "continue until these traitors [Plaintiffs] are finished," suggesting the scheme could persist indefinitely until Plaintiffs are completely discredited or withdraw from litigation. This open-ended continuity satisfies RICO's pattern requirement as interpreted by the Supreme Court in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989). The repeated use of wires, over months, and multiple instances of intimidation reflect a regular way of conducting business for this group, not a one-time event.

131.  **E. Causation (Injury to Business or Property):** Defendants' racketeering acts have directly and proximately caused injury to Plaintiffs' business and property, as required by 18 U.S.C. § 1964(c). "Business or property" injuries include loss of employment or professional opportunities, loss of income, and out-of-pocket expenses, which Plaintiffs have indeed suffered. For example, Plaintiff Freites lost a consultancy contract worth over $50,000 per year that he was about to start with an international labor NGO—after the Defendants'

smear, the NGO severed ties, citing concerns about controversy. Plaintiff Otero's media enterprise suffered decreased advertising revenue and the collapse of a planned partnership (a measurable financial loss) due to reputational damage. Plaintiff Rodriguez had potential recovery/contingent fee interests in legal actions that have been jeopardized by Defendants' interference (a property interest in the outcome) as well as cancellation of two important consultancy contracts within his field of expertise, energy, as well as cancellation (*sine die* postponement) of a financial venture by partners waiting for a clarification of the allegations against him manufactured in the orchestrated campaign *("hasta que esto se aclare")* . These injuries were the foreseeable and intended result of Defendants' actions. There is a direct chain: defamation and threats -> diminished trust and broken deals -> financial loss to Plaintiffs. Under *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), Plaintiffs do not need to be the direct recipients of Defendants' false statements to be injured by them; here, Plaintiffs themselves were the targets and victims, making the causal connection even more straightforward.

132.   **F. Scienter:** Defendants acted with the requisite criminal intent. The wire fraud was executed knowingly with intent to deceive; the

obstruction and tampering were done with intent to impede justice; the extortionate communications were willful. Defendants cannot claim mistake or accident — the campaign was too coordinated and deliberate. The presence of actual malice in the defamation (discussed in Count III) further supports that Defendants acted intentionally in their racketeering conduct.

133.   **G. Conclusion (RICO Violation):** By conducting and participating in the affairs of the above-described enterprise through a pattern of racketeering activity, Defendants have violated 18 U.S.C. § 1962(c). Each Defendant is jointly and severally liable for the RICO violation as each played a part in the common scheme.

134.   **H. Damages Under RICO:** As a result of this RICO violation, Plaintiffs have suffered substantial damages to their business, property, and reputations, as detailed. RICO provides for recovery of treble damages and attorneys' fees for prevailing plaintiffs.

135.   **I. Tax Fraud (26 U.S.C. § 7206):** In furtherance of their racketeering scheme, Defendants intentionally misrepresented their organizations to the public and the Internal Revenue Service (IRS) as charitable or educational nonprofits compliant with IRS regulations under section

501(c)(3). Defendants fraudulently solicited and obtained public donations by falsely asserting their organizations' charitable or educational purposes. In reality, these entities systematically diverted donations and resources towards politically motivated defamatory campaigns and retaliatory actions against Plaintiffs. By knowingly submitting false statements regarding the nature of their activities to the IRS, Defendants committed tax fraud, specifically violating 26 U.S.C. § 7206. Such actions demonstrate deliberate misuse of tax-exempt status to finance unlawful racketeering activities.

136.    **J. Money Laundering (18 U.S.C. §§ 1956, 1957):** Defendants knowingly engaged in financial transactions involving proceeds illicitly obtained from Venezuelan government-owned entities. These funds were strategically concealed and integrated into Defendants' organizational accounts and operations. Defendants subsequently utilized these unlawfully derived funds to sustain their defamatory, retaliatory, and obstructive conduct against Plaintiffs, constituting violations of federal money laundering statutes, specifically 18 U.S.C. §§ 1956 and 1957. Defendants' laundering activities were intended both to conceal the origin of illicit funds and to finance their ongoing racketeering activities.

137.    **K. Foreign Corrupt Practices Act (FCPA) Violations (15 U.S.C.**

**§§ 78dd-1, et seq.):** Further compounding their racketeering misconduct, Defendants knowingly received and utilized funds derived directly or indirectly from Venezuelan state-controlled entities. By improperly diverting and utilizing these foreign-sourced funds to support their unlawful domestic activities against Plaintiffs, Defendants engaged in violations of the Foreign Corrupt Practices Act (FCPA), specifically prohibited under 15 U.S.C. §§ 78dd-1, et seq. These illicit financial practices demonstrate Defendants' willingness to leverage foreign corrupt financial transactions to fund and enhance the enterprise's capacity for intimidation, defamation, obstruction of justice, and retaliation.

138.  The integration of these additional predicate acts further underscores the comprehensive and deliberate nature of Defendants' ongoing criminal enterprise, strengthening the already established pattern of racketeering activity and providing additional grounds for holding Defendants jointly and severally liable under 18 U.S.C. § 1962(c).

139.  **WHEREFORE,** Plaintiffs demand judgment against **all Defendants** on Count I, jointly and severally, for compensatory damages in an amount to be proven at trial, **trebled** pursuant to 18 U.S.C. § 1964(c),

plus costs of suit and reasonable attorneys' fees, and such other relief as the Court deems just. Plaintiffs also seek appropriate **injunctive relief** as permitted under RICO (such as prohibiting further racketeering acts, including ongoing intimidation or defamation), to prevent continued harm to Plaintiffs.

140. **Count II: Civil Conspiracy (Under Florida Common Law)**

141. **(Against All Defendants)**

142. **Agreement and Unlawful Objective:** Defendants, acting in concert, knowingly and willfully agreed and conspired among themselves to commit unlawful acts against Plaintiffs, including defamation, intimidation (harassment and threats), invasion of privacy, and intentional infliction of emotional distress. There was a **meeting of the minds** — both explicit and implicit — between and among the Defendants to achieve the objective of harming Plaintiffs. This agreement is evidenced by the synchronized and cooperative nature of Defendants' actions as described above: the timing of publications, the sharing of resources and information, and the collective advancement of

the same false narratives. Defendants' common goal was unlawful (to injure Plaintiffs through tortious acts) and/or involved achieving a purported goal (silencing Plaintiffs' opposition) through unlawful means.

143. **Overt Acts in Furtherance of Conspiracy:** In furtherance of this conspiracy, each Defendant committed at least one overt act, and numerous overt acts were committed in total. These overt acts were themselves tortious or unlawful. By way of illustration and not limitation, the overt acts included:

144. Creating, producing, and disseminating false and defamatory content (videos, audio messages, tweets, emails, etc.) portraying Plaintiffs as criminals and traitors, which harmed Plaintiffs' reputations and well-being.

145. Unlawfully obtaining and disclosing confidential and private information about Plaintiffs (such as Rodriguez's sealed identity and Freites's asylum status), thereby invading Plaintiffs' privacy and violating court orders.

146. Coordinating communication strategies (via group chats, meetings, or phone calls) to systematically release defamatory statements at times

calculated to maximize pressure on Plaintiffs (for instance, just before court dates or media appearances by Plaintiffs).

147.    Issuing or encouraging threats and menacing language toward Plaintiffs in public forums, intending to instill fear (e.g., comments like "they should be taught a lesson" or sharing images implying violence).

148.    Misrepresenting to third parties (such as donors or journalists) that Plaintiffs were under criminal investigation or were sabotaging Venezuelan causes, in order to isolate Plaintiffs socially and financially.

149.    Each of these acts was done to further the conspiracy's aims and was reasonably foreseeable to all members of the conspiracy. Indeed, many acts were done openly in the public domain, and co-conspirators amplified each other's acts (for example, one Defendant makes a defamatory statement, and others share or echo it, thereby adopting it).

150.    **Joint and Several Liability for Underlying Torts:** Under common law conspiracy principles, all Defendants are jointly and severally liable for the torts committed by any one of them in furtherance of the conspiracy. Thus, even if a particular Defendant did not personally author a specific defamatory post or make a certain threat, each Defendant is liable for that act as a co-conspirator, because it was

within the scope and in furtherance of the conspiracy. This means Defendants collectively bear responsibility for the cumulative harm caused by the entire campaign.

151.    **Damages Caused by Conspiracy:** As a direct and proximate result of Defendants' conspiracy and the overt acts committed to advance it, Plaintiffs have suffered substantial harm, including:

152.    Severe reputational injury and loss of standing in their communities.

153.    Extreme emotional distress (as detailed earlier).

154.    Economic losses (lost income opportunities, costs incurred to mitigate harm).

155.    Diminished ability to pursue their legal rights and advocacy (a form of special damage insofar as it hindered specific prospects or claims). These damages were the natural and intended result of the conspiracy. Each Defendant could reasonably foresee that a coordinated smear and harassment campaign would cause the type of harm that occurred.

156.    **Malice:** The conspiracy was conceived and carried out with express malice toward Plaintiffs. Defendants' statements and actions were not just false, but malicious — driven by a desire to injure Plaintiffs. This

unity of purpose in causing harm establishes that punitive damages are warranted under this claim, in addition to compensatory damages.

157.   **No Immunity or Privilege:** There is no lawful justification for Defendants' concerted actions. Their conduct is not protected by any privilege (e.g., it was not legitimate free speech or fair comment — it was knowingly false and malicious). Thus, their agreement to engage in this conduct is wholly outside any protected activity.

158.   **WHEREFORE,** Plaintiffs seek judgment against **all Defendants** on Count II. Plaintiffs request an award of compensatory damages, jointly and severally, against the Defendants in an amount to fully compensate Plaintiffs for all losses caused by the conspiracy. Furthermore, due to the egregious and malicious nature of Defendants' conduct, Plaintiffs seek an award of **punitive damages** against the Defendants to punish and deter such conduct. Plaintiffs also seek equitable relief as appropriate (such as an injunction to halt ongoing coordinated harassment), plus pre- and post-judgment interest, and recovery of costs and such other relief as this Court deems just and proper.

## 159.   Count III: Defamation (Libel and Slander)

160.   **(Against All Defendants)**

161.   **Defamatory Statements:** Defendants have made and published numerous false and defamatory statements about Plaintiffs, both in writing (constituting libel, including online postings and video subtitles) and orally or in audio/visual form (slander, including spoken statements in videos, podcasts, and radio broadcasts). These statements included, but are not limited to, accusations that Plaintiffs: are **fraudsters, thugs, false opposition, traitors,** figures engaged in a conspiracy to harm **CITGO** and PDVSA for personal gain; have participated in criminal, corrupt, or treasonous activities (e.g., being secretly on the payroll of corrupt Venezuelan officials, engaging in fraud or embezzlement); are "farsantes" (fraudsters), "fariseos" (hypocrites), and "traidores" (traitors) to the Venezuelan people; have illicit financial arrangements or kickback schemes with individuals like former PDVSA president Rafael Ramírez or other discredited figures.

162.   These statements were communicated in various formats, including social media posts (Twitter/X threads naming Plaintiffs), YouTube videos containing narrative commentary, and WhatsApp voice notes circulated to community groups. In every instance, the statements assert or clearly imply factual allegations of serious wrongdoing by

Plaintiffs. The **gist** of Defendants' statements is that Plaintiffs are unethical and engaged in dishonesty or crimes — a quintessentially defamatory charge.

163.  **Falsity:** All such statements about Plaintiffs are **entirely false**. Plaintiffs have never engaged in the conduct alleged by Defendants. To the contrary, Plaintiffs are known for fighting against corruption and wrongdoing. For example:

164.  It is false that Plaintiffs are working to enrich themselves at Venezuela's expense; they have no financial scheme as alleged and, in fact, often volunteer their efforts or work at personal cost.

165.  It is false that Plaintiff Otero ever colluded with the Chávez regime; his record as an opposition journalist refutes that.

166.  It is false that Plaintiff Rodriguez received illicit funds; he has not received money from Ramírez or similar figures, and Defendants have no evidence beyond fabrication.

167.  It is false that Plaintiff Freites is a traitor or fraud; his critiques of CITGO and PDVSA's mismanagement were made in good faith to protect workers' rights and public resources. On the contrary, only a few weeks before starting the orchestrated campaign, Defendant Medina praised Plaintiff Freites as an honest, politically persecuted

union leader.

168.    Defendants made these claims up out of whole cloth or grossly distorted benign facts into defamatory lies. There is no credible or legitimate source backing any of these accusations. Indeed, some statements are demonstrably false by public records (for instance, Defendants accused Plaintiffs of crimes for which other people have been indicted, not Plaintiffs).

169.    **Publication to Third Parties:** Defendants intentionally and widely **published** these false statements to numerous third parties. The publication element is easily satisfied here:

170.    Defendants posted statements on **public social media platforms** (Twitter/X, Facebook, Instagram, YouTube) where they were seen by thousands of viewers/followers.

171.    Defendants disseminated statements via **mass emails** and WhatsApp groups with numerous (thousands) recipients (beyond Plaintiffs themselves). For example, an email blast in October 2023 was sent to a mailing list of over 1500 addresses, containing a newsletter-style write-up accusing Plaintiff Freites of criminal activities against fellow workers he represents as recognized union leader.

172. Defendants spoke on **radio shows and YouTube live streams**, effectively broadcasting their claims to the general public. Each Defendant either directly published false statements or acted in concert with others to ensure publication (for instance, by sharing or retweeting another Defendant's defamatory post). The reach of these publications was broad, including international audiences, as Defendants intended.

173. **Identification of Plaintiffs:** The defamatory statements **explicitly identified** Plaintiffs by name or by clear reference. Defendants used Plaintiffs' actual names (Ivan Freites, Miguel Otero, Jorge Rodriguez) in many posts and videos. In cases where they used descriptors, those were unambiguously about Plaintiffs (such as referring to Mr. Rodriguez as a "fake diputado [congressman] in exile in Switzerland involved in the CITGO case" — which can only point to Plaintiff Rodriguez showing his image). The context of the statements made it obvious to any reasonable reader or listener that the subject of the allegations were these Plaintiffs. There is no issue of mistaken identity or ambiguity; the defamatory campaign targeted these specific individuals.

174. **Defamatory Nature (Defamation Per Se):** The content of Defendants' statements constitutes defamation **per se** under Florida law (and generally under defamation law), because the statements accuse Plaintiffs of:

175. committing serious crimes (e.g., fraud, corruption, treason) — falsely charging someone with a crime is defamation per se;

176. conduct incompatible with their business, trade, or profession (e.g., a journalist being corrupt, an activist being a paid shill) — which is also defamation per se;

177. having characteristics or actions that would naturally harm one's personal and professional reputation in the community. Because the statements impute criminal behavior and lack of ethics, the law presumes that these statements are defamatory and that Plaintiffs suffered damage, without requiring proof of special damages (though Plaintiffs have such proof as well).

178. **Fault – Actual Malice:** Plaintiffs are public figures at least in a limited capacity, as they are prominent in matters of public concern (Venezuelan political affairs and anti-corruption efforts). Therefore, the **New York Times v. Sullivan** "actual malice" standard applies (to the extent any Plaintiff is deemed a public figure). Defendants acted with **actual malice**, meaning they knew their statements were false or

acted with reckless disregard for the truth:

179. **Knowledge of Falsity:** Many Defendants were personally familiar with Plaintiffs' work and knew the truth. For example, Medina and Viera-Blanco had interacted with Plaintiffs in contexts that gave them no reason to genuinely suspect Plaintiffs of treason or fraud. Any insider with genuine knowledge of the CITGO litigation would know Plaintiffs' intentions were legitimate. The Defendants nonetheless stated the opposite, indicating they lied knowingly. Furthermore Defendant Horacio Medina and Defendant Goicoechea had praised Plaintiffs Freites and Otero as exemplar citizens in several ocasions and public interviews.

180. **Reckless Disregard:** Defendants had obvious reasons to doubt the veracity of their claims. The accusations were inherently improbable (such as the notion that Plaintiffs were simultaneously working for both the Maduro regime and elements of the opposition — a contradictory claim). Defendants conducted no investigation and ignored all sources that contradicted their narrative. They deliberately avoided the truth. None of the Defendants reached out to Plaintiffs for comment or clarification before publishing — a hallmark of reckless disregard in circumstances like these.

181. There are documented instances where Defendants internally

acknowledged uncertainty or falsity. (For instance, leaked messages or testimony may show some Defendants referring to "going after" Plaintiffs without actual evidence—indicating the purpose was to smear rather than report truth.) Thus, whether under a public-figure standard or even a private-figure standard (which requires at least negligence), Defendants' level of fault satisfies the requirement for defamation. In fact, it exceeds it; it was malicious.

182.    **Injury and Damages:** As a direct result of the defamatory statements, Plaintiffs have suffered the injuries previously described:

183.    Reputational harm in their personal and professional communities, causing loss of friendships, community standing, and career prospects.

184.    Emotional distress to Plaintiffs and their families (which is recoverable as part of defamation damages, especially since it was intended).

185.    Special damages in the form of economic losses (lost income from specific opportunities, costs of combatting the defamation, etc.). For example, Plaintiff Otero can quantify lost advertising deals for *El Nacional* due to the scandal, and Plaintiff Freites can show lost stipends from union organizations that suspended their collaboration with him. These damages are ongoing and were all proximately caused by Defendants' defamation. The foreseeability of such harm was clear — calling someone a traitor and criminal in their community will

destroy them socially and economically, which is exactly what Defendants sought to do.

186. **Absence of Privilege:** Defendants' statements were not privileged. They were not made in any legislative, judicial, or otherwise protected proceeding. They were not fair reports of any official action; they were lies, not reports. They were not opinion; to the extent any opinion was mixed in, it was based on false facts (and also delivered with malice, taking it outside any First Amendment protection for opinion). Additionally, Plaintiffs demanded retractions (through cease-and-desist letters and public refutations), and Defendants refused to retract, which undercuts any argument that they might have believed the statements to be true or that they were made without malice.

187. **Punitive Damages for Defamation:** Defendants' conduct was grossly willful, malicious, and indicative of ill will, thus justifying punitive damages under state law to punish and deter. The breadth and coordination of the defamation campaign — effectively a propaganda operation — is extraordinary and reprehensible.

188. **WHEREFORE,** Plaintiffs respectfully request judgment in their favor on Count III for **defamation**. Plaintiffs seek an award of **general and presumed damages** (for the harm to reputation and emotional anguish, presumed by law in defamation per se) and **special damages**

(for specific economic losses) in an amount to be determined at trial. Plaintiffs also seek **punitive damages** against all Defendants due to the presence of actual malice and wanton disregard for Plaintiffs' rights. Additionally, Plaintiffs ask for **injunctive relief** requiring Defendants to remove all defamatory publications still under their control and to publish full and prominent retractions/apologies to mitigate the ongoing harm. Plaintiffs further seek court costs, interest as allowed by law, and any other relief deemed just and proper.

## 189.  Count IV: Invasion of Privacy – Public Disclosure of Private Facts

190.  **(Against All Defendants)**

191.  **Private Facts Disclosed:** Defendants intentionally publicized highly sensitive and private facts about Plaintiffs that were not of legitimate public concern. The private facts that Defendants disclosed include:

192.  **Plaintiff Jorge Alejandro Rodriguez's sealed identity in litigation:** Mr. Rodriguez was proceeding as an anonymous or protected litigant in a federal case (specifically, the Delaware action concerning CITGO). His involvement and true identity were under court seal for his safety. Defendants (notably Viera-Blanco and the pseudonymous Twitter accounts) publicly revealed that Mr. Rodriguez

was a "John Doe" or Lead plaintiff in that case, directly violating the court-ordered confidentiality.

193. **Plaintiff Ivan Freites's asylum application and immigration status:** Mr. Freites was in the process of seeking asylum in the United States, a fact that had not been publicly disclosed and is inherently private. Defendants obtained and broadcast information about his immigration status (for example, Viera-Blanco and mirroring accounts stating on social media and in videos that "Freites begged the U.S. for asylum" and detailing the status of his case), which is a private matter under immigration law and personal privacy norms.

194. **Miguel Enrique Otero's family safety measures and whereabouts:** Mr. Otero's family had taken measures to ensure their safety due to threats from the Venezuelan regime (such as relocating family members, security protocols, etc.). Defendants exposed details of these measures and the location of certain family members, which had been kept strictly private to protect them from harm. Defendants did so in an attempt to depict Otero as cowardly or hiding, but in the process they publicized personal details that were not public.

195. **Confidential litigation strategies and communications of Plaintiffs:** Defendants came into possession (through illicit means or leaks) of certain internal communications or plans of Plaintiffs related

to their legal and advocacy efforts (for instance, discussions about legal funding or coordination with U.S. authorities). Defendants then selectively published or described these in public forums, casting them in a false light. While this overlaps with defamation when false, the mere publication of some true but private details (like names of contacts or tentative strategies) is itself a privacy invasion.

196. **Personal relationships and family matters:** Defendants dragged wholly personal matters of Plaintiffs into the public view without any relevance. For example, they referenced Plaintiff Otero's divorce and remarriage history (clearly a private, personal life matter) purely to embarrass him and suggest moral equivocation. Similarly, they mentioned health scares or personal tragedies from Plaintiffs' pasts which had no public bearing.

197. These facts were not previously known to the public. Plaintiffs had kept them confidential (with the aid of courts in some instances). Defendants exposed them widely.

198. **Expectation of Privacy:** Plaintiffs had a reasonable expectation of privacy in these matters:

199. Being an anonymous litigant under a court seal is perhaps the

strongest expectation of privacy the law can afford — it is explicitly protected by a judge's order. Mr. Rodriguez reasonably expected that his identity in that context would remain private.

200. An asylum application is a private proceeding between an applicant and the government; asylum seekers often conceal their status out of fear of retribution. Mr. Freites had every expectation that his immigration status would remain a private matter until and unless he chose to disclose it.

201. Family security measures and whereabouts are private. Mr. Otero took steps precisely to keep those details secret for safety; that clearly indicates an expectation of privacy. These were not things he publicized.

202. Internal strategy communications and personal relationship details are classic private facts — not typically something an individual expects to see on the internet. In sum, Plaintiffs took care to keep these facts confidential. Their expectation of privacy is also evidenced by the shock and humiliation they felt when these facts were aired by Defendants.

203. **Public Disclosure:** Defendants **publicly disclosed** these private facts by posting them on the internet (Twitter threads, YouTube videos, etc.), discussing them on public streams, and sending them in mass communications. The disclosure was "public" in the sense that it was

available to the general public and certainly to a broad audience beyond any limited circle. For instance, when Viera-Blanco tweeted about Rodriguez's identity, that tweet was visible worldwide to anyone who came across it or followed him. The private facts quickly spread beyond the initial disclosures, as other users and even news outlets picked up the information (since it was salacious). Thus, information that was once closely guarded became, through Defendants' actions, essentially common knowledge in certain circles and readily accessible to those who searched online.

204. **Not of Legitimate Public Concern:** The private facts disclosed were **not newsworthy** or of any legitimate public concern. They had no bearing on public issues except where Defendants tried to falsely create a scandal:

205. The identity of an anonymous litigant is not newsworthy simply for its own sake; it was made public by Defendants purely to intimidate, not to inform public debate. There was no legitimate reason for anyone outside the case to need to know Rodriguez's identity, except that Defendants wanted to harm him. The fact that the court protected identity of other (totally and indisputably) private individuals,

co-plaintiffs in the Delaware case, was made public shows the clear intent of Defendants to jeopardize the Delaware case and to create fear among potential plaintiffs who relied on the privacy of their identities to participate in the proceedings.  Over one thousand persecuted workers have halted their participation in the Delaware case until additional privacy measures are enforced, as was one of the purposes of the campaign.

206.   An individual's immigration status (especially an asylum application) is a private humanitarian matter, not a matter of public interest about governmental operations or anything. Defendants revealed it solely to paint Freites as "fleeing" or to invite reprisal; that's not a public concern, that's personal.

207.   Details of Otero's family or personal life have no relevance to the issues Defendants claimed to care about (PDVSA or CITGO disputes). Discussing his divorce, portraying his wife as a corrupted person, or where his family lives served only to embarrass and was a prurient exposure, not connected to public welfare.

208.   Private litigation strategy notes or communications do not involve matters of public policy — they involve legal tactics that every litigant is entitled to keep private. Defendants unveiled them to sabotage Plaintiffs' efforts, not to enlighten any public policy discussion.

209.   If anything, Defendants tried to argue that exposing these facts showed Plaintiffs had "secrets." But that argument is circular and disingenuous; every person has private aspects of life, and making them public is precisely the harm the law protects against unless there is an overriding public interest, which there was not here.

210.   **Highly Offensive Disclosure:** Defendants' public disclosure of these private facts would be highly offensive to a reasonable person (and indeed was highly offensive to Plaintiffs). It meets the standard of being the type of disclosure that causes shame, humiliation, and anguish:

211.   Having one's asylum status broadcast can expose the person to retaliation by hostile agents (here, Venezuelan regime sympathizers) and stigma (some may wrongfully see asylum seekers as problematic). It is deeply distressing and dangerous.

212.   Having one's confidential role in litigation blown open not only endangers the person but also paints them as if they were hiding something nefarious, causing emotional distress and fear.

213.   Revealing personal family matters or health issues is the kind of privacy invasion that courts have long considered offensive — akin to publishing someone's private diary or medical records.

214.   The way Defendants did it, often with mocking or sensational commentary, exacerbated the offensiveness. This was not a respectful or inadvertent slip; it was a malicious broadcast of privacy that any decent person would find unacceptable.

215.   In context, Defendants' actions far exceed any social norm of acceptable behavior. They publicized information that even enemies typically would not, crossing lines of basic human decency.

216.   **Damages from Privacy Invasion:** Plaintiffs suffered serious damages as a result of these privacy invasions, on top of and distinct from the defamation harms:

217.   **Emotional Distress and Mental Anguish:** The invasion of privacy itself caused profound distress — different in quality from the defamation. Plaintiffs felt violated, exposed, and vulnerable. For example, after his asylum status was outed, Mr. Freites felt extreme anxiety and lost sleep worrying that he or his family in Venezuela and other latin american countries could be targeted. Mr. Rodriguez felt humiliation and fear when his identity was revealed, as he had to explain to associates, and he legitimately feared for his life. Mr. Otero was outraged and hurt that personal family issues were dragged into

this; it caused tension and upset within his family and made them all feel unsafe. All three Plaintiffs had to relocate, two of them permanently, due to safety concerns originating from the campaign.

218. **Loss of Security and Trust:** Plaintiffs now struggle with trusting even legitimate processes (like giving information to a court or government) because they experienced that information being misused. The sense of security and control over one's personal information has been irreparably harmed.

219. **Increased Threats and Harassment:** The exposure of private facts gave additional fodder to third parties to harass Plaintiffs. For instance, regime trolls began taunting Freites publicly about his asylum ("we'll make sure you never get it" kind of comments), and unknown callers referenced those private details in threatening calls, showing that harmful actors picked up and used the information once it was public.

220. **Physical Safety Concerns:** The privacy invasions tangibly increased the danger to Plaintiffs. For example, once Rodriguez was known to be "John Doe," the Venezuelan regime openly condemned him, and he had to further secure his location. Such tangible harm (necessity to spend money on security, relocation, etc.) flows from the privacy breach as well.

221.   These harms were proximately caused by Defendants' disclosures. But for Defendants exposing these facts, Plaintiffs would have continued to enjoy the privacy and safety they had maintained.

222.   **Defendants' Conduct Was Intentional or Reckless:** Defendants knew that these facts were private and that disclosing them would harm Plaintiffs, and they did it anyway. Even if any Defendant tries to claim ignorance of how sensitive it was, their actions demonstrate a willful disregard for Plaintiffs' privacy rights. They acted in conscious disregard of a substantial probability of causing injury through these disclosures.

223.   **Punitive Aspect:** Defendants' invasive acts were malicious and wanton, justifying punitive damages to deter such outrageous breaches of privacy in the future.

224.   **WHEREFORE,** Plaintiffs request judgment against **all Defendants** on Count IV for invasion of privacy. Plaintiffs seek compensatory damages for the mental anguish, humiliation, and other harm suffered from the public disclosure of private facts. Plaintiffs also seek **punitive**

**damages** due to the willful and egregious nature of Defendants' conduct. In addition, Plaintiffs ask for **injunctive relief** ordering Defendants to remove from any website or public forum any remaining publicly disclosed private information that originated from them (to the extent possible) and prohibiting any further disclosure. Plaintiffs further seek all other relief the Court deems just, including costs and interest.

## 225. Count V: Intentional Infliction of Emotional Distress (IIED)

226. **(Against All Defendants)**

227. **Extreme and Outrageous Conduct:** Defendants engaged in extreme and outrageous conduct by orchestrating and executing a relentless campaign of defamation, harassment, intimidation, and privacy invasion against Plaintiffs. The totality of Defendants' conduct — including personal attacks on character, exposure of private matters, and implicit threats — was so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency in a civilized society. It is difficult to imagine a more invasive and malicious non-physical attack:

228. Defendants targeted Plaintiffs' core identities (painting freedom fighters as fraudsters and traitors) which is deeply insulting and degrading in Plaintiffs' community context.

229. They sustained this attack over many months, not giving Plaintiffs any respite, and even after being asked to stop.

230. They leveraged public platforms to maximize humiliation.

231. The campaign had aspects of bullying, stalking (monitoring Plaintiffs' moves for information to expose), and sheer cruelty. A reasonable member of the community would exclaim that Defendants' conduct was "outrageous!" and unacceptable. Indeed, many observers were shocked by the ferocity and baselessness of the attacks. Florida law's high threshold for IIED is met here; this was not mere incivility or isolated insult, but a calculated war on Plaintiffs' peace of mind and dignity.

232. **Intent or Reckless Disregard:** Defendants intended to cause Plaintiffs emotional distress, or at the very least, acted with reckless disregard of the high probability that emotional distress would result. The evidence of intent is clear:

233. Defendants explicitly expressed a desire to "make them [Plaintiffs] suffer" or to "teach them a lesson."

234. The nature of the acts (attacking family and personal life, using ethnic or personal slurs like "traidor" which in the Venezuelan exile context is

a grave insult) shows they were trying to emotionally hurt Plaintiffs, not just correct some wrongdoing.

235. Even if one argues Defendants' primary aim was something else (like to stop a lawsuit), they used emotional harm as the means to that end, which qualifies as intent to cause distress.

236. If any Defendant claims they did not intend severe distress, they at least knew it was a likely result (any reasonable person would know that smearing someone's reputation and endangering their family causes severe distress) and proceeded in conscious disregard of that risk. That satisfies recklessness.

237. **Severe Emotional Distress Suffered:** Plaintiffs have each suffered severe emotional distress as a result of Defendants' conduct. "Severe" in this context means distress so substantial or enduring that no reasonable person should be expected to endure it. For example:

238. Plaintiff Freites experienced anxiety attacks, depression, and a sense of helplessness that interfered with his daily functioning. He had to seek medical attention for stress-related symptoms and psychological counseling. He felt such despair at one point that he briefly contemplated abandoning his activism altogether, which had been a core part of his identity.

239. Plaintiff Otero similarly suffered deep emotional anguish. Being a

veteran journalist, he had faced criticism before, but nothing like this personal vendetta. He reported persistent insomnia, loss of appetite, heart issues and an inability to concentrate on work, all due to the distress. Family members noticed his withdrawal and alarmingly elevated stress levels.

240.    Plaintiff Rodriguez, was extremely traumatized. He had fled Venezuela to escape persecution, only to experience a similar terror orchestrated by compatriots in exile. He became paranoid about communications, experienced nightmares, and exhibited symptoms of PTSD (flinching at notifications on his phone, etc.). His severe distress is evidenced by the fact that he required medication for anxiety and had to take a sabbatical from some of his duties. The intensity and duration of Plaintiffs' emotional distress goes well beyond mere hurt feelings or transient embarrassment. It is ongoing and has fundamentally affected their lives.

Several persons within the families of Plaintiffs were affected in a similar (and even worse) manner, medically documented as well, as a consequence of being exposed to this campaign.

241.    **Causation:** Defendants' outrageous conduct was the cause of Plaintiffs' emotional distress. Prior to the events in question, Plaintiffs did not suffer these extreme psychological issues. The distress manifested soon

after and during the campaign against them. There were direct triggers: seeing the defamatory video caused Plaintiff Rodriguez to have a panic attack; reading the leak of his asylum status caused Plaintiff Freites intense fear; hearing insults about his family drove Plaintiff Otero to anger and sorrow. There is no superseding cause that could explain these reactions – they are clearly attributable to Defendants' actions.

242. **No Privilege or Immunity:** Defendants have no privilege or legal right to engage in the conduct that caused the emotional distress. Their acts were not justifiable expressions of opinion or fair commentary; they were lies and harassment. Thus, there is nothing in law that shields Defendants from liability for the emotional harm they intentionally inflicted.

243. **Overlap with Other Torts:** While much of Defendants' conduct also constitutes defamation and privacy invasion as alleged above, Plaintiffs plead IIED in the alternative and additionally, recognizing that the cumulative nature of the conduct and the severe emotional harm it caused is itself actionable. Even if, hypothetically, some defamatory statements might not be actionable due to a technicality, the manner

and context in which Defendants carried out their campaign could still meet the elements of IIED.

244.  **Punitive Damages Justification:** The extreme and malicious nature of Defendants' behavior also warrants punitive damages under this count. Few cases of IIED involve such calculated and public cruelty; awarding punitive damages would serve to punish this conduct and deter others from similar campaigns of personal destruction.

245.  **WHEREFORE,** Plaintiffs seek judgment against **all Defendants** on Count V for Intentional Infliction of Emotional Distress. Plaintiffs request an award of damages sufficient to compensate them for the severe emotional pain, suffering, and mental anguish they have endured (and continue to endure). Additionally, Plaintiffs seek **punitive damages** against Defendants to punish their malicious conduct and deter such outrageous behavior in the future. Plaintiffs also seek any appropriate injunctive relief (for instance, prohibiting Defendants from contacting or harassing Plaintiffs directly), as well as costs of this action and any further relief deemed just and proper by the Court.

# 246.  Count VI: Negligence

247.   **(Against All Defendants, in the Alternative)**

248.   **Duty of Care:** At all relevant times, each Defendant owed Plaintiffs a duty to exercise reasonable care so as not to cause foreseeable harm to Plaintiffs. This duty arises under general tort principles that one must refrain from actions that create an unreasonable risk of injury to others. In the context of the events here, this duty of care included, but was not limited to:

249.   A duty to refrain from disseminating unverified and potentially false information about individuals that could foreseeably injure their reputation or safety.

250.   A duty to handle sensitive personal information (if somehow obtained) with a reasonable level of care and confidentiality, rather than recklessly broadcasting it.

251.   A duty to avoid causing emotional or physical harm through reckless harassment.

252.   For those Defendants with positions in organizations (like non-profits) or social media accounts with wide reach, a duty not to misuse those platforms in a way that could foreseeably cause unjust harm to others. These duties are recognized by society—reasonable people are expected not to casually ruin others' lives or leak private data. Florida law

imposes a general duty of reasonable care to prevent foreseeable injuries.

253. **Breach of Duty:** Defendants breached their duties of care through multiple acts of negligence (each also intertwined with their intentional acts, but pleaded in the alternative, should the Court or jury find any lack of intent). The breaches include:

254. **Dissemination of False Information without Due Care:** Even if, arguendo, Defendants did not intentionally lie (which Plaintiffs believe they did), then at minimum they spread very damaging allegations about Plaintiffs **without proper investigation or regard for the truth**. Any reasonable person (especially an attorney like Viera-Blanco or a journalist like those with media experience) would have taken steps to verify such serious claims or refrained from publication if unverified. Defendants did not, thereby breaching a basic duty to ensure they were not needlessly harming Plaintiffs with falsehoods.

255. **Negligent Disclosure of Confidential Info:** If any Defendant contends the private facts they revealed were obtained inadvertently or through rumor (as opposed to intentionally hacking or leaking), then disclosing them was at least negligent. A reasonable person who somehow learned of someone's asylum status, for example, would understand that it's private and not blurt it out online. Defendants'

publication of that info was a breach of the duty to handle another's sensitive information with care.

256. **Failure to Moderate or Retract:** Some Defendants may not have authored certain statements but saw them and negligently allowed them to propagate (for example, not moderating comments on an organization's page or not correcting a known false narrative among their peers). Given their involvement, a duty arose to do something a reasonable person would do — e.g., issue a clarification or stop colleagues from going too far. Defendants breached this by doing nothing or even joining in.

257. **General Recklessness Equating to Negligence:** Defendants undertook actions (like mass emailing and social posting) that carry serious consequences without taking the precautions a reasonable actor would (fact-checking, considering privacy, etc.). This reckless behavior is negligence.

258. **Foreseeability:** It was eminently foreseeable that Defendants' breaches would cause harm to Plaintiffs. Any ordinary person understands that spreading potentially false claims of criminal conduct can ruin reputations and cause severe distress. It's also foreseeable that exposing private data can lead to emotional trauma and dangers.

Thus, Defendants should have foreseen that their lack of due care in these actions would likely result in precisely the kind of harm that befell Plaintiffs.

259.   **Causation:** Defendants' negligent acts and omissions were the actual and proximate cause of Plaintiffs' injuries. Had Defendants exercised reasonable care (for instance, double-checking facts, keeping private info private, not piling on a defamatory bandwagon), Plaintiffs would not have suffered the extent of reputational damage, emotional distress, and other losses that occurred. The chain of causation is clear: failure to be careful -> false info spread / private info leaked -> harm to Plaintiffs. There were no unforeseeable intervening causes; the harms (reputation loss, etc.) directly flowed from the negligent publications and disclosures.

260.   **Damages:** As a result of Defendants' negligence, Plaintiffs have suffered damages including, but not limited to:

261.   Reputational harm and associated economic losses (negligently causing someone to be defamed still causes the same reputational and income harm).

262.   Emotional distress (while often an element of IIED, even negligence can lead to significant emotional distress damages, especially when the negligence leads to a campaign like this).

263.   Costs incurred to mitigate damage (like hiring professionals to help restore their reputation or enhance security due to negligently caused threats). These damages have been detailed earlier and are incorporated here. Under a negligence theory, Plaintiffs would at least be entitled to recover the quantifiable losses and compensation for the genuine emotional and reputational injuries that a reasonable person would suffer in such circumstances.

264.   **Comparative Fault of Defendants:** All Defendants contributed to the harm; Plaintiffs bear no fault. Plaintiffs had no role in inducing Defendants to act negligently, and indeed one can hardly imagine what Plaintiffs could have done differently to avoid being victimized by Defendants' lack of care. The entire fault lies with Defendants.

265.   **Alternative Pleading:** This count is pled in the alternative to the intentional tort counts. If the trier of fact finds that Defendants did not act intentionally or with actual malice (which Plaintiffs maintain they did), then Plaintiffs assert that at minimum Defendants acted

negligently. Under notice pleading, Plaintiffs are entitled to plead this alternative theory.

266.     **WHEREFORE,** Plaintiffs demand judgment against **all Defendants** on Count VI for negligence. Plaintiffs seek an award of damages sufficient to compensate them for all injuries proximately caused by Defendants' negligence, including but not limited to economic losses (past and future), damage to reputation/goodwill, and mental anguish. Plaintiffs also seek pre-judgment and post-judgment interest as allowed by law, costs of suit, and any further relief deemed just and equitable. *(Plaintiffs note that if both intentional tort and negligence liability are found for the same acts, they will elect appropriate remedies to prevent double recovery. This count ensures that if for any reason the intentional tort claims failed, a jury could still find Defendants liable for the wrongful harm under negligence principles.)*

## 267.     Count VII: Violation of 42 U.S.C. § 1985(2) and (3) – Conspiracy to Interfere with Civil Rights

268.     **(Against All Defendants)**

269.     **Conspiracy to Obstruct Justice (42 U.S.C. § 1985(2)):** Defendants

have engaged in a conspiracy to interfere with justice in the United States courts with the intent to impede, hinder, obstruct, or defeat the due course of justice, and to injure Plaintiffs in their persons or property for their attempts to enforce rights. Specifically, Plaintiffs Freites and Rodriguez (and potentially others aligned with them) are parties, witnesses, or potential witnesses in federal proceedings (such as the Delaware PDVSA/CITGO cases). Defendants conspired to intimidate and retaliate against them for participating in those proceedings. This violates the second clause of 42 U.S.C. § 1985(2), which addresses conspiracies to harm parties or witnesses in federal courts (no class-based animus requirement for the federal-court clause).

270.

    270.1.    The overt acts described – e.g., publicizing sealed court info, smearing Plaintiffs to discredit their testimony, issuing threats should they "show their face in court" – all were aimed at undermining Plaintiffs' ability to pursue their claims and at deterring them from further participation. This falls squarely within the conduct § 1985(2) prohibits.

    270.2.    Defendants took these actions jointly, as evidenced by their coordinated campaign, satisfying the agreement requirement of a conspiracy.

270.3.

271. **Conspiracy to Deprive Equal Protection (42 U.S.C. § 1985(3)):**
Defendants also conspired for the purpose of depriving Plaintiffs of the
equal protection of the laws, or of equal privileges and immunities
under the laws. In particular, Defendants conspired to prevent
Plaintiffs (who are Venezuelan exiles/dissidents) from freely and
equally exercising their legal rights in the U.S. (such as the right to
seek redress in courts, the right to speak freely against corruption,
etc.), which U.S. law ordinarily protects all persons in its jurisdiction to
do. Defendants' actions had the intent and effect of denying Plaintiffs
the protection of laws that shield participants in litigation and political
speech.

272.

272.1. **Class-Based Animus:** Section 1985(3) typically requires that
the conspiracy be motivated by some class-based, invidiously
discriminatory animus. Here, Plaintiffs allege that Defendants
were motivated, at least in part, by Plaintiffs' membership in a
definable class: *Venezuelan dissidents aligned with
anti-corruption and opposition efforts.* While not a traditional
protected class like race, courts have sometimes considered
political association or advocacy as a class if the animus is strong

and invidious. Defendants viewed Plaintiffs as part of a group of "unwelcome whistleblowers" or "outsiders challenging the status quo" and targeted them as such. This animus is akin to a political retaliation akin to what the Ku Klux Klan Act was meant to address (originally, Republicans in the South or African Americans – here, political dissidents from a regime). Defendants' own words show a group-based enmity: they frequently lumped Plaintiffs together as "la falsa oposición" (the false opposition) – indicating a hated class of individuals who pretend to oppose the regime but (according to Defendants) are traitors. This labeling and hatred was not based on personal disputes alone; it was targeting them for the role they played in the political-judicial process.

272.2. Even if the class-based animus requirement is in question, Plaintiffs would note that § 1985(2) does not require class animus for federal witness targeting, and the conspiracy alleged covers that.

272.3.

273. **Overt Acts and Involvement:** The overt acts of this conspiracy have been enumerated previously and include: intimidating communications, defamation designed to impede court proceedings, disclosure of

identities to expose Plaintiffs to danger, etc. Each Defendant was an active participant, as detailed. The conspiracy was an agreement among all Defendants – an agreement reflected in their concerted campaign – to achieve the unlawful objectives stated.

274. **Injury:** Plaintiffs have been directly injured by this conspiracy:

275.

275.1. Plaintiff Rodriguez's ability to avail himself of the court (in Delaware) was compromised; after his identity was revealed and he was smeared, there were tangible negative impacts on that litigation, including chilling other potential plaintiffs witnesses.

275.2. Plaintiff Freites similarly was put in fear and had to curtail some of his legal involvement due to safety concerns stoked by Defendants.

275.3. All Plaintiffs have suffered the aforementioned emotional and economic injuries which are actionable under § 1985 as injuries to person and property. For instance, legal costs increased, and certain legal avenues closed or were delayed because of Defendants' interference.

275.4. They have also suffered a deprivation of their right to equal protection in that, unlike other litigants who can pursue cases

without facing organized private terror, they were denied that security and equality by Defendants' conspiracy.

275.5.

276. **State Action Not Required:** Plaintiffs proceed under § 1985(2) and the portion of § 1985(3) addressing private conspiracies (not requiring involvement of state actors). Defendants are private individuals, but that suffices for these clauses as long as the aim was to deprive rights protected against private interference (the right to be free from private intimidation in federal court, for example, is such a right; the right to not be targeted for who you are might require showing an animus as alleged above).

277.

278. **Legal Malice and Knowledge:** Defendants acted with malice and knowledge. They knew what they were doing was wrongful and would likely (and intended to) stop Plaintiffs from enjoying equal protection of the laws (like the protection of the court's anonymity order) and full access to the courts. They proceeded anyway, demonstrating the "intent to deprive" required by statute.

279.

280. **WHEREFORE,** Plaintiffs pray for judgment in their favor on Count VII, and request that this Court:

281.

282.   Declare that Defendants have violated 42 U.S.C. § 1985(2) and (3).

283.   Award Plaintiffs **compensatory damages** for the losses they suffered as a result of Defendants' conspiracy to intimidate and injure them (including emotional distress, out-of-pocket expenses, and other consequential damages).

284.   Award **punitive damages** against the individual Defendants for this egregious civil rights conspiracy, as the law permits punitive recovery to punish willful, malicious violations of civil rights.

285.   Award Plaintiffs their **costs and reasonable attorneys' fees** pursuant to 42 U.S.C. § 1988 (since this Count is an action to enforce civil rights).

286.   Grant injunctive relief as appropriate to prevent further intimidation or harassment related to Plaintiffs' roles in litigation (for example, ordering Defendants to cease contact or communications that threaten Plaintiffs regarding their court cases).

287.   Any further relief deemed just and proper.

## 288.   Count VIII: Violation of 42 U.S.C. § 1986 – Neglect to Prevent Conspiracy

289.   **(Against All Defendants)**

290.   **Existence of § 1985 Conspiracy:** Plaintiffs incorporate by reference the allegations of the § 1985 conspiracy (Count VII). Given that Defendants (each and every one of them) were part of the § 1985 conspiracy or at least had knowledge of it, 42 U.S.C. § 1986 now imposes liability on any of those persons who, having the power to prevent or aid in preventing the wrongs conspired to be done, neglected or refused to do so. This count thus addresses the **failure to prevent** the conspiracy's harms by those who could have.

291.   **Defendants Had Knowledge:** At various times, each Defendant became aware of the unlawful conspiracy described in Count VII (if not from inception, certainly as it unfolded). They knew that others were engaged in a plan to intimidate and harm Plaintiffs to obstruct justice and deny equal rights. Many Defendants were present at meetings or communications planning the smear campaign, so they had actual knowledge. Others at least had constructive knowledge once they saw the campaign in motion and were themselves invited to participate or saw their co-Defendants' acts. For example, even if a particular Defendant didn't initially agree to everything, by the time they saw Plaintiffs' sealed info being leaked (clearly illegal) and threats being thrown around, they knew a conspiracy to break the law was afoot.

292. **Defendants Had the Power to Prevent or Aid in Preventing the Wrong:** Each Defendant had some ability to stop or mitigate the conspiracy's wrongdoing:

293.

293.1. **Leadership figures (Medina, Viera-Blanco, Goicoechea)** had the power to call off the campaign or discipline their subordinates/associates, given their influence.

293.2. **Content distributors (Carrasquero, Ortiz, F. Medina, Chacón-Pacheco, Urgelles)** had the power to halt further dissemination and delete prior posts, thereby preventing more harm.

293.3. **Those controlling resources (entities or finances)** could cut off funding or access to platforms which would significantly hamstring the conspiracy.

293.4. **Even rank-and-file participants** could have blown the whistle or warned Plaintiffs or authorities (like informing the court that someone was about to leak sealed info, which could have prevented that wrong). In sum, none of the Defendants were completely powerless to act. At minimum, they could refuse to participate further and urge others to stop.

293.5.

294.   **Neglect or Refusal to Prevent:** Despite this power and knowledge, Defendants neglected and refused to prevent the commission of the wrongful acts. Not a single Defendant took effective action to stop the ongoing conspiracy:

295.

295.1.   No one alerted law enforcement or sought a court injunction when private info was being unlawfully exposed.

295.2.   No one stood up within the group and said "this is wrong, we must stop," in a manner sufficient to curb the behavior.

295.3.   Often, those in a position to intervene chose instead to remain silent or even passively continue contributing (which is neglect under § 1986).

295.4.   Example: Defendant Medina, who was a leader, absolutely could have stopped it by withdrawing support and instructing all to cease. Instead, he not only neglected to stop it, he encouraged and financed it – a willful neglect of duty.

295.5.   Example: Even someone like Lainette, after seeing the threats and harm from his videos, had the ability (control of content) to take them down; he neglected to do so.

295.6.   Those who might claim they were less involved (if any) still did

nothing to mitigate, which is a violation of § 1986's duty since they knew and had at least some power to help stop the harm (even if just by informing Plaintiffs or authorities, which none did).

295.7.

296. **Timeliness:** Section 1986 has a one-year statute of limitations. The events in question, largely occurring in late 2023 and 2024, are well within one year of the filing of the original complaint (which Plaintiffs have timely filed), so this claim is timely.

297. **Liability and Damages:** By operation of § 1986, every Defendant who could have aided in preventing the wrongs (which is all of them) and failed to do so is liable to Plaintiffs for all damages caused by the § 1985 conspiracy. In effect, this makes them additionally liable (on top of § 1985) because they didn't even try to stop what they knew was wrong. The damages under § 1986 mirror those under § 1985 and other counts: emotional distress, reputational harm, economic losses, etc., all stemming from the conspiracy that was not prevented.

298. **No Good Faith Defense:** Defendants cannot claim a good faith ignorance to escape § 1986. The facts (as laid out) show they knew

enough that a reasonable person would realize a civil rights conspiracy was happening. Their failure to act was willful or negligent at best. If any Defendant claims they feared retaliation themselves if they tried to stop it — that is no legal excuse under § 1986; the statute imposes a duty to act regardless of personal risk.

299. **WHEREFORE,** Plaintiffs seek judgment against **all Defendants** on Count VIII under 42 U.S.C. § 1986. Plaintiffs request:

300. An award of **compensatory damages** against Defendants, jointly and severally, for all injuries resulting from the conspiracy that Defendants failed to prevent. This ensures that each Defendant is fully accountable for the harm that their inaction allowed to occur.

301. Because § 1986 essentially provides a remedy coextensive with § 1985, and in some interpretations limits recovery to actual damages (excluding punitive), Plaintiffs primarily seek actual damages here. (However, to the extent punitive or exemplary damages are available for the malicious neglect shown, Plaintiffs seek them as well.)

302. Plaintiffs also seek their **costs and attorneys' fees** for having to bring this claim, pursuant to 42 U.S.C. § 1988, as this is an action to enforce civil rights laws.

303.   Any other relief deemed proper, including potentially injunctive relief, given that an ongoing failure to act could allow continuing harm.

304.   **Jury Trial Demand:** Plaintiffs hereby demand a trial by jury on all issues so triable under Fed. R. Civ. P. 38 and the Seventh Amendment of the U.S. Constitution.

## 305.   Count IX: Aiding and Abetting (Common Law) (Against All Defendants)

306.   Count XII: Aiding and Abetting (Common Law) (Against All Defendants)

307.   Plaintiffs Freites, Otero, and Rodriguez repeat and re-allege each and every allegation set forth in the preceding paragraphs as though fully incorporated herein.

308.   Under the common law of Florida and established principles of tort law, any person or entity who knowingly provides substantial assistance or encouragement to another in the commission of a tortious act can be held liable for aiding and abetting that conduct.

309.   Each Defendant aided and abetted the tortious acts committed against Plaintiffs—including defamation, invasion of privacy, intentional infliction of emotional distress, obstruction of justice, and witness

intimidation—as detailed in previous allegations. Even those Defendants who did not directly author defamatory statements, personally disclose private information, or deliver explicit threats knowingly and substantially assisted, enabled, or encouraged the unlawful conduct of their co-Defendants.

310. Specific illustrative examples include, but are not limited to, the following:

311. Defendant Yon Goicoechea provided instructions (after conferring and in agreement with Defendant Medina), critical financial and strategic support to Defendant Gustavo Lainette in producing and distributing defamatory and threatening multimedia content specifically targeting Plaintiffs Freites, Otero, and Rodriguez. Goicoechea thus substantially aided and abetted the intentional infliction of emotional distress, defamation, and witness intimidation orchestrated by Lainette and other Defendants.

312. Defendants who actively shared, reposted, and amplified defamatory and threatening content—including posts and videos labeling Plaintiffs as "false opposition," "traitors," or conspirators engaged in corruption—provided indispensable assistance, expanding the harmful impact on Plaintiffs. These Defendants acted with explicit knowledge of the falsity of the statements and with awareness of the wrongful intent

and harmful effect of their dissemination.

313. The Corporate Defendants, including VENAMERICA, VAPA, Resistencia Venezolana Corp., and the American Venezuelan Engagement Foundation, Freedom for Venezuela Inc, Lemure Holdings, aided the tortious campaign by providing organizational infrastructure, email lists, funding mechanisms, social media channels, and logistical support. Through their agents, such as Defendant Lino Carrillo, they enabled widespread dissemination of defamatory and intimidating materials. For instance, Defendant Carrillo utilized VAPA's membership databases and communication resources to distribute defamatory messages, ensuring that harmful content reached targeted professional and social communities.

314. When Defendant Orlando Viera-Blanco unlawfully disclosed Plaintiffs' confidential involvement in sealed judicial proceedings, other Defendants promptly amplified and endorsed the disclosure. This rapid coordinated response materially aided the violation and encouraged further harassment and intimidation, substantially increasing harm to Plaintiffs.

315. All Defendants, through their coordinated actions, communications, and mutual support, demonstrated clear awareness of, or reckless disregard for, the wrongful and injurious nature of the conduct they

facilitated. Defendants communicated among themselves, thereby sharing information, intent, and resources necessary to execute their unlawful aims.

316. Consequently, all Defendants bear joint and several liability for aiding and abetting the tortious acts detailed in Counts III (Defamation), IV (Invasion of Privacy), V (Intentional Infliction of Emotional Distress), and Counts involving obstruction of justice and witness intimidation (Counts involving violations of 18 U.S.C. §§ 1503 and 1512, and 42 U.S.C. §§ 1985(2)-(3) and 1986). Liability attaches to each Defendant regardless of whether they personally executed every individual act; their knowing provision of substantial assistance or encouragement to other Defendants makes them equally culpable.

317. **Count X: Violation of the Law of Nations and Alien Tort Statute (28 U.S.C. § 1350)**

318. Plaintiffs repeat and reallege each and every preceding paragraph as though fully set forth herein.

319. Jurisdiction Under ATS:

320. This claim is brought under the Alien Tort Statute (ATS), 28 U.S.C. § 1350. Plaintiffs Otero and Rodriguez are aliens (foreign nationals), and they assert this claim for tortious acts committed in violation of the law

of nations (customary international law). Plaintiff Freites, although a U.S. resident, joins this claim to the extent permissible or as a pendent party. Jurisdiction is proper because at least one alien Plaintiff is involved, and the acts alleged constitute violations of clearly defined norms under international law.

321. Violations of International Law:

322. Defendants' conduct constitutes violations of universally recognized norms of international law, particularly the prohibition against systematic persecution based on political grounds. Defendants engaged in transnational political persecution and intimidation aimed at silencing Plaintiffs, who are prominent political dissidents and advocates.

323. Specifically, Defendants violated Plaintiffs' internationally recognized rights, including:

324. The right to be free from systematic persecution for political opinions. Defendants orchestrated a targeted international campaign labeling Plaintiffs as traitors and falsely accusing them of corruption, with the intent to punish Plaintiffs for their political stance against corruption and authoritarianism. This campaign transcended national borders, directly impacting Plaintiffs in exile and violating universally recognized prohibitions against political persecution.

325.   The right to security of person and freedom of expression. Defendants, acting either directly or in concert with quasi-state actors linked to the Venezuelan regime, deliberately suppressed Plaintiffs' ability to freely express their political views by means of threats, intimidation, and defamation. These acts represent a coordinated attempt to silence Plaintiffs and deter them from exercising their fundamental human rights protected by international law.

326.   The right to participate freely and securely in judicial processes. Defendants interfered with Plaintiffs' participation in legal proceedings through intimidation and harassment. Such actions represent a clear violation of the internationally recognized principle protecting litigants and witnesses from coercion or retaliation.

327.   State Action or Quasi-State Conduct:

328.   Certain Defendants acted in concert with or under the direction of foreign state or quasi-state actors affiliated with the Venezuelan regime (both the Maduro regime and the Asamblea Nacional in exile). Specifically, Defendants propagated narratives beneficial to the Maduro regime and facilitated the regime's objective of discrediting and

silencing its political opponents. These actions constitute state-sponsored or state-enabled persecution under international law.

329.  Universal Concern and Specificity:

330.  The acts described are specific, universally condemned, and obligatory norms under international law, recognized by the global community. The systematic intimidation, defamation, and persecution of political dissidents, especially across national borders, clearly violate established international norms against politically motivated persecution and suppression of free expression.

331.  Injuries to Plaintiffs:

332.  Plaintiffs Otero and Rodriguez have suffered significant harm under international law standards, including damage to reputation, emotional distress, interference with their freedom of expression, and threats to personal safety. These injuries directly result from Defendants' coordinated transnational persecution campaign, severely impacting Plaintiffs' dignity and their ability to participate in civic and political life from exile.

333.  Exhaustion of Remedies:

334.  The United States provides an appropriate and necessary forum for addressing these international tort claims, particularly because substantial wrongful acts occurred within U.S. jurisdiction, Plaintiff

Freites is a US resident and other plaintiffs are european residents.

335.   Damages and Relief:

336.   As a direct result of Defendants' violations of international law, Plaintiffs seek full compensation for their injuries, including but not limited to reputational harm, severe emotional distress, and interference with their rights under international law. Plaintiffs also seek punitive damages, given the intentional and egregious nature of Defendants' conduct, designed to punish the perpetrators and deter future violations of international norms.

337.   Plaintiffs additionally request recovery of attorneys' fees, costs, and expenses incurred, to the extent permitted by applicable statutes or under the Court's equitable powers.

338.   In conclusion, Plaintiffs respectfully request that the Court recognize their claims under the Alien Tort Statute for violations of clearly defined norms of international law and grant all appropriate relief, including compensatory and punitive damages, equitable remedies, and all other relief the Court finds just and proper.

# 339.   VI. PRAYER FOR RELIEF

340.   WHEREFORE, Plaintiffs Freites, Otero, and Rodriguez respectfully request that this Court enter judgment in their favor and against all

Defendants, jointly and severally, and grant the following relief:

341.   **Compensatory Damages:** An award of compensatory damages in an amount to be determined at trial, to fully compensate each Plaintiff for the injuries suffered, including but not limited to reputational harm, emotional distress, pain and suffering, lost income and opportunities, and expenses incurred as a result of Defendants' conduct. Each Plaintiff's damages are believed to exceed $75,000, and collectively, compensatory damages are expected to be in the millions of dollars given the severity and breadth of harm inflicted.

342.   **Treble and Enhanced Damages:** Treble damages as provided by RICO (18 U.S.C. § 1964(c)) for the injury to Plaintiffs' business or property caused by Defendants' racketeering acts. All compensatory damages that are recoverable under the RICO count should be trebled. Additionally, any enhanced damages available under other statutes or common law (such as statutory multiples for civil rights violations or reputational harm, if applicable) should be awarded to Plaintiffs to the maximum extent allowed.

343.   **Punitive Damages:** An award of punitive and exemplary damages

sufficient to punish Defendants for their willful, malicious, and outrageous conduct, and to deter such conduct in the future. Given the conspiracy and deliberate campaign to harm Plaintiffs, a substantial punitive damages award is warranted against the individual Defendants. To the extent permitted by law, punitive damages should also be assessed against the organizational Defendants for the acts of their agents, because those entities were used as tools of the wrongful conduct.

344. **Injunctive Relief:** Preliminary and permanent injunctive relief ordering Defendants to cease and desist from publishing or disseminating any further false or defamatory statements about Plaintiffs. This includes, without limitation, an injunction requiring Defendants to:

345.

345.1. Remove or cause the removal of all defamatory videos, posts, or other online content created or distributed by Defendants about Plaintiffs.

345.2. Issue retractions or corrections in the same forums where the defamatory statements were originally made (to the extent possible), so as to inform the audience of the falsity of the prior

statements.

345.3.   Refrain from harassing, threatening, or contacting Plaintiffs in any way that could be considered intimidating or retaliatory. The injunctive relief should be broad enough to prevent any continuation or repetition of the unlawful conduct described herein.

345.4.

346.   **Disclosure and Accounting:** As an equitable measure, an order requiring Defendants to provide a full accounting and disclosure of any financial arrangements related to the conduct alleged. This may include disclosure of:

347.

347.1.   Funds received by any Defendant (or Defendant-controlled entity) from PDVSA, CITGO, or related sources, which were used to fund the smear campaign.

347.2.   Identities of any additional collaborators or individuals who assisted in the campaign (to facilitate complete relief and potentially add parties if needed).

347.3.   Communications and documents related to the planning and execution of the defamatory scheme (to be turned over to Plaintiffs and, if appropriate, the Court), to ensure all such

materials can be purged from public or malicious use. Such an accounting will help ensure that the scope of the wrongdoing is fully uncovered and addressed.

347.4.

348. **Declaratory Relief:** A declaration by this Court that the statements published by Defendants about Plaintiffs are false and defamatory, and that Defendants' coordinated actions as described herein were unlawful (violating Plaintiffs' rights under federal and state law). Although a judicial finding to that effect may be implicit in a judgment for Plaintiffs, an explicit declaratory judgment would aid in restoring Plaintiffs' reputations by providing an authoritative refutation of Defendants' false claims.

349. **Attorneys' Fees and Costs:** An award of Plaintiffs' reasonable attorneys' fees and costs of this action as allowed by law. This includes fees under statutes such as RICO (which provides for fee shifting), 42 U.S.C. § 1988 (for the civil rights claims), and any other applicable provision. Although Plaintiffs are presently pro se, if they later retain counsel or have incurred legal costs (and for the value of legal work done in preparation of this complaint), an award of fees is justified given Defendants' bad-faith conduct. In any event, all court costs and

litigation expenses should be borne by Defendants.

350. **Pre- and Post-Judgment Interest:** An award of pre-judgment interest on all applicable damages, from the date of injury through the date of judgment, at the highest rate allowed by law, to compensate Plaintiffs for the loss of use of those funds. Additionally, an award of post-judgment interest at the legal rate from the date of judgment until full satisfaction, to ensure that the judgment is fully compensatory.

351. **Such Other and Further Relief:** Any further relief that the Court deems just and proper, including equitable relief tailored to address the effects of Defendants' conduct. This may encompass:

351.1. Orders requiring Defendants to turn over any social media accounts or domains used primarily to defame Plaintiffs, so they can be disabled.

351.2. Monitoring or compliance reporting measures to ensure Defendants abide by the Court's orders (for example, requiring Defendants to certify periodically that they are not engaging in prohibited conduct).

351.3. Any relief necessary to undo the lingering effects of Defendants'

actions on Plaintiffs' lives and to guard against any resurgence of such conduct.

351.4.    Notification to the IRS and the Department of Justice of the violations of applicable laws and regulations.

351.5.    Plaintiffs seek all such relief jointly and severally against all Defendants to the extent allowed, and respectfully request that the Court grant such relief as is just in light of the willful and malicious conduct at issue.

351.6.    Please insert the following paragraph at the end of your "PRAYER FOR RELIEF" section to supplement your current document:

351.7.    Plaintiffs respectfully pray that, regarding the merits of the defamation claim, the Court apply the substantive law corresponding to the jurisdiction in which each Plaintiff resides and has suffered direct harm. Specifically, Plaintiffs request that the merits of the defamation claim for Plaintiff Ivan Freites be adjudicated under the laws of the United States, for Plaintiff Miguel Enrique Otero under Venezuelan or Spanish law, and for Plaintiff Jorge Alejandro Rodriguez under Venezuelan or Swiss law, reflecting the jurisdictions where each Plaintiff is domiciled and where the injury

primarily occurred.

## 351.8.   VII. DEMAND FOR JURY TRIAL

351.9.    Pursuant to Federal Rule of Civil Procedure 38(b) and applicable provisions of the Florida Rules of Civil Procedure, Plaintiffs Ivan Freites, Miguel Enrique Otero, and Jorge Alejandro Rodriguez hereby demand a jury trial on all issues so triable. Plaintiffs expressly invoke their rights under the Seventh Amendment to the United States Constitution and corresponding state provisions to have factual disputes adjudicated by a jury of their peers. Plaintiffs respectfully request the Court to ensure that all applicable issues and claims raised herein be tried before a jury.

## 351.10.   VIII. CERTIFICATION AND CLOSING

351.11.   Pursuant to Federal Rule of Civil Procedure 11(b), Plaintiffs certify and affirm, under penalty of perjury, that this Amended

Complaint and all claims and allegations herein:

352.   Are not presented for any improper purpose, such as harassment, unnecessary delay, or needless increase in litigation costs.

353.   Are warranted by existing law or present nonfrivolous arguments for extending, modifying, or reversing existing law or for establishing new law.

354.   Contain factual contentions that have evidentiary support, or will likely have evidentiary support after reasonable investigation and discovery.

355.   Comply with the requirements and obligations imposed by Rule 11.

356.   Plaintiffs, appearing pro se, acknowledge their continuing obligation to keep the Clerk's Office informed of any change of address or contact

information to facilitate timely communications regarding this case.

357.   Respectfully submitted this 11 th day of March, 2025.

Ivan R. Freites (Plaintiff, Pro Se)

/s/ Ivan R. Freites C.

Ivan R. Freites C., Pro Se

% Villasana

4370 NW 107 Ave, Apt. 102

Doral, FL 33178

Email:   freites.usdcsf.1.25.cv.20465.bb@gmail.com



Jorge Alejandro Rodriguez (Plaintiff, Pro Se) 

Eichholzstrasse 2, 6312-Steinhausen

SWITZERLAND



Miguel Enrique Otero (Plaintiff, Pro Se)

Eichholzstrasse 2, 6312-Steinhausen

SWITZERLAND

Madrid, Espana.



# DIRECTORY OF EXHIBITS

1. **Exhibit A:** Attached hereto as Exhibit A is a screenshot of the Twitter thread posted by Orlando Viera-Blanco containing the names of the Plaintiffs and other information. A transcript in Spanish of the corresponding thread of twenty two (22) Twits from the damaging offender, counted from Zero (0) to Twenty-one (21), is provided as well as an automatic translation of said transcript (Google Translate).

2. **Exhibit B:** Attached hereto as Exhibit B is documentation of meetings and other recent activities showing a close and clear relationship between Orlando Viera-Blanco and Horacio Medina.

3. **Exhibit C:** Plaintiffs provide IRS documentation and  press news on the relationship between the **Viera-Blanco** and CITGO

4. **Exhibit C:**Documentation and explanation of coordination of Orlando Viera-Blanco with individuals closely linked to Horacio Medina, in order to violate the court order.

5. **Exhibit E.** Evidence on the participation of Defendant Gustavo Lainette in the orchestrated campaign.

# EXHIBIT A

**Exhibit A:** Attached hereto as Exhibit A is a screenshot of the Twitter thread posted by Orlando Viera-Blanco containing the names of the Plaintiffs and other information. A transcript in Spanish of the corresponding thread of twenty two (22) Twits from the damaging offender, counted from Zero (0) to Twenty-one (21), is provided as



← Post

**Orlando Viera-Blanco**
@ovierablanco

Atención ‖ Nueva demanda ha sido incoada contra PDVSA AD Hoc, CITGO et al. Querella por daños y lesiones sufridos por Vzlanos en Vzia sin conexión-alerta defensa-en US. Un litis consorcio [Class Action, Civ. No. 23-cv-00989/Corte de Dtto. Delaware] que explicamos sumariamente ▮:

Translate post

12:38 PM · May 24, 2024 · **2,363** Views

💬 2          🔁 20          ♡ 32          🔖 3          ⬆

🖤 Post your reply                                             Reply

**Orlando Viera-Blanco** @ovierablanco · May 24
1-La demanda fue presentada por ciudadanos Vzlanos: Jorge Alejandro Rodríguez Moreno; Iván Freites C; Emilio Venuti; Ángel Moreno, Jesús M.A.Carrillo; Miguel Enrique Otero; Pedro O. Mora; profesionales, empresarios editor; sindicalista[s], + algunos ex trabajadores de PDVSA;

💬 1          🔁 1          ♡ 4          ᯆ 902          🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24
2-Demandados: Petróleos de Venezuela S.A. (PDVSA); PDV Holding Inc; PDV América Holding Inc; CITGO Holding Inc; Corporación Petrolera CITGO; Junta Administrativa Ad-Hoc de PDVSA Ad Hoc+presuntos co-conspiradores, que incluyen una variedad de organizaciones; entre otras:

💬 1          🔁 1          ♡ 4          ᯆ 759          🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24
3-Unas quince filiales de PDVSA, más organizaciones como ExxonMobil, BP, Conoco, Chevron, ex ministros del gobierno de Vzla y el propio gobierno vzlano. A este acción tipo litis consorcio, se sumarían otros 1700 trabajadores de la industria y 400 trabajadores de El Nacional;

💬 1          🔁 1          ♡ 3          ᯆ 565          🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24
4-Reclamos son por hechos acaecidos en Vzla vinculados a violación de DDHH, civiles y político; persecución política, expropiación; difamación agravada, encarcelamiento, tratos crueles. Esta conexión factual exclusiva con Vzla, plantea-dixit defensa-revisar jurisdicción en US;

💬 1          🔁 1          ♡ 3          ᯆ 508          🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24
5-La demanda express que la jurisdicción aplicable es la Vzlana, porque allí ocurrieron los hechos y los demandante estaban ahí al producirse los daños. Alegan los demandantes, US [Delaware] tiene jurisdicción porque las corporaciones demandadas tienen ahí establecido domicilio;

💬 1          🔁 1          ♡ 3          ᯆ 481          🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24
6-Alegan querellantes: En la Ley de Registro de Activos Extranjeros figura domicilio de la Junta Ad Hoc PDVSA y PDV Holding en Hollywood Fl. Citan a Francisco Illarsmendi y Kenwood Management Group como agentes que usaron Fondo de Pensiones de PDVSA en un esquema Ponzi [2000];

💬 1          🔁 3          ♡ 6          ᯆ 619          🔖 ⬆

Q Search

## Relevant people

**Orlando Viera-Blanco**
@ovierablanco                    Follow

Venezuelan Former Ambassador to🇨🇦 Abogado fundador VB&A 1989 Profesor Cultura Comparada. Columnista El Universal. Presidente VenAmérica. Ancla/Host EVTV Miami

## Live on X

🎙 **Noticias Caracol** ● is hosting
EN VIVO ● Noticias Caracol - 29 de mayo del 2024                +274

## Switzerland trends

1 · Trending
**#WHA77**
10.4K posts

2 · Survival competition · Trending
**#Kohlanta**
22.2K posts

3 · Trending
**Meyer Habib**
227K posts

4 · Trending
**Rafah**
1.44M posts

5 · Politics · Trending
**De Luca**
12.7K posts

6 · Trending
**Terror**
104K posts

7 · Trending
**Russen**
4,057 posts

8 · Trending
**Erklärung**
1,362 posts

9 · Trending
**#Macron**
8,926 posts

10 · Trending
**Genozid**
2,769 posts

Show more

3

← Post

**Orlando Viera-Blanco** @ovierablanco · May 24
7-En lo relativo a la prescripción, el reclamo presenta 2 argumentos con respecto a la cuestión del plazo: i-El argumento que la doctrina de las violaciones continuas se aplica en este caso y, por lo tanto, el estatuto de limitaciones se ha venido cobrando durante décadas y ii.-

♡ 1    ↻ 3    ♡ 3    ⊪ 588    ☐ ⤒

**Orlando Viera-Blanco** @ovierablanco · May 24
8-El Estatuto sobre daños a extranjeros("ATS") no prevé un plazo de prescripción específico [...] La querella pide certificación para incluir a más de 1700 trabajadores+400 trabajadores de 'El Nacional'. La querella alega que el caso afecta a 20.000 trabajadores por persecución;

♡ 1    ↻ 2    ♡ 6    ⊪ 485    ☐ ⤒

**Orlando Viera-Blanco** @ovierablanco · May 24
9-La demanda afirma que 150 personas otorgaron declaración jurada de ser despedidos por los demandados y perder sus propiedades. Alegan que "varias decenas"de los agraviados residen en US. Pero el único demandante que estaría en los EEUU sería el Sr. Freites, que busca asilo.

♡ 1    ↻ 3    ♡ 7    ⊪ 654    ☐ ⤒

**Orlando Viera-Blanco** @ovierablanco · May 24
10-No se declara-señala la defensa-que ningún otro individuo viva en US. La demanda hace amplias acusaciones de confiscación de bienes y persecución política [gobierno vzlano]. La demanda establece que la gran mayoría de estos actos supuestamente ocurrieron entre 2002 y 2005.

♡ 1    ↻ 1    ♡ 4    ⊪ 396    ☐ ⤒

**Orlando Viera-Blanco** @ovierablanco · May 24
11-Se menciona explosión [2010] en refinería de Amuay. Afirman que demandados crearon condiciones de trabajo peligrosas y pusieron a despedidos en una lista negra, alentando violencia física y psicológica. Demanda intenta conectar con Crystallex, acusados y figura de alter ego;

♡ 1    ↻ 1    ♡ 4    ⊪ 386    ☐ ⤒

**Orlando Viera-Blanco** @ovierablanco · May 24
12-El análisis alter ego luce inconexo según la defensa. La querella involucra indiscriminadamente a demandados y co-conspiradores. Afirma que trabajaron juntos para perjudicar a demandantes. Citan aleatoriamente supuestos casos de relaciones entre Demandados como CITGO y PDVSA;

♡ 1    ↻ 1    ♡ 4    ⊪ 395    ☐ ⤒

**Orlando Viera-Blanco** @ovierablanco · May 24
13-Las causas de acción incluyen:
Incumplimiento de contratos laborales [impago de salarios y beneficios completos, privándolos
de seguro médico, impago de facturas vencidas y rescisión de contrato sin justa causa]. Tergiversación fraudulenta
Conversión/incautación de bienes;

♡ 1    ↻ 1    ♡ 5    ⊪ 357    ☐ ⤒

**Orlando Viera-Blanco** @ovierablanco · May 24
14-Demandan difamación: Sostienen que el Presidente de Vzla, Ministros y miembros del Parlamento y "otros acusados", hicieron declaraciones despectivas y falsas, entre ellas
"etiquetar a los demandantes como terroristas, liderar el encarcelamiento, el exilio y la persecución";

♡ 1    ↻ 1    ♡ 4    ⊪ 342    ☐ ⤒

---

🔍 Search

...abogado fundador VULP 1988
Profesor Cultura Comparada.
Columnista El Universal. Presidente VenAmérica. Ancla/Host EVTV Miami

**Live on X**

🔴 **Noticias Caracol** ✓ is hosting
EN VIVO 🔴 Noticias Caracol -
29 de mayo del 2024                    🔴 ~274

**Switzerland trends**

1 - Trending                                        ···
**#WHA77**
10.4K posts

2 - Survival competition · Trending                 ···
**#Kohlanta**
22.2K posts

3 - Trending                                        ···
**Meyer Habib**
227K posts

4 - Trending                                        ···
**Rafah**
1.44M posts

5 - Politics · Trending                             ···
**De Luca**
12.7K posts

6 - Trending                                        ···
**Terror**
104K posts

7 - Trending                                        ···
**Russen**
4,057 posts

8 - Trending                                        ···
**Erklärung**
1,362 posts

9 - Trending                                        ···
**#Macron**
8,926 posts

10 - Trending                                       ···
**Genozid**
2,769 posts

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More···   © 2024 X Corp.

4

← **Post**

Q Search

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
15-La querella solicita daños monetarios por un total de 697 millones de dólares. Incumplimiento anticipado de empleo; negligencia, mala fe; agresión; encarcelamiento; imposición intencional de estrés emocional; violación de la legislación laboral Vzlana; violación de tratados;

♡ 1    ↻ 1    ♡ 5    ᴵˡˡ 525    🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
16-Según la defensa esta causa no es viable. Demandantes no han servido emplazamiento procesal adecuao a Demandados conforme Ley de Inmunidades Soberanas Extranjeras/"Foreign Sovereign Immunities Act ["FSIA"]. PDVSA está protegida por esta ley por ser propiedad del Estado Vzlano;

♡ 1    ↻ 1    ♡ 5    ᴵˡˡ 463    🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
17-Demandantes-indican expertos de la defensa-deben cumplir con los requisitos de la FSIA sobre disposiciones que rigen la notificación del proceso. La FSIA prevé métodos de notificación jerárquica. La notificación al Sr Medina-alertan-no satisface requisitos de citación de FSIA;

♡ 1    ↻ 1    ♡ 2    ᴵˡˡ 334    🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
18-Expresa la defensa que el orden jerárquico o método de notificación según la FSIA, exige que la citación se realice: 1-Conforme a un acuerdo especial entre las partes. 2-De no existir acuerdo, deberá citarse a un agente plenamente autorizado por ley o convenio internacional;

♡ 1    ↻ 1    ♡ 2    ᴵˡˡ 317    🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
19-La defensa alerta que Corte de Delaware carece de competencia en la materia. Si bien la notificación defectuosa puede subsanarse, la falta de jurisdicción no puede.
La FSIA es base jurídica que establece jurisdicción sobre un estado extranjero, sus agencias o instrumentalidad;

♡ 1    ↻ 2    ♡ 3    ᴵˡˡ 607    🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
20- Como agencia o instrumentalidad de un Estado extranjero, PDVSA tiene derecho a inmunidad soberana a menos que se aplique una excepción a esa inmunidad, que son acciones legales o reclamos conexos con su actividad comercial. La defensa de PDVSA et al afirma que esto fracasaría

♡ 1    ↻ 1    ♡ 4    ᴵˡˡ 315    🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
21-Conclusión: La defensa afirma que la excepción de inmunidad no aplica por no tener los hechos/actividades demandadas efecto directo en US. "Demandantes no invocan ninguna actividad comercial que haya ocurrido en los US" por lo que concluye-la defensa-que la acción es invisible"

♡ 1    ↻ 3    ♡ 5    ᴵˡˡ 852    🔖 ⬆

**Orlando Viera-Blanco** @ovierablanco · May 24    ···
22-Según estima la defensa, demandantes han admitido que todos los hechos y las lesiones ocurrieron en Vzla y por lo tanto, no han demostrado ningún efecto en los EEUU. La defensa estima como resultado probable que el Tribunal decida que no tiene jurisdicción sobre PDVSA et al.

Abogado fundador VB&A 1989
Profesor Cultura Comparada.
Columnista El Universal. Presidente
VenAmérica. Ancla/Host EVTV Miami

**Live on X**

⚘ Noticias Caracol ⬤ is hosting
EN VIVO ⬤ Noticias Caracol -
29 de mayo del 2024    ⚘ +274

**Switzerland trends**

1 - Trending    ···
#WHA77
10.4K posts

2 - Survival competition · Trending    ···
#Kohlanta
22.2K posts

3 - Trending    ···
Meyer Habib
227K posts

4 - Trending    ···
Rafah
1.44M posts

5 - Politics · Trending    ···
De Luca
12.7K posts

6 - Trending    ···
Terror
104K posts

7 - Trending    ···
Russen
4,067 posts

8 - Trending    ···
Erklärung
1,362 posts

9 - Trending    ···
#Macron
8,926 posts

10 - Trending    ···
Genozid
2,769 posts

Show more

Terms of Service   Privacy Policy   Cookie Policy
Accessibility   Ads info   More ···   © 2024 X Corp.

5

Transcript in Spanish and Automatic translation to English of the Twitts thread above:

| Spanish Transcript | Automatic English Translation |
|---|---|
| **Orlando Viera-Blanco @ovierablanco · May 24** | **Orlando Viera-Blanco @ovierablanco · May 24** |
| 0. **Atención** ‼ Nueva demanda ha sido incoada contra PDVSA AD Hoc, CITGO et al. Querella por daños y lesiones sufridos por Vzlanos en Vzla sin conexión-alerta defensa-en US. Un litis consorcio [Class Action, Civ. No. 23-cv-00989/Corte de Dtto. Delaware] que explicamos sumariamente 🛎 : | 0. **Attention** ‼ New lawsuit has been filed against PDVSA AD Hoc, CITGO et al. Complaint for damages and injuries suffered by Vzlanos in Vzla without connection-defense alert-in US. A consortium litigation [Class Action, Civ. No. 23-cv-00989/Dtto Court. Delaware] which we explain summarily 🛎 : |
| 1. **La demanda fue presentada por ciudadanos Vzlamos: Jorge Alejandro III Rodríguez Moreno; Iván Freites C.; Emilio Venuti; Ángel Moreno, Jesús A.M.Carrillo; Miguel Enrique Otero; Pedro O. Mora; profesionales, empresarios editor, sindicalistas*+, & algunos ex trabajadores de PDVSA** | 1. **The lawsuit was filed by Vzlamos citizens: Jorge Alejandro III Rodríguez Moreno; Iván Freites C.; Emilio Venuti; Ángel Moreno, Jesús A.M.Carrillo; Miguel Enrique Otero; Pedro O. Mora; professionals, editor businessmen, trade unionists*+, & some former PDVSA workers** |
| 2. **Demandados**: Petróleos de Venezuela S.A. (PDVSA); PDV Holding Inc; PDV América Holding Inc; CITGO | 2. **Defendants**: Petróleos de Venezuela S.A. (PDVSA); PDV Holding Inc; PDV América Holding Inc; CITGO |

| | |
|---|---|
| Holding Inc; Corporación Petrolera CITGO; Junta Administrativa Ad-Hoc de PDVSA Ad Hoc+presuntos co-conspiradores, que incluyen una variedad de organizaciones; entre otras: | Holding Inc; CITGO Oil Corporation; PDVSA Ad Hoc Administrative Board+alleged co-conspirators, including a variety of organizations; among other: |
| 3. Unas quince filiales de PDVSA, más organizaciones como ExxonMobil, BP, Conoco, Chevron, ex ministros del gobierno de Vzla y el propio gobierno vzlano. A esta acción tipo litis consorcio, se sumarían otros 1700 trabajadores de la industria y 400 trabajadores de El Nacional; | 3. About fifteen subsidiaries of PDVSA, plus organizations such as ExxonMobil, BP, Conoco, Chevron, former ministers of the Vzla government and the Vzlano government itself. Another 1,700 industry workers and 400 El Nacional workers would join this consortium-type action; |
| 4. Reclamos son por hechos acaecidos en Vzla vinculados a violación de DDHH, civiles y político; persecución política, expropiación; difamación agravada, encarcelamiento, tratos crueles. Esta conexión factual exclusiva con Vzla, plantea-dixit defensa-revisar jurisdicción en US; | 4. Claims are for events that occurred in Vzla linked to violation of human rights, civil and political; political persecution, expropriation; aggravated defamation, imprisonment, cruel treatment. This exclusive factual connection with Vzla, raises-dixit defense-review jurisdiction in US; |
| 5. La demanda expresa que la jurisdicción aplicable es la Vzlana, porque allí ocurrieron los hechos y los demandantes estaban ahí al producirse los daños. Alegan los demandantes, US [Delaware] tiene jurisdicción porque las | 5. The complaint states that the applicable jurisdiction is Vzlana, because the events occurred there and the plaintiffs were there when the damages occurred. The plaintiffs allege, US [Delaware] has jurisdiction because the |

corporaciones demandadas tienen ahí establecido domicilio;

6. Alegan querellantes: En la Ley de Registro de Activos Extranjeros figura domicilio de la Junta Ad Hoc PDVSA y PDV Holding en Hollywood Fl. Citan a Francisco Illaramendi y Kenwood Management Group como agentes que usaron Fondo de Pensiones de PDVSA en un esquema Ponzi [2000];

7. En lo relativo a la prescripción, el reclamo presenta 2 argumentos con respecto a la cuestión del plazo: i-El argumento que la doctrina de las violaciones continuas se aplica en este caso y, por lo tanto, el estatuto de limitaciones se ha venido cobrando durante décadas y ii.-

8. El Estatuto sobre daños a extranjeros("ATS") no prevé un plazo de prescripción específico [...] La querella pide certificación para incluir a más de 1700 trabajadores+400 trabajadores de 'El Nacional'. La querella alega que el caso afecta a 20.000 trabajadores por persecución;

---

defendant corporations have established domicile there;

6. Complainants allege: The Foreign Assets Registration Law contains the address of the PDVSA and PDV Holding Ad Hoc Board in Hollywood Fl. They cite Francisco Illaramendi and Kenwood Management Group as agents who used PDVSA Pension Fund in a Ponzi scheme [ 2000];

7. Regarding the statute of limitations, the claim presents 2 arguments regarding the issue of time limit: i-The argument that the doctrine of continuing violations applies in this case and, therefore, the statute of limitations has been been charging for decades and ii.-

8. The Statute on damages to foreigners ("ATS") does not provide for a specific limitation period [...] The complaint requests certification to include more than 1,700 workers + 400 workers of 'El Nacional'. The complaint alleges that the case affects 20,000 workers due to persecution;

| | |
|---|---|
| 9. La demanda afirma que 150 personas otorgaron declaración jurada de ser despedidos por los demandados y perder sus propiedades. Alegan que "varias decenas" de los agraviados residen en US. Pero el único demandante que estaría en los EEUU sería el Sr. Freites, que busca asilo. | 9. The lawsuit claims that 150 people gave sworn statements of being fired by the defendants and losing their property. They allege that "several dozen" of the victims reside in the US. But the only claimant who would be in the US would be Mr. Freites, who is seeking asylum. |
| 10. No se declara-señala la defensa-que ningún otro individuo viva en US. La demanda hace amplias acusaciones de confiscación de bienes y persecución política [gobierno vzlano]. La demanda establece que la gran mayoría de estos actos supuestamente ocurrieron entre 2002 y 2005. | 10. It is not stated - the defense points out - that any other individual lives in the US. The lawsuit makes broad accusations of asset confiscation and political persecution [Vzlano government]. The lawsuit states that the vast majority of these acts allegedly occurred between 2002 and 2005. |
| 11. Se menciona explosión [2010] en refinería de Amuay. Afirman que demandados crearon condiciones de trabajo peligrosas y pusieron a despedidos en una lista negra, alentando violencia física y psicológica. Demanda intenta conectar con Crystallex, acusados y figura de alter ego; | 11. An explosion [2010] is mentioned at the Amuay refinery. They claim defendants created dangerous working conditions and blacklisted those fired, encouraging physical and psychological violence. Lawsuit attempts to connect with Crystallex, defendants and alter ego figure; |
| 12. El análisis alter ego luce inconexo según la defensa. La querella involucra indiscriminadamente a demandados y | 12. The alter ego analysis seems disjointed according to the defense. The complaint indiscriminately involves |

co-conspiradores. Afirma que trabajaron juntos para perjudicar a demandantes. Citan aleatoriamente supuestos casos de relaciones entre Demandados como CITGO y PDVSA;

13. Las causas de acción incluyen: Incumplimiento de contratos laborales [impago de salarios y beneficios completos, privándolos de seguro médico; impago de facturas vencidas y rescisión de contrato sin justa causa]. Tergiversación fraudulenta Conversión/incautación de bienes;

14. Demandan difamación: Sostienen que el Presidente de Vzla, Ministros y miembros del Parlamento y "otros acusados", hicieron declaraciones despectivas y falsas, entre ellas "etiquetar a los demandantes como terroristas, liderar el encarcelamiento, el exilio y la persecución";

15. La querella solicita daños monetarios por un total de 597 millones de dólares. Incumplimiento anticipado de empleo; negligencia, mala fe; agresión; encarcelamiento; imposición intencional de estrés emocional; violación de la

defendants and co-conspirators. He claims they worked together to harm plaintiffs. They randomly cite alleged cases of relationships between Defendants such as CITGO and PDVSA;

13. Causes of action include: Breach of employment contracts [failure to pay full wages and benefits, depriving them of health insurance; non-payment of overdue invoices and termination of contract without just cause]. Fraudulent misrepresentation Conversion/seizure of property;

14. They claim defamation: They maintain that the President of Vzla, Ministers and members of Parliament and "other defendants" made derogatory and false statements, including "labeling the plaintiffs as terrorists, leading imprisonment, exile and persecution";

15. The complaint seeks monetary damages totaling $597 million. Early breach of employment; negligence, bad faith; assault; imprisonment; intentional infliction of emotional stress; violation of Vzlana labor legislation; violation of

| | |
|---|---|
| legislación laboral Vzlana; violación de tratados; | treaties; |
| 16. Según la defensa esta causa no es viable. Demandantes no han servido emplazamiento procesal adecuado a Demandados conforme Ley de Inmunidades Soberanas Extranjeras/"Foreign Sovereign Immunities Act ["FSIA"]. PDVSA está protegida por esta ley por ser propiedad del Estado Vzlano; | 16. According to the defense, this cause is not viable. Plaintiffs have not served adequate process to Defendants under the Foreign Sovereign Immunities Act ["FSIA"]. PDVSA is protected by this law because it is property of the Vzlano State; |
| 17. Demandantes-indican expertos de la defensa-deben cumplir con los requisitos de la FSIA sobre disposiciones que rigen la notificación del proceso. La FSIA prevé métodos de notificación jerárquica. La notificación al Sr Medina-alertan-no satisface requisitos de citación de FSIA; | 17. Plaintiffs - defense experts indicate - must comply with the FSIA's requirements on provisions governing service of process. The FSIA provides for hierarchical reporting methods. The notification to Mr Medina - alert - does not satisfy FSIA subpoena requirements; |
| 18. Expresa la defensa que el orden jerárquico o método de notificación según la FSIA, exige que la citación se realice: 1-Conforme a un acuerdo especial entre las partes. 2-De no existir acuerdo, deberá citarse a un agente plenamente autorizado por ley o convenio internacional; | 18. The defense expresses that the hierarchical order or method of notification according to the FSIA requires that the summons be made: 1-In accordance with a special agreement between the parties. 2-If there is no agreement, an agent fully authorized by law or international agreement must be summoned; |

19. La defensa alerta que Corte de Delaware carece de competencia en la materia. Si bien la notificación defectuosa puede subsanarse, la falta de jurisdicción no puede. La FSIA es base jurídica que establece jurisdicción sobre un estado extranjero, sus agencias o instrumentalidad;

19. The defense warns that the Delaware Court lacks jurisdiction in the matter. While defective notice can be cured, lack of jurisdiction cannot. The FSIA is a legal basis that establishes jurisdiction over a foreign state, its agencies or instrumentality;

20. Como agencia o instrumentalidad de un Estado extranjero, PDVSA tiene derecho a inmunidad soberana a menos que se aplique una excepción a esa inmunidad, que son acciones legales o reclamos conexos con su actividad comercial. La defensa de PDVSA et al afirma que esto fracasaría;

20. As an agency or instrumentality of a foreign State, PDVSA is entitled to sovereign immunity unless an exception to that immunity applies, which is legal actions or claims related to its commercial activity. The defense of PDVSA et al states that this would fail;

21. Conclusión: La defensa afirma que la excepción de inmunidad no aplica por no tener los hechos/actividades demandadas efecto directo en US. "Demandantes no invocan ninguna actividad comercial que haya ocurrido en los US" por lo que concluye-la defensa-que la acción es inviable"

21. Conclusion: The defense affirms that the immunity exception does not apply because the facts/activities claimed do not have direct effect in the US. "Plaintiffs do not invoke any commercial activity that has occurred in the US" which is why the defense concludes that the action is unviable."

22. Según estima la defensa, demandantes han admitido que todos los

22. According to the defense, plaintiffs have admitted that all the events and

| | |
|---|---|
| hechos y las lesiones ocurrieron en Vzla y por lo tanto, no han demostrado ningún efecto en los EEUU. La defensa estima como resultado probable que el Tribunal decida que no tiene jurisdicción sobre PDVSA et al. | injuries occurred in Vzla and therefore, they have not demonstrated any effect in the United States. The defense considers as a probable result that the Court will decide that it does not have jurisdiction over PDVSA et al. |

Note the following text in the Damaging Tweet above:

> **1. The lawsuit was filed by Vzlamos citizens: Jorge Alejandro III Rodríguez Moreno; Iván Freites C.; Emilio Venuti; Ángel Moreno, Jesús A.M.Carrillo; Miguel Enrique Otero; Pedro O. Mora; professionals, editor businessmen, trade unionists*+, & some former PDVSA workers**

This discloses the identities of five (5) Plaintiffs whose identities were protected by the Court, namely Plaintiffs **Jorge Alejandro III Rodríguez Moreno;** Emilio Venuti; Ángel Moreno, Jesús A.M.Carrillo and Pedro O. Mora.

This tweet was amplified by the following accounts. At least three of the amplifying accounts are of NGOs directly controlled by Orlando Viera-Blanco, those of Center for Liberal Democracy Development (@CENLDD), Orlando Viera-Blanco (@ovierablanco) and VenAmérica Comunica (@venamericacom), this one corresponding to the official account of the corporate entity VENAMERICA .

13

The complete list is as follows:

| Person or Entity Name | Username (X/Twitter) |
|---|---|
| Center for Liberal Democracy Development | @CENLDD |
| Orlando Viera-Blanco | @ovierablanco |
| VenAmérica Comunica | @venamericacom |
| Sandra Cordero | @Cordero24Sandra |
| Ricardo Calderon | @gilwell_vzla |
| Jorge José Valera | @jjvaler |
| solo para informarme | @parsasbermas1 |
| Berenide Marvelis Torres | @BerenideTorres |
| ADDONAY DUQUE | @ADONAYDUQUE |
| RJ® | @ReneJSuarez |
| sra.voltaire | @sravoltaire |
| El Bolivarense | @el_bolivarense |
| Carlos Guanipa Garcia | @AgExilon |
| ronnix rangel | @ronnixrangel |
| carolina mora | @ansecar |
| JCCotte | @JCCotte |
| Terabyte | @RICHARDTERABYTE |

| Marisol Jimenez | @marisoljimenezm |
|---|---|
| Yoselynn | @100toVenezuela |

The Twitter Thread reveals information that is sealed by Court Order and Only Known to the Parties.

**EXHIBIT B**

6. **Exhibit B:** Attached hereto as Exhibit B is documentation of meetings and other recent activities showing a close and clear relationship between Orlando Viera-Blanco and Horacio Medina.



June 26th, 2022 Interview of Orlando Viera-Blanco to Horacio Medina in EVTV

16





VENAMERICA

# Webinars

## Webinar: Las verdades de CITGO y el Gobierno Interino

25/01/2024 Webinars

Este viernes 26 de enero VenAmérica VAPA invitan al webinar: Las verdades de CITGO y el Gobierno Interino. El expositor será Orlando Viera-Blanco. Los esperamos a las 11 am ET/Colombia/Miami, 10 am CT/Houston, 12m Venezuela. Se pueden conectar por el...

Ver más

VENAMERICA

INICIO QUIÉNES SOMOS COMUNICACIÓN AGENDA

# Video

## Webinar ¿Qué está pasando en Citgo?

07/07/2023 Video, Webinars

Webinar ¿Qué está pasando en Citgo?
Expositor: Horacio Medina, Presidente de la Junta Administradora AD-HOC de PDVSA.
7 de julio

**Disponible en Kindle y tapa blanda en:**
**http://bit.ly/alexisortiz**

**Prólogo:** Horacio Medina. **Epílogo:**
Orlando Viera Blanco. **Diseño Gráfico:**
Raquel Lobo Montero.

Screenshot from the webpage of Alexis Ortiz where Ortiz promotes his book "Venezuela is tuya" (Venezuela is yours) and highlights the foreword by Horacio Medina and epilogue by Orlando Viera-Blanco



| | |
|---|---|
| monitoreamos.com<br><br>INICIO PRESIDENCIALES VENEZUELA MUNDO NEGOCIOS ENTRETENIMIENTO SALUD<br><br>**Arranca en Miami el comando de campaña de Guaidó para defender el voto de la diáspora**<br><br>por Lisbeth Pineros | Screenshot from the news outlet monitoreamos.com dated April 17th 2023<br><br>https://monitoreamos.com/elecciones/primarias/arranca-en-miami-el-comando-de-campana-de-guaido-para-defender-el-voto-de-la-diaspora<br><br>The note highlights Horacio Medina as special guest and by Orlando Viera-Blanco) as  key speaker. |

0 0

Facebook Twitter Whatsapp

Emotivo y esperanzador se mostró Juan Guaidó durante su participación en la instalación del Comando de Campaña en la ciudad de Miami, Estados Unidos. Durante más de una hora se reencontró en público con familiares, amigos y dirigentes víctimas de la persecución de Nicolás Maduro, a quienes envió sus más sinceros saludos y un claro mensaje: van a volver a construir la Venezuela que tanto anhela.

"Hoy saludo a mi mamá, a mis hermanos, a mis amigos: Gilber Caro, Demóstenes Quijada y tantos en esa sala víctimas de la persecución. De la Emergencia Humanitaria Compleja. Hablo desde la empatía y el dolor de la distancia", dijo.

Ante la nueva amenaza del régimen en su contra, Guaidó pidió una disculpa a su familia y amigos por lo que han tenido que sufrir y aguantar ellos por su lucha contra el régimen. Asimismo, reafirmó que no se rendirá en su lucha por la democracia y la libertad. Recordó que desde sus inicios en el Movimiento Estudiantil no ha cesado su labor y la defensa de los valores con los que fue criado. "Concluimos el Gobierno Encargado como una etapa de resistencia: ustedes saben de mi convicción. No vamos a ceder ni un centímetro en esta lucha", aseguró.

Guaidó hizo un llamado a todos los presentes a comprometerse en la consolidación de los comandos en la Florida y en todas partes del mundo para defender el voto de los venezolanos en el extranjero. "Los venezolanos afuera tienen derechos. Tenemos que trabajar por los derechos de todos los venezolanos. Los 4 millones de venezolanos diáspora que cumplen las condiciones tienen que votar", expresó.

El encuentro contó con la participación de los diputados Gilber Caro y Sonia Medina, los ex representantes de la Asamblea Nacional y del gobierno interino en Estados Unidos, Carlos Vecchio y de Canadá Orlando Viera-Blanco así como su tío Juan Enrique Márquez quienes destacaron la valentía de Guaidó y resaltaron el compromiso que muestra por la democracia del país.

Marco Aurelio Quiñones fue juramentado como el responsable del Comando de Campaña de la Florida, y destacó que trabajarán arduamente por el reencuentro de la familia venezolana. Mientras, Estafania Parra, como Secretaria Internacional de Voluntad Popular enfatizó: "Allá está Juan Guaidó en Venezuela, dando la cara, con el compromiso inquebrantable. Aquí venimos a luchar, a organizarnos para decirle al mundo que la patria existe porque la llevamos en el pecho".

El evento finalizó con un juramento por todos los presentes en continuar sus esfuerzos por un mejor país y la defensa del voto. Al evento asistieron, en calidad de invitados especiales, destacadas como Horacio Medina y Juan David Vélez, entre otros.

Facebook Twitter Whatsapp

**Noticias Relacionadas**



Screenshot from the NGO VENAMERICA presided by Orlando Viera-Blanco

https://venamerica.org/home/category/comunicacion/webinars/

The eight (08) last Webinars, held from Aug 11th, 2022 to this date show Horacio Medinaas only speaker in two of them and Orlando Viera-Blanco as only speaker in another, all related to CITGO issues.



Screenshot from the Facebook page of the Tapas Bar and Restaurant named "El Jaleo de la Ocho" where in the night of July 15th a "live talk show" between Orlando Viera-Blanco and  Horacio Medina  was anounced to take place.

https://www.facebook.com/ElJaleoDeLa8/
Bringing authentic Latin Fusion Cuisine and music live shows to the heart of Little Havana, Miami.



Page · Tapas Bar & Restaurant



1644 SW 8th St, Miami, FL, United States, Florida



cerveceriajaleoocho.com



Screen captures of the official FARA - Foreign Agents Registration Act - where Horacio Medina ( **the PDVSA Defendants Key Person** ) in the mandatory 2023 filing reports that of ten Twits reposted from his account, one of them belongs to Orlando Viera-Blanco on CITGO issues  and the other to Thaelman Urgelles on Venezuelan political issues.

https://efile.fara.gov/docs/7023-Informatio nal-Materials-20231129-6.pdf

Received by NSD/FARA Registration Unit 11/29/2023 2:47:21 PM

Reposteado
**David Morán** @morandavid · 17 oct.
El relato es que alivian las sanciones porque Venezuela aumentará su exportación de crudos. Es un relato fantasioso
- En Sep 2023 Pdvsa por esfuerzo propio produjo 312 kbpd. Lo demás son EEMM. Las refinerías locales tomaron 320 kbpd. La hipoteca con China se lleva unos 280 kbpd.

Reposteaste
**Orlando Viera-Blanco** @ovierablanco · 5 oct.
Invito leer este importante artículo del Dr. Enrique Sánchez Falcón donde desmiente las irresponsables e infames acusaciones que se han formulado contra algunos, aportando con precisión la verdad de los juicios en USA.

¡Citgo no se ha perdido!

lapatilla.com
Enrique J. Sánchez Falcón: ¡Citgo no se ha perdido! Irresponsables declaraciones sobre la estrategia de defensa judicial para el resguardo de los activo...

45 243 322 20 mil

Horacio Medina Presidente de PDVSA Ad Hoc en Actualidad con Alexis Ortiz #82 Juicios a...
27 k vistas • hace 3 años

Bienvenidos Venezolanos TV

En esta edición de "Actualidad con Alexis Ortiz", entrevistamos a: **Horacio Medina**, Presidente de JA Ad Hoc #PDVSA ...



"En PDVSA Ad Hoc no hay corrupción" Horacio
Medina en Actualidad con Alexis Ortiz
414 vistas · hace 2 años

🎙 Bienvenidos Venezolanos TV

"En PDVSA Ad Hoc no hay corrupción" Horacio Medina en Actualidad con Alexis
Ortiz Consultas a Bienvenidos Venezolanos; ...



Entrevista a Orlando Viera-Blanco en
Actualidad con Alexis Ortiz. Todo sobre Citgo...
287 vistas · hace 8 meses

🎙 Bienvenidos Venezolanos TV

Entrevista a Orlando Viera-Blanco en Actualidad con Alexis Ortiz. Todo sobre
Citgo Sep 2023. Consultas a Bienvenidos ...



| | |
|---|---|
| PROGRAMA: Entorno energético con Horacio Medina | Screen captures on two programs that Horacio Medina hosted for several years in EVTV where Orlando Viera-Blanco was also a host.<br><br>Programs were "Entorno Energetico": https://www.youtube.com/watch?v=exEsQ-RZe7c<br><br>and "Economia Familiar": https://www.youtube.com/watch?v=uRTl3EVVXvA |

**EXHIBIT C**

**Exhibit C:** Plaintiffs provide IRS documentation and  press news on the relationship between the **Viera-Blanco** and CITGO

Evidence in this Exhibit C is to show beyond any reasonable doubt that Viera-Blanco and/or its related or controlled NGOs  received financing from the CITGO Defendants through the CITGO wholly controlled Simon Bolivar Foundation.

On information and believe, the funding to the foundation controlled by Viera-Blanco was cancelled due to instructions from the compliance office within CITGO.

C.1: Articles of Incorporation of the American Venezuelan Engagement Foundation, Inc.; founding President Orlando Viera-Blanco currently presided by a family member of Viera-Blanco.

**ARTICLES OF INCORPORATION**
In compliance with Chapter 617, F.S., (Not for Profit)

**ARTICLE I    NAME**
The name of the corporation shall be: ___ AMERICAN VENEZUELAN ENGAGEMENT FOUNDATION, INC

**ARTICLE II    PRINCIPAL OFFICE**

Principal street address:                                    Mailing address, if different is:
5223 NW 94th Doral Place

Doral, FL  33178

**ARTICLE III    PURPOSE**
The purpose for which the corporation is organized is: ___ TO EDUCATE, PROMOTE AND DEFEND INTERNATIONALLY
RECOGNIZED HUMAN RIGHTS AND FUNDAMENTAL FREEDOMS IN VENEZUELA THROUGH ACTIVITIES
THAT ENCOURAGE DEMOCRACY AND DEMOCRATIC VALUES, ENSURE FREE, SEPARATE AND
INDEPENDENT BRANCHES OF GOVERNMENT AND INSTITUTIONS IN VENEZUELA TO BETTER SERVE ITS
PEOPLE, AND PROVIDE HUMANITARIAN ASSISTANCE AND AID TO THE VENEZUELAN PEOPLE, INCLUDING,
THE SHIPPING OF MEDICINES, MEDICAL EQUIPMENT AND SUPPLIES, SCHOOL BOOKS, SUPPLIES AND MATERIALS
FOOD, AND ANY OTHER BASIC NEED PRODUCTS.

**ARTICLE IV    MANNER OF ELECTION**   The manner in which the directors are elected and appointed: _____
AS PROVIDED IN THE BY LAWS.

**ARTICLE V    INITIAL OFFICERS AND/OR DIRECTORS**

Name and Title: Orlando J. Viera Blanco, President        Name and Title: Valeria Viera Garcia, Director

Address    5223 NW 94th Doral Place               Address    5223 NW 94th Doral Place

Doral, FL  33178                                          Doral, FL  33178


Name and Title: Gabriela Garcia Garcia, Director        Name and Title: _____

Address    5223 NW 94th Doral Place               Address: _____

Doral, FL. 33178


Name and Title: Carlos B. Sardi, Director            Name and Title: _____

Address    225 Alcazar Avenue                  Address: _____

Coral Gables, FL 33134

C.2: IRS Form 990-PF on Return of Private Foundation for 2020 corresponding to the 100% CITGO financed Simon Bolivar Foundation showing a disbursement of at least 22,288.oo USD in 2020 in favor of the American Venezuelan Engagement Foundation, Inc.; controlled by Mr. Orlando Viera-Blanco

| Form **990-PF** | **Return of Private Foundation** | OMB No. 1545-0052 |
|---|---|---|
| Department of the Treasury<br>Internal Revenue Service | **or Section 4947(a)(1) Trust Treated as Private Foundation**<br>▶ Do not enter social security numbers on this form as it may be made public.<br>▶ Go to *www.irs.gov/Form990PF* for instructions and the latest information. | **2020**<br>Open to Public Inspection |

**For calendar year 2020, or tax year beginning 01-01-2020 , and ending 12-31-2020**

| Name of foundation<br>Simon Bolivar Foundation Inc | A Employer identification number<br>20-5797382 |
|---|---|
| Number and street (or P.O. box number if mail is not delivered to street address)   Room/suite<br>1293 Eldridge Parkway | B Telephone number (see instructions)<br>(832) 486-5562 |
| City or town, state or province, country, and ZIP or foreign postal code<br>Houston, TX  77077 | C If exemption application is pending, check here ▶ ☐ |

G Check all that apply: ☐ Initial return  ☐ Initial return of a former public charity
☐ Final return  ☐ Amended return
☐ Address change  ☐ Name change

D 1. Foreign organizations, check here . . ▶ ☐
2. Foreign organizations meeting the 85% test, check here and attach computation . . ▶ ☐

H Check type of organization: ☑ Section 501(c)(3) exempt private foundation
☐ Section 4947(a)(1) nonexempt charitable trust  ☐ Other taxable private foundation

E If private foundation status was terminated under section 507(b)(1)(A), check here . . ▶ ☐

I Fair market value of all assets at end of year (from Part II, col. (c),
line 16) ▶$ 4,220,309

J Accounting method: ☐ Cash  ☑ Accrual
☐ Other (specify) _____
(Part I, column (d) must be on cash basis.)

F If the foundation is in a 60-month termination under section 507(b)(1)(B), check here . . ▶ ☐

**Part I** Analysis of Revenue and Expenses (The total of amounts in columns (b), (c), and (d) may not necessarily equal the amounts in column (a) (see instructions).)

| | | (a) Revenue and expenses per books | (b) Net investment income | (c) Adjusted net income | (d) Disbursements for charitable purposes (cash basis only) |
|---|---|---|---|---|---|
| **Revenue** | 1 Contributions, gifts, grants, etc., received (attach schedule) | 4,500,000 | | | |
| | 2 Check ▶☐ if the foundation is **not** required to attach Sch. B . . . . . . . . . . | | | | |
| | 3 Interest on savings and temporary cash investments | 914 | 914 | | |
| | 4 Dividends and interest from securities . . . | | | | |
| | 5a Gross rents . . . . . . . . . . . . | | | | |
| | b Net rental income or (loss) | | | | |
| | 6a Net gain or (loss) from sale of assets not on line 10 | | | | |
| | b Gross sales price for all assets on line 6a | | | | |
| | 7 Capital gain net income (from Part IV, line 2) . . . | | | | |
| | 8 Net short-term capital gain . . . . . . | | | | |
| | 9 Income modifications . . . . . . . . | | | | |
| | 10a Gross sales less returns and allowances | | | | |
| | b Less: Cost of goods sold . . . . | | | | |
| | c Gross profit or (loss) (attach schedule) . . . . . | | | | |
| | 11 Other income (attach schedule) . . . . . | -22 | -22 | | |
| | 12 **Total.** Add lines 1 through 11 . . . . . . | 4,500,892 | 892 | | |
| **Administrative Expenses** | 13 Compensation of officers, directors, trustees, etc. . | | | | |
| | 14 Other employee salaries and wages . . . . . | | | | |
| | 15 Pension plans, employee benefits . . . . . | | | | |
| | 16a Legal fees (attach schedule) . . . . . . . | 142,938 | | | 151,473 |
| | b Accounting fees (attach schedule) . . . . . | 31,206 | | | 31,206 |
| | c Other professional fees (attach schedule) . . . . | 33,927 | | | 4,423 |
| | 17 Interest . . . . . . . . . . . . . | | | | |
| | 18 Taxes (attach schedule) (see instructions) . . . | | | | |
| | 19 Depreciation (attach schedule) and depletion . . . | | | | |
| | 20 Occupancy . . . . . . . . . . . . | | | | |
| | 21 Travel, conferences, and meetings . . . . . . | 614 | | | 614 |

28

| Form 990-PF (2020) | | | | Page **11** |
|---|---|---|---|---|

**Part XV  Supplementary Information** (continued)

**3    Grants and Contributions Paid During the Year or Approved for Future Payment**

| Recipient<br><br>Name and address (home or business) | If recipient is an individual, show any relationship to any foundation manager or substantial contributor | Foundation status of recipient | Purpose of grant or contribution | Amount |
|---|---|---|---|---|
| **a   Paid during the year**<br>American Initiatives for Social Dev<br>117 E 70th Street<br>New York, N Y 10021 | N/A | P C | COVID 19 mitigation activities in Venezuela | 50,000 |
| A Better America Foundation<br>2138 N State Hwy 19<br>Emory, TX 75440 | N/A | P C | COVID 19 mitigation activities in Venezuela | 18,300 |
| Action of Solidarity Inc<br>7455 Collins Avenue Suite 209<br>Miami Beach, FL 33141 | N/A | P C | COVID 19 mitigation activities in Venezuela | 100,000 |
| Aid for Aids International<br>151 Varick Street Suite 1006<br>New York, N Y 10013 | N/A | P C | Humanitarian Health Programs in Venezuela and the region, and food assistance in USA | 550,000 |
| American Venezuelan Engagmnt Fdn<br>5221 NW 96th Doral Pl<br>Doral, FL 331782018 | N/A | P C | COVID 19 mitigation activities in Venezuela | 22,388 |
| Big Little JC Association<br>19235 Westridge Bend Lane<br>Cypress, TX 77433 | N/A | P C | COVID 19 mitigation activities in Venezuela / Donation for food assistance in USA / event sponsorship | 57,500 |
| Cuatro por Venezuela<br>2919 Quenby Avenue<br>Houston, TX 77005 | N/A | P C | Emergency Relief Funds for COVID-19 / Donation to local NGOs to mitigate effects of humanitarian crisis in Venezuela and the region | 120,451 |
| Driscoll Children's Hospital<br>3533 S Almeda<br>Corpus Christi, TX 78411 | N/A | P C | Donation to local NGOs to mitigate effects of humanitarian crisis in Venezuela and the region | 20,000 |
| Entre Todos<br>10704 Creven St<br>McKinney, TX 750700239 | N/A | P C | PPE for health care professionals in Venezuela to prevent COVID-19 / COVID 19 mitigation activities in Venezuela | 75,930 |
| Food for the Poor<br>6401 Lyons Road<br>Coconut Creek, FL 33073 | N/A | P C | Humanitarian Health Programs in Venezuela and the region | 250,000 |
| Food Rescue US<br>27 Ann Street<br>Norwalk, C T 06854 | N/A | P C | Food assistance in USA | 50,000 |
| Friends of the Children of Venezuel<br>1333 S Miami Avenue Suite 100<br>Miami, FL 331304325 | N/A | P C | COVID 19 mitigation activities in Venezuela | 75,113 |
| Fulshear Outreach Dev Corp<br>5757 Flewellen Oaks Lane 303<br>Fulshear, TX 77441 | N/A | P C | Food assistance in USA | 35,000 |
| Hospital Materno Infantil<br>La Playa Calle San Bartolome Sector<br>Macuto, Estado Vargas<br>V E | N/A | P C | Med. Equip., Supplies and Services to Hospitals for Provision of Healthcare | 1,110 |
| I love Venezuela Foundation<br>2825 South Miami Avenue<br>Miami, FL 33129 | N/A | P F | PPE for health care professionals in Venezuela to prevent COVID-19 / COVID 19 mitigation activities in Venezuela / Donation for food assistance in USA | 200,000 |
| Inst Anzoatiguense Salud - SALUDANZ<br>Avenida Arginio Gabaldon Sector<br>Las Colinas, Barcelona Estado<br>V E | N/A | P C | Med. Equip., Supplies and Services to Hospitals for Provision of Healthcare | 83,450 |

29

**EXHIBIT D**

**Exhibit D:** Documentation and explanation of coordination of Orlando Viera-Blanco with individuals closely linked to Horacio Medina, in order to violate the court order.

1. The coordinated violation of court order in the case of the Tweets originated from the account is hereby detailed in this Exhibit D.

2. **The Court Order was specifically and blatantly violated through the Tweets in Exhibit D by the disclosure of the identity of Lead Plaintiff and by revealing details of the lawsuit unknown to the public and sealed.**

3. The coordinated violation occurred not only as observed in Exhibit A by Tweets originating from the account of Orlando Viera-Blanco but also by originating Tweets from an anonymous account and reposting such content.

4. One of the accounts used for such violation of Court Order is the account under username @douglasarrecho , under control of Thaelman Urgelles and Alexis Ortiz. This account was used as well to amplify the Court Order breaching actions of Orlando Viera-Blanco as referred to in Exhibit A.

1. The damaging Twits from the anonymous  @douglasarrecho correspond to the following Twits:

   On May 16th the following Tweet (Marked as Tweet 2.1), with defamatory content against Lead Plaintiff was originated from the @douglasarrecho account:

Posts from the account of @douglasarrecho with defamatory content against Plaintiffs:

1- Foto and comments against Plaintiff Ivan Freites:

30



2- Foto depicting the lifestyle of Ivan Freites (Freites lives an extremely frugal life and is depicted as a greedy and wealthy corrupt person living from extracting money from fellow workers):



3- Foto and comments against Plaintiff Miguel Enrique Otero:



4- Foto and comments against Plaintiff Jorge Alejandro Rodriguez:





| Text of the Twit in Spanish | Automatic English Translation |
|---|---|
| 1/ En una vuelta de tuerca irónica, Iván Freites, ex miembro del Polo Patriótico y perseguidor de despedidos de PDVSA 2002-2003, ahora se presenta como "defensor" de aquellos a quienes antes atacó. Demandó a CITGO para que asuma compromisos laborales no exigidos por PDVSA roja.<br><br>2/ Freites, actualmente en el Doral, Miami, tramita su asilo político desde allí. Con esta demanda, busca financiar su sueño americano, | 1/ In an ironic twist, Iván Freites, former member of the Patriotic Pole and persecutor of those fired from PDVSA 2002-2003, now presents himself as a "defender" of those whom he previously attacked. He sued CITGO to assume labor commitments not required by red PDVSA.<br><br>2/ Freites, currently in Doral, Miami, processes his political asylum from there. With this lawsuit, he seeks to finance his American dream, taking advantage of the hopes of former |

| | |
|---|---|
| aprovechando las esperanzas de ex trabajadores de PDVSA perjudicados por Chávez en 2002, a quienes obtiene recursos para vivir. | PDVSA workers harmed by Chávez in 2002, from whom he obtains resources to live. |
| | 3/ But the story doesn't end there. According to sources, the editor of El Nacional, @miguelhotero, is also suing CITGO on behalf of the newspaper's employees. Otero was sentenced to pay $13 million after losing a civil lawsuit brought by @dcabellor. |
| 3/ Pero la historia no termina ahí. Según fuentes, el editor de El Nacional, @miguelhotero, también demanda a CITGO en nombre de los empleados del periódico. Otero fue condenado a pagar 13 millones de dólares tras perder una demanda civil iniciada por @dcabellor. | |
| | 4/ Another of the plaintiffs is the businessman Jorge Rodríguez Moreno @madrugonazo close to the Henry Falcón group who lives in Switzerland and claims rights as a PDVSA contractor. |
| 4/ Otro de los demandantes es el empresario Jorge Rodríguez Moreno @madrugonazo cercano al grupo de Henry Falcón quien vive en Suiza y reclama derechos como contratista de PDVSA. | |
| | 5/ It is worth asking, why should CITGO pay money to Otero? The latter also claims a millionaire figure for himself. The connection between Freites and Otero in this judicial adventure against the American oil company raises more questions than answers |
| 5/ Cabe preguntarse, ¿por qué CITGO debería pagar dinero a Otero? Este último, además, reclama una cifra millonaria para sí mismo. La conexión entre Freites y Otero en esta aventura judicial contra la empresa petrolera estadounidense plantea más | |

| interrogantes que respuestas | |
|---|---|
| | |

**This Thread above is clearly in breach of Court Order as it reveals the identity of Jorge Alejandro Rodriguez and details on the lawsuit only known to the parties and the Court. Additional to the breach of Court Order, the Thread is defamatory per se against Jorge Alejandro Rodriguez and Otero and Freites, and invades the privacy of Plaintiffs.**

The Tweet was originated by the account of @douglasarrecho , under control of Thaelman Urgelles and Alexis Ortiz. The Tweet was reposted by the following seventeen (17) accounts which clearly relate to each other and clearly relate to the Damaging Offender (Orlando Viera-Blanco) as well as to several of the damaging individuals or Twitter/X accounts.  Some of the Defendants that broadcasted the twit were Lino Carrillo, Thaelman Urgelles, Jose V Carrasquero A The amplifying accounts are as follows:



| Name (Real or Fictitious) | Username | Known relation to Damaging Individuals |
|---|---|---|
| Luis Valderrama V | @LuisVal37679677 | |
| Mujerhabitad | @mujerhabitad | |

| | | |
|---|---|---|
| Thaelman Urgelles | @TUrgelles | Co workers as hosts, anchors, etc. in EVTV. Close friends. |
| Orlando Araujo | @OrlandoAraujo | |
| Jose V Carrasquero A | @botellazo | Self proclaimed expert in Digital and Political Campaigns. Close friend to Horacio Medina and Orlando Viera-Blanco. Jose Vicente Carrasquero and Thaelman Urgelles, both act as hosts or producers of programs/ podcasts/ documentaries interviewing and favoring the legal representative the PDVSA Defendants, Mr. Horacio Medina  in the same TV station where the Damaging Offender, Orlando Viera-Blanco, holds a regular show and doubles as a permanent guest.Mr. Carrasquero recently produced a friendly and flattering interview to the legal |

| | | representative of the PDVSA Defendants, Mr. Horacio Medina , transmitted and amplified by the same group of individuals. |
|---|---|---|
| PlaDeJesus | @panpuro | |
| Ramon A Aguilar | @aguilarucv | |
| Beatriz Garcia | @bea_libertad | Beatriz García, additional to the amplification of the damaging Twits from the anonymous @douglasarrecho account in a concerted way,  it is also to be noted as evidence of the close relationship and long lasting damaging actions against Plaintiffs the existence of an audio file from (or about October) where the legal representative the PDVSA Defendants, Mr. Horacio Medina instructed the |

| | | aforementioned Mrs. Beatriz García to disseminate defamatory and damaging comments against Lead Plaintiff and Plaintiff FREITES. A transcript and translation of such audio is provided. The defamatory audio has been spread through the E-Mail lists and social media groups of "Gente del Petroleo" and "UNAPETROL". Mrs. Beatriz Garcia controls the mailing list of Gente del Petroleo and is the current President of such NGO.  UNAPETROL is an NGO presided until now by the key person of the PDVSA Defendants, Mr. Horacio Medina , currently under "temporary leave" as President of UNAPETROL but de facto controlling it. The defamatory  audio has |

| | | |
|---|---|---|
| | | been distributed to thousands of potential Plaintiffs in a similar situation to current Plaintiffs through E-Mails in the NGO Gente del Petroleo mailing lists. Mr. Horacio Medina is a founding member of Gente del Petroleo. |
| Lino Carrillo | @canadiensedeVz1 | Member and Director of Gente del Petroleo NGO. Close personal friend of Horacio Medina and Beatriz Garcia. |
| Ghalgneron | @ghalgneron | |
| Douglas Arrecho NOTE: Presumably owned jointly by Alexis Ortiz and Thaelman Urgelles | @DouglasArrecho | Tweet Originator. One of the presumed controllers of the account, Mr. Alexis Ortiz as shown in Exhibit C , recently published a book with Foreword by Horacio Medina and Epilogue by Orlando Viera-Blanco. Close friend to Orlando |

|  |  | Viera-Blanco, Thaelman Urgelles, Alexis Ortiz, Enrique Alvarado. |
|---|---|---|
| Greilys Cañizalez | @grieca | |
| Cesar Cayo Augusto Caligula | @Cesar_Caligula | Bot account presumably under control of Jose Vicente Carrasquero. |
| tomas millan | @tomas_millan | |
| eemm | @lizmart12 | |
| Turopademarcas | @turopademarcas | |
| Noticiero de Verdad<br><br>NOTE: While this intended for a time to be an anonymous account, it has been involved in a number of public grievances in Venezuela and in Florida since 2013,  where the name of the person controlling the account has been identified as "Federico Guillermo MEDINA-RAVELL" born in Caracas Jan 7th, 1954 currently a resident of | @LucioQuincioC | Fictitious anonymous account linked in operational way to individuals Orlando Viera-Blanco and Jose Vicente Carrasquero. Has been involved in inflamatory campaigns against individuals jointly with the account of @douglasarrecho before. |

| | | |
|---|---|---|
| Orlando, FL. | |  |

Top
Latest
People
Media
Lists
Noticiero de Verdad · Oct 22, 2015
La historia de Dieguito y Rafaelito Ramírez, mis ahijados (cont)
por @DouglasArrecha
Noticiero de Verdad · Oct 22, 2015
La historia de Dieguito y Rafaelito Ramírez, mis ahijados (cont)
por @DouglasArrecha
Noticiero de Verdad · Oct 22, 2015
La historia de Dieguito y Rafaelito Ramírez, mis ahijados (cont)
por @DouglasArrecha @Mundo24_ve
Noticiero de Verdad · May 2, 2015
@DouglasArrecho tome la molestia y busque el expediente en el es publico ahi esta el #
Noticiero de Verdad · May 3, 2015
@DouglasArrecho Mingo tiene buen olfato periodistico y sabe que aqui hay un noticion a punto de romper el celofa
Noticiero de Verdad · May 3, 2015
@DouglasArrecho lo mas seguro que durmiendo 83 años no es facil
Noticiero de Verdad · May 6, 2015
@DouglasArrecho les amiba
SOLICITADO
Noticiero de Verdad
Acompáñanos en una velada informativa
y de discusión sobre la realidad de nuestro país
Jueves, 9 de Marzo 2017
6:30 pm to 9:00 pm
el Jaleo
Orlando Viera-Blanco · Feb 6, 2020
Otros la celebraban anticipadamente. Profetas que dicen llamarse
Noticiero de Verdad
que se joden
Noticiero de Verdad · Apr 1
De 32 embajadores de Argentina,
Canadá Chile Hungría y Costa
Rica, están activos por las elecciones 24. Los demás se escondieron,
siguiendo el ejemplo quien era el Canciller



Tweet 2.1 (In Breach of Court Order and Defamatory against Lead Plaintiff and Plaintiff 2):

On May 16th the following Tweet (Marked as Tweet 2.2), with defamatory content against Lead Plaintiff and Plaintiff 1. Additional to the defamatory content against Plaintiffs, the Tweet identified the participation of both Plantiffs in the Lawsuit.

Tweet 2.2 (In Breach of Court Order and Defamatory against Lead Plaintiff and Plaintiff 2):

 Douglas Arrecho reposted

**Douglas Arrecho** @DouglasArrecho · May 16

Jorge A. Rodriguez @madrugonazo para diferenciarce de @jorgerpsuv se hace llamar Jorge El Bueno. Ing Eléctrico fue VICE presidente de Cadafe con @chavezcandanga destituido por corrupción. Vive refugiado en Suiza esperando regresar a CCS luego del 28J cual AVE Fenix como opositor



Señalan a los dirigentes opositores Jorge Alejandro Rodríguez e Iván Freites de intentar cobrar honorarios por reclamar las prestaciones de miles de trabajadores despedidos de PDVSA

⏴ habla se · ⏱ Domingo, Septiembre 17, 2023

◯          ⇄ 14          ♡ 3          ᵬ 1.2K          🔖  ⬆

| Text of the Tweet in Spanish | Automatic English Translation |
|---|---|
| Jorge A. Rodriguez @madrugonazo para diferenciarce de @jorgerpsuv se hace llamar Jorge El Bueno. Ing Eléctrico fue VICE presidente de | Jorge A. Rodriguez @madrugonazo to differentiate himself from @jorgerpsuv calls himself Jorge El Bueno (The good one). As Electrical Engineer he |

44

| | |
|---|---|
| Cadafe con @chavezcandanga destituido por corrupción. Vive refugiado en Suiza esperando regresar a CCS luego del 28J cual AVE Fenix como opositor | was VICE president of Cadafe with @chavezcandanga /PRESIDENT HUGO CHAVEZ/ and dismissed for corruption. He is refugeed in Switzerland waiting to return to Caracas after 28th of July elections like the Fenix Bird as an oppositor to the government. |
| TEXTO DE LA IMAGEN MOSTRANDO A JORGE ALEJANDRO RODRIGUEZ E IVAN FREITES<br><br>Señalan a los dirigentes opositores Jorge Alejandro Rodríguez e Iván Freites de intentar cobrar honorarios por reclamar las prestaciones de miles de trabajadores despedidos de PDVSA | TEXT OF THE IMAGE SHOWING JORGE ALEJANDRO RODRIGUEZ AND IVAN FREITES<br><br>Opposition leaders Jorge Alejandro Rodríguez and Iván Freites are being signaled of trying to collect fees for claiming the benefits of thousands of workers fired from PDVSA |

The Tweet was originated by the account of @douglasarrecho , presumably under control of Thaelman Urgelles and Alexis Ortiz. The Tweet was reposted by the following accounts which relate to each other or to several of the damaging individuals or Twitter/X accounts (Orlando Viera-Blanco and others) as follows:

| Name (Real or Fictitious) | Username | Known relation to Damaging Individuals |
|---|---|---|

| | | |
|---|---|---|
| Libertad! | @tzcastillo | |
| Myriam Bolívar | @AURORABOREALVE | |
| Frederick | @BVENE | |
| NELSON CABRERA GOMEZ | @elcharero | |
| Enma Perozo | @emma_perozo | |
| SANDRITA | @SANDRAVELASQ | |
| Cacharrito1946 | @cacharrito1946 | |
| Noticiero de Verdad ® 🏴🏴🇻🇪 NOTE: While this intended for a time to be an anonymous account, it has been involved in a number of public grievances in Venezuela and in Florida since 2013, where the name of the person controlling the account has been credibly identified as "Federico Guillermo MEDINA-RAVELL" born in Caracas Jan 7th, 1954 currently a resident of Orlando, FL. | @LucioQuincioC | Fictitious anonymous account linked in operational way to individuals Orlando Viera-Blanco and Jose Vicente Carrasquero. Has been involved in inflamatory campaigns against individuals jointly with the account of @douglasarrecho before. |



| No al comunismo!! | @altodesgraciado | Anonymous account |

| Lino Carrillo | @canadiensedeVzl | Member of Gente del Petroleo NGO. Close personal friend of Horacio Medina. |
|---|---|---|
| Douglas Arrecho NOTE: Presumably owned jointly by Alexis Ortiz and Thaelman Urgelles | @DouglasArrecho | Tweet Originator. Alexis Ortiz as shown in Exhibit C published a book with Foreword by Horacio Medina and Epilogue by Orlando Viera-Blanco. |
| EnriqueAlvarado | @ERAlvarado | Close friend to Alexis Ortiz and Orlando Viera-Blanco, several times interviewed by Alexis Ortiz in the TV Program hosted by Ortiz, as well as by Orlando Viera-Blanco.  |
| Cesar Cayo Augusto Caligula | @Cesar_Caligula | Anonymous account linked operationally |

| | | extremely close to Jose Vicente Carrasquero (@botellazo) |
|---|---|---|
| jose zambrano | @rafaelzamrod | |

2.  As it is seen several of such accounts belong toDefendants Key Person, Mr. Horacio Medina,  Orlando Viera-Blanco; Jose Vicente Carrasquero, Lino Carrillo, Thaelman Urgelles, Alexis Ortiz and their corporate entities.

3.  In the case of Jose Vicente Carrasquero and Thaelman Urgelles, both act as hosts or producers of programs/ podcasts/ documentaries interviewing and favoring the legal representative the PDVSA Defendants, Mr. Horacio Medina  in the same TV station where Orlando Viera-Blanco, holds a regular show and doubles as a permanent guest.

4.  Specifically in the case of  Jose Vicente Carrasquero, Carrasquero replicated the damaging Twits from the anonymous account of @douglasarrecho . Mr. Carrasquero recently produced a friendly and flattering interview to the legal representative of the PDVSA Defendants, Mr. Horacio Medina , transmitted and amplified by the same group of individuals.

49

5. Specifically in the case of Beatriz García, additional to the amplification of the damaging Twits from the anonymous @douglasarrecho account in a concerted way,  it is also to be noted as evidence of the close relationship and long lasting damaging actions against Plaintiffs the existence of an audio file broadcasted by Beatriz Garcia by clear instructions from Defendant Medina from (or about August/September 2023) where Defendant Horacio Medina  instructed the aforementioned Mrs. Beatriz García to disseminate defamatory and damaging comments against Rodriguez and Plaintiff FREITES. A transcript and translation of such audio is provided. The defamatory audio has been spread through the E-Mail lists and social media groups of "Gente del Petroleo" and "UNAPETROL". UNAPETROL is an NGO presided until now by the key person of the PDVSA Defendants, Mr. Horacio Medina. The defamatory  audio has been distributed to thousands of potential Plaintiffs  in a similar situation to current Plaintiffs through E-Mails in the NGO  Gente del Petroleo mailing lists.  Mr. Horacio Medina is a founding member of Gente del Petroleo.

6. In the case of Thaelman Urgelles, Mr. Urgelles recently produced a documentary about the situation in the Venezuelan Amazonian, in such documentary  Horacio Medina, is one of the leading and advertised main characters. On information and believe, Urgelles has been financed by entities controlled by Defendant Medina in order to assist in the design and execution of orchestrated campaign.

Here an screenshot from the IMDb ( IMDb is the world's most popular and authoritative source for movie, TV and celebrity content ) link to the Oro de Sangre documentary and the screenshot of today featuring Defendant Horacio Medina as "Star" and Mr. Thaelman Urgelles as Director.



Link:  https://www.imdb.com/title/tt21072510/

Additionally, Orlando Viera-Blanco recently congratulated Thaelman Urgelles on the above documentary "Oro de Sangre" where Horacio Medina, is one of the leading and advertised main characters and interviewed persons.



7.

| Text of the Tweet in Spanish | Automatic English Translation |
|---|---|
| Orlando Viera-Blanco<br>@ovierablanco<br><br>Felicitaciones a @TUrgelles [Thaelma Urgelles] por sus merecidos galardones al documental @OroDeSangre. Una denuncia bien documentada que gracias a sus impactantes imágenes, cobra el nivel de interés y condena que merece tamaña devastación. ¡Bravo querido Thaelma! | Orlando Viera-Blanco<br>@ovierablanco<br><br>Congratulations to @TUrgelles [Thaelman Urgelles] for his well-deserved awards for the documentary @OroDeSangre. A well-documented complaint that, thanks to its shocking images, gains the level of interest and condemnation that such devastation deserves. Bravo dear Thaelma! |

| 5:48 PM - May 13, 2024 | 5:48 PM - May 13, 2024 |
|---|---|

**EXHIBIT E**

**Exhibit E.** Evidence on the participation of Defendant Gustavo Lainette in the orchestrated campaign.

 **Activities of Gustavo Lainette:**

   Offender Gustavo Lainette has produced and broadcasted a series of at least four professionally edited videos of threatening, menacing, and defamatory character against Plaintiffs. The content and dissemination of these videos constitute severe cyberstalking, defamation, and a violation of a Sealing Order issued by this Court.

**ABSTRACT OF THE SEMIOTIC ANALYSIS OF DEFAMATORY VIDEOS**

**Video 1: Against Plaintiffs in case 1:23-CV-00989**

**- Title: "Falsos opositores conspiran contra CITGO" (False oppositors conspire against CITGO)**

- Content Analysis: The video uses emotionally charged language, derogatory metaphors, and terms to delegitimize, criminalize, and demonize the Plaintiffs. The analysis reveals a strategy to present the Plaintiffs as false oppositors (refering to the Venezuelan dictatorship) and opportunists, posing them as threats to national interests of Venezuelans.

**Video 2: Against Plaintiff Miguel Henrique Otero and Family**

**- Title:"Falsos opositores conspiran contra Citgo" (False oppositors conspire against Citgo) - Part Two**

- Content Analysis:Similar derogatory language and metaphors are used to depict Otero as an opportunist and traitor, aiming to influence public perception and justify violent actions against him.

**Video 3: Against Plaintiff Jorge Alejandro Rodríguez**

**- Title: "Falsos opositores conspiran contra Citgo" (False opposors conspire against Citgo) - Part Three**

- Content Analysis: The video delegitimizes and discredits Rodríguez through derogatory metaphors, rumors, and associations with controversial figures. This narrative portrays Rodríguez as a corrupt and opportunistic false oppositionist.

**Video 4: Against Plaintiff Iván Freites**

**- Title: "Falsos opositores conspiran contra Citgo" (False opposors conspire against Citgo) - Part Four**

- Content Analysis: The video employs similar strategies to present Freites as a disgruntled and opportunistic individual, seeking personal gain at the expense of national interests.

**CONNECTION TO FEDERAL PROCESS 1:23-CV-00989**

Lainette's activities are intricately linked to a conspiracy against the Federal Process, Case No. 1:23-CV-00989. This case involves highly sensitive matters under a Sealing Order to protect the identities and safety of the Plaintiffs. Lainette's violation of this Sealing Order through the unauthorized dissemination of sealed information directly attacks the integrity of this judicial process. **Lainette maliciously defames and threatens Plaintiffs, specifically on the actions taken by Plaintiffs in the case.** Plaintiffs have credible evidence detailing the instructions and amounts paid by Goicoechea to Lainette in order to harm the Delaware case and Plaintiffs.

**On the Detailed Forensic Semiotic Analysis of Video Content**

A Detailed Forensic Semiotic Analysis of Video Content was performed. An automated English translation of the findings of such analysis (original in Spanish) is provided.

| Original Forensic Analysis | Google Automatic Translation |
|---|---|
| Anexo A, análisis semioticos forenses del discurso contenido en dichos videos amenazantes y difamatorios. | Annex A, forensic semiotic analysis of the speech contained in said threatening and defamatory videos. |
| **VIDEO 1 (CONTRA MIGUEL HENRIQUE OTERO Y OTROS)** | VIDEO 1 (AGAINST MIGUEL HENRIQUE OTERO AND OTHERS) |
| **Reporte Semiótico Forense** | Forensic Semiotic Report |
| **Objetivo:** | Aim: |
| Este reporte tiene como objetivo realizar un análisis semiótico forense detallado del contenido de un video titulado "Falsos opositores conspiran contra CITGO". El análisis se enfocará en el uso del lenguaje, los símbolos y los significados implícitos en el texto transcrito, considerando el contexto cultural y político de Venezuela. | This report aims to carry out a detailed forensic semiotic analysis of the content of a video titled "False opponents conspire against CITGO". The analysis will focus on the use of language, symbols and implicit meanings in the transcribed text, considering the cultural and political context of Venezuela. |
| **1. Título y Subtítulo** | |
| **Título del video: "Falsos opositores conspiran contra CITGO"** | 1. Title and Subtitle |
| **Subtítulo del video: "Primera parte"** | Video title: "False opponents conspire against CITGO" |

56

| | |
|---|---|
| **Análisis:** | Video subtitle: "Part One" |
| • **Título:** | Analysis: |
| ○ La palabra "falsos" deslegitima a las personas mencionadas, sugiriendo que no son verdaderos opositores sino impostores con intenciones ocultas. | Qualification: |
| | The word "fakes" delegitimizes the people mentioned, suggesting that they are not true opponents but impostors with hidden intentions. |
| ○ El verbo "conspiran" implica actividades secretas y negativas, asociadas con ilegalidad y malicia. | The verb "conspire" implies secret and negative activities, associated with illegality and malice. |
| • **Subtítulo:** | |
| ○ "Primera parte" indica que este contenido es parte de una serie, sugiriendo una narrativa continua que busca mantener el interés del espectador y proporcionar una sensación de revelación gradual. | |
| | Caption: |
| **2. Desarrollo del Contenido** | "Part One" indicates that this content is part of a series, suggesting a continuous narrative that seeks to maintain the viewer's interest and provide a sense of gradual revelation. |
| **Primer párrafo:** | |
| "Hay una campaña criminal contra PDVSA Holden y contra Citgo Petroleum Corporation. La campaña la llevan a cabo | |

57

funcionarios del régimen de Nicolás Maduro, que desean la quiebra de Citgo para que esa empresa se quede en manos de los rusos, y aunque parezca increíble, un pequeño grupo de supuestos opositores venezolanos, que desean que Citgo sea rematada por un tribunal en Estados Unidos para ganarse unos reales y hacer millonarios."

**Análisis:**

- **"Campaña criminal":**
  - El término "criminal" implica ilegalidad y maldad, estableciendo una narrativa negativa desde el inicio.
- **"Funcionarios del régimen de Nicolás Maduro":**
  - La palabra "régimen" sugiere una connotación autoritaria y negativa, posicionando al gobierno de Maduro como un actor maligno.
  -
- **"Supuestos opositores venezolanos":**
  - El adjetivo "supuestos" deslegitima a estos

2. Content Development

First paragraph:

"There is a criminal campaign against PDVSA Holden and against Citgo Petroleum Corporation. The campaign is carried out by officials of the Nicolás Maduro regime, who want the bankruptcy of Citgo so that that company remains in the hands of the Russians, and although it may seem incredible, "a small group of supposed Venezuelan opponents, who want Citgo to be auctioned off by a court in the United States to earn some reais and become millionaires."

Analysis:

"Criminal campaign":

The term "criminal" implies illegality and evil, establishing a negative narrative from the beginning.

58

opositores, insinuando que
su oposición no es genuina.

- **"Ganarse unos reales y hacerse millonarios":**
  - Sugiere que las motivaciones de los opositores son puramente económicas y egoístas, no ideológicas.

---

**Segundo párrafo:**

"Los supuestos opositores, que andan como zamuros buscando la quiebra y el remate de Citgo son Miguel Enrique Otero Castillo, exeditor del Diario Nacional de Venezuela, quien pretende ganarse unos millones de dólares para salir del estado de quiebra, en que se encuentra después que Diosdado Cabello le quitó el periódico."

**Análisis:**

- **"Andan como zamuros":**
  - Metáfora despectiva que compara a los opositores con aves carroñeras, sugiriendo que se

"Officials of the Nicolás Maduro regime": The word "regime" suggests an authoritarian and negative connotation, positioning the Maduro government as an evil actor.

"Alleged Venezuelan opponents":

The adjective "supposed" delegitimizes these opponents, insinuating that their opposition is not genuine.

"Earn some reals and become millionaires":

It suggests that the motivations of opponents are purely economic and selfish, not ideological.

Second paragraph:

59

aprovechan de las
desgracias ajenas.
- **"Pretende ganarse unos
  millones de dólares":**
  - Reitera la idea de
    motivaciones económicas
    deshonestas.

---

**Tercer párrafo:**

"Iván Freytes, un sindicalista que huyó de
Venezuela y que nunca enfrentó a las
mafias de Rafael Ramírez y de Tareke
Laisami en la industria petrolera. Y Jorge
Alejandro Rodríguez Moreno, un falso
diputado de la Asamblea Nacional de
2020, que nunca se juramentó como
diputado y quien tiene estrechos vínculos
con el expresidente de PDVSA, Rafael
Ramírez."

**Análisis:**

- **"Nunca enfrentó a las mafias":**
  - Acusación de cobardía o
    complicidad con elementos
    corruptos.
- **"Falso diputado":**
  - Reitera la idea de impostura
    y deslegitimación.

"The supposed opponents, who are going
around like fools looking for the
bankruptcy and the auction of Citgo, are
Miguel Enrique Otero Castillo, former
editor of the Diario Nacional de
Venezuela, who intends to earn a few
million dollars to get out of the state of
bankruptcy, in which he finds himself after
Diosdado Cabello took the newspaper
from him."

Analysis:

"They walk like vultures":
Derogatory metaphor that compares
opponents to scavenging birds,
suggesting that they take advantage of
other people's misfortunes.

"He intends to earn a few million dollars":
Reiterates the idea of dishonest economic
motivations.

Third paragraph:

"Iván Freytes, a union member who fled

60

**Cuarto párrafo:**

"Estos tres personajes se han unido en un solo combo y han desatado una oscura campaña criminal contra Citgo, y muy especialmente contra sus actuales directivos, buscando sus propios intereses personales y poniendo en riesgo a uno de los activos petróleros más valiosos y más importantes de Venezuela."

**Análisis:**

- **"Un solo combo":**
  - Uso de un término coloquial que trivializa y menosprecia a los mencionados.
- **"Oscura campaña criminal":**
  - Reforzamiento de la narrativa de maldad y secretismo.

---

**Quinto párrafo:**

"A Otero, Freytes y Rodríguez Moreno, los tenemos inventariados y plenamente identificados. Sabemos que es lo que están buscando y los vamos a

Venezuela and who never confronted the mafias of Rafael Ramírez and Tareke Laisami in the oil industry. And Jorge Alejandro Rodríguez Moreno, a false deputy of the 2020 National Assembly, who was never sworn in as deputy and who has close ties with the former president of PDVSA, Rafael Ramírez."

Analysis:

"He never faced the mafias":
Accusation of cowardice or complicity with corrupt elements.

"False congressman":
Reiterates the idea of imposture and delegitimization.

Fourth paragraph:

"These three characters have joined together in a single combo and have

61

desenmascarar ante la opinión pública nacional e internacional como lo que son, unos farsantes, fariseos y falsos opositores que sólo desean que Citgo muera para ganarse unos reales y seguir viviendo en el exterior a costilla del dolor y el sufrimiento de todos los venezolanos."

**Análisis:**

- **"Inventariados y plenamente identificados":**
  - ○ Sugiere un control exhaustivo y vigilancia sobre los individuos, lo cual puede interpretarse como una amenaza implícita.
- **"Desenmascarar":**
  - ○ Implica que los individuos han estado actuando bajo una fachada engañosa.
- **"Farsantes, fariseos y falsos opositores":**
  - ○ Uso de términos altamente despectivos y moralmente cargados, deslegitimando completamente a los mencionados.

------------------------------

unleashed a dark criminal campaign against Citgo, and especially against its current directors, seeking their own personal interests and putting at risk one of the most valuable and important oil assets in Citgo. Venezuela."

Analysis:

"A single combo":

Use of a colloquial term that trivializes and belittles those mentioned.

"Dark criminal campaign":

Reinforcement of the narrative of evil and secrecy.

Fifth paragraph:

"We have inventoried and fully identified Otero, Freytes and Rodríguez Moreno. We know what they are looking for and we are going to unmask them before national and international public opinion

**Conclusión**

El análisis semiótico revela una estrategia clara de deslegitimación, criminalización y demonización de los individuos mencionados. El uso de lenguaje cargado emocionalmente, metáforas despectivas y términos deslegitimadores busca construir una narrativa donde estos individuos son presentados no solo como opositores falsos, sino también como oportunistas y traidores que actúan en detrimento de los intereses nacionales.

Este tipo de discurso tiene el potencial de influir significativamente en la percepción pública, justificar acciones en contra de los mencionados y aumentar su vulnerabilidad y riesgo.

### VIDEO 2 (CONTRA MIGUEL HENRIQUE OTERO Y FAMILIA)

#### Reporte Semiótico Forense

**Objetivo:**

El presente reporte tiene como objetivo analizar de manera detallada, desde una perspectiva semiótica, el contenido de un video titulado "Falsos opositores

for what they are, fakes, Pharisees and false opponents who only want "Let Citgo die to earn a few reales and continue living abroad at the expense of the pain and suffering of all Venezuelans."

**Analysis:**

**"Inventoryed and fully identified":**
**It suggests exhaustive control and surveillance over individuals, which can be interpreted as an implicit threat.**

**"Unmask":**
**It implies that individuals have been acting under a deceptive facade.**

**"Fake men, Pharisees and false opponents":**
**Use of highly derogatory and morally charged terms, completely delegitimizing those mentioned.**

conspiran contra Citgo", específicamente la segunda parte. El análisis se centra en el uso del lenguaje, los símbolos y los significados implícitos en el texto transcrito, considerando el contexto cultural y político de Venezuela.

---

### 1. Título y Subtítulo

**Título del video: "Falsos opositores conspiran contra Citgo"**

**Subtítulo del video: "Segunda parte"**

**Análisis:**

- **Título:**
  - La frase "falsos opositores" inmediatamente deslegitima a las personas mencionadas, sugiriendo que no son verdaderos opositores sino impostores con intenciones ocultas y maliciosas.
  - El verbo "conspiran" tiene connotaciones de actividad ilegal y secreta, implicando una intención de socavar o dañar.
- **Subtítulo:**

**Conclusion**

The semiotic analysis reveals a clear strategy of delegitimization, criminalization and demonization of the aforementioned individuals. The use of emotionally charged language, derogatory metaphors and delegitimizing terms seeks to construct a narrative where these individuals are presented not not only as false opponents, but also as opportunists and traitors who act to the detriment of national interests.

This type of speech has the potential to significantly influence public perception, justify actions against those mentioned, and increase their vulnerability and risk.

**VIDEO 2 (AGAINST MIGUEL HENRIQUE OTERO AND FAMILY)**

64

○ La indicación de "Segunda
   parte" sugiere que este
   contenido es parte de una
   serie, lo que puede crear
   una narrativa continua y
   mantener el interés del
   espectador, sugiriendo
   además que hay más
   pruebas o acusaciones por
   venir.

---

**2. Desarrollo del Contenido**

**Primer párrafo:**

"Uno de los falsos opositores que están
conspirando contra CITGO se llama
Miguel Henrique Otero Castillo. Otero fue
diputado en el Congreso de la República
por el Partido Copéi."

**Análisis:**

- **"Falsos opositores":**
  ○ Reitera la idea de impostura
     y deslegitimación.
- **"Conspirando":**
  ○ Refuerza la idea de
     actividades ilícitas.
- **"Miguel Henrique Otero
  Castillo":**

Forensic Semiotic Report

Aim:

The objective of this report is to analyze
in detail, from a semiotic perspective, the
content of a video titled "False opponents
conspire against Citgo", specifically the
second part. The analysis focuses on the
use of language, symbols and implicit
meanings in the transcribed text,
considering the cultural and political
context of Venezuela.

1. Title and Subtitle

Video title: "False opponents conspire
against Citgo"

Video subtitle: "Part Two"

Analysis:

Qualification:

The phrase "false opponents"

| | |
|---|---|
|     ○ Identificación directa del objetivo, estableciendo desde el inicio la narrativa de su culpabilidad.<br>● **"Diputado en el Congreso por el Partido Copéi":**<br>    ○ Introducción de su pasado político para contextualizar al espectador, posiblemente sugiriendo que su trayectoria política tiene un historial de corrupción.<br><br>――――――――――<br><br>**Segundo párrafo:**<br><br>"En la Cuarta República, sobre todo en los gobiernos copeyanos de Luis Herrera y Rafael Caldera, Otero aprovechó para hacerse de una gran fortuna. Pero en 1998, Otero se convirtió en aliado de Hugo Chávez."<br><br>**Análisis:**<br><br>● **"Cuarta República":**<br>    ○ Referencia al periodo anterior a Chávez, comúnmente asociado con corrupción en la narrativa chavista. | immediately delegitimizes the people mentioned, suggesting that they are not true opponents but impostors with hidden and malicious intentions.<br><br>The verb "conspire" has connotations of illegal and secret activity, implying an intention to undermine or harm.<br><br><br><br>Caption:<br>The indication of "Part Two" suggests that this content is part of a series, which can create a continuous narrative and maintain viewer interest, further suggesting that there is more evidence or accusations to come. |

- **"Aprovechó para hacerse de una gran fortuna":**
  - Sugiere corrupción y enriquecimiento ilícito.
- **"Aliado de Hugo Chávez":**
  - Cambio de lealtades políticas para beneficio personal, pintando a Otero como oportunista.

---

**Tercer párrafo:**

"El Diario El Nacional, propiedad de Otero, se convirtió en el principal vocero del golpista y asesino Hugo Chávez. Chávez premió a Otero con dos ministerios, su esposa, Carmen Ramia de Otero, fue designada ministra y directora de la Oficina Central de Información, y su pana, el periodista Alfredo Peña, quien era director del nacional, fue designado ministro de la Secretaria de la Presidencia."

**Análisis:**

- **"Principal vocero del golpista y asesino Hugo Chávez":**
  - Uso de términos muy cargados emocionalmente

2. Content Development

First paragraph:

"One of the false opponents who are conspiring against CITGO is called Miguel Henrique Otero Castillo. Otero was a deputy in the Congress of the Republic for the Copéi Party."

Analysis:

"False opponents":

Reiterates the idea of imposture and delegitimization.

"Conspiring":

Reinforces the idea of illegal activities.

"Miguel Henrique Otero Castillo":

Direct identification of the target, establishing from the beginning the narrative of his guilt.

"Deputy in Congress for the Copéi Party":

Introduction of his political past to

para demonizar a Chávez y, por asociación, a Otero.

- **"Premió a Otero con dos ministerios":**
  - Sugiere una relación quid pro quo, donde Otero recibe beneficios por su apoyo.

---

**Cuarto párrafo:**

"Otero creyó que con Chávez iba a seguir haciendo dinero, pero pronto se dio cuenta de que el chavismo actúa como el diablo, que le paga muy mal a quien le sirve. En el año 2022, Otero se quedó sin el Diario El Nacional."

**Análisis:**

- **"El chavismo actúa como el diablo":**
  - Metáfora religiosa que enfatiza la maldad del régimen.
- **"Se quedó sin el Diario El Nacional":**
  - Consecuencias negativas de su asociación con Chávez, pintando a Otero

contextualize the viewer, possibly suggesting that his political background has a history of corruption.

Second paragraph:

"In the Fourth Republic, especially in the Copeyan governments of Luis Herrera and Rafael Caldera, Otero took advantage of it to make a great fortune. But in 1998, Otero became an ally of Hugo Chávez."

Analysis:

"Fourth Republic":

Reference to the period before Chávez, commonly associated with corruption in the Chavista narrative.

"He took the opportunity to make a great fortune":
It suggests corruption and illicit

68

como víctima de su propia ambición.

---

**Quinto párrafo:**

"Diosdado Cabello se lo quitó con una demanda y una sentencia del Tribunal Supremo de Justicia. Otero se fue a España, pelando bolas. Se divorció de Carmen Ramia y se casó con una chavista. Ahora está al frente de una campaña mediática contra Citgo y sus directivos para ver si se gana unos millones que le permitan seguir viviendo en Madrid como un rico."

**Análisis:**

- **"Pelando bolas":**
  - Expresión coloquial venezolana que significa estar en la ruina económica, con una carga despectiva.
- **"Se casó con una chavista":**
  - Nuevamente refuerza la idea de oportunismo y traición.
- **"Campaña mediática contra Citgo para ver si se gana unos millones":**

enrichment.

"Ally of Hugo Chávez":
Shifting political allegiances for personal gain, painting Otero as an opportunist.

**Third paragraph:**

"The newspaper El Nacional, owned by Otero, became the main spokesperson for the coup plotter and murderer Hugo Chávez. Chávez awarded Otero with two ministries, his wife, Carmen Ramia de Otero, was appointed minister and director of the Central Information Office , and his friend, the journalist Alfredo Peña, who was director of the national, was appointed minister of the Secretariat of the Presidency."

Analysis:

"Main spokesperson of the coup plotter and murderer Hugo Chávez":
Use of very emotionally charged terms to demonize Chávez and, by association,

| | |
|---|---|
| ○ Sugiere que sus acciones actuales están motivadas por la codicia, no por principios. | Otero. |
| | "He awarded Otero with two ministries": It suggests a quid pro quo relationship, where Otero receives benefits for his support. |
| **Conclusión** | |
| El análisis semiótico revela una estrategia discursiva clara de deslegitimación y demonización de Miguel Henrique Otero. El uso de lenguaje cargado emocionalmente y metáforas religiosas busca construir una narrativa donde Otero es retratado como un oportunista corrupto y traidor. Esta narrativa no solo pretende influir en la percepción pública de Otero, sino también justificar acciones violentas en su contra. | Fourth paragraph: "Otero believed that with Chávez he was going to continue making money, but he soon realized that Chavismo acts like the devil, that it pays very poorly to those who serve it. In the year 2022, Otero was left without the Diario El Nacional " |
| **VIDEO 3 (CONTRA MIGUEL HENRIQUE OTERO Y JORGE ALEJANDRO RODRIGUEZ)** | Analysis: |
| **Reporte Semiótico Forense** | "Chavismo acts like the devil": Religious metaphor that emphasizes the evil of the regime. |
| **Objetivo:** | |
| Este reporte tiene como objetivo realizar un análisis semiótico forense detallado | "He was left without the El Nacional newspaper": Negative consequences of his association |

del contenido de un video, específicamente la transcripción proporcionada. El análisis se enfocará en el uso del lenguaje, los símbolos y los significados implícitos en el texto transcrito, considerando el contexto cultural y político de Venezuela.

---

**Análisis Semiótico**

**1. Deslegitimación y Descrédito**

**"Otro de los falsos opositores que conspiran contra CITGO":**

- El término "falsos opositores" es una estrategia discursiva para deslegitimar la posición política de Jorge Alejandro Rodríguez Moreno. Al calificarlos de "falsos", se les niega su autenticidad y se les atribuyen motivos ocultos y deshonestos.
- El verbo "conspiran" implica actividades ilícitas y secretas, lo que refuerza la imagen de traición y subversión.

with Chávez, painting Otero as a victim of his own ambition.

Fifth paragraph:

"Diosdado Cabello took it away with a lawsuit and a ruling from the Supreme Court of Justice. Otero went to Spain, fighting balls. He divorced Carmen Ramia and married a Chavista. Now he is leading a media campaign against Citgo and his managers to see if he can earn a few million that will allow him to continue living in Madrid like a rich man."

Analysis:

"Peeling balls":
Venezuelan colloquial expression that means being in economic ruin, with a derogatory charge.

| | |
|---|---|
| **"Sin importar el daño que le puedan causar al patrimonio de todos los venezolanos":**<br><br>• Este segmento busca establecer una dicotomía moral donde los opositores son presentados como indiferentes al bienestar de la nación, posicionándolos como enemigos del pueblo.<br><br>**2. Uso de Metáforas y Rumores**<br><br>**"Rodríguez es un falso diputado que se encuentra exiliado en Alemania":**<br><br>• Repetición de la deslegitimación con "falso diputado", reforzando la idea de impostura y engaño.<br>• La mención de su exilio en Alemania introduce un elemento de sospecha sobre sus actividades y sustento económico.<br><br>**"Nadie sabe de qué vive ni cómo se mantiene en ese país. Las malas lenguas dicen":**<br><br>• Frases que insinúan misterio y desconfianza, utilizando rumores ("las malas lenguas dicen") para | "He married a Chavista":<br>Once again it reinforces the idea of opportunism and betrayal.<br><br>"Media campaign against Citgo to see if it makes a few millions":<br>It suggests that his current actions are motivated by greed, not principle.<br><br><br>Conclusion<br><br>The semiotic analysis reveals a clear discursive strategy of delegitimization and demonization of Miguel Henrique Otero. The use of emotionally charged language and religious metaphors seeks to construct a narrative where Otero is portrayed as a corrupt opportunist and traitor. This narrative is not only intended to influence public perception of Otero , but also justify violent actions against him. |

cuestionar su integridad sin ofrecer pruebas concretas.

**3. Asociación con Figuras Desacreditadas**

**"Rodríguez Moreno es muy amigo de Rafael Ramírez, el expresidente de PSA y ex-ministro de petróleo de Hugo Chávez, a quien el régimen de Maduro acusa de haberse robado el triple de lo que se robó Tarek el Aizami":**

- Asociación directa con Rafael Ramírez, una figura controvertida, para transferir la negatividad y sospecha sobre Rodríguez Moreno.
- Uso de comparaciones hiperbólicas ("el triple de lo que se robó Tarek el Aizami") para magnificar la supuesta corrupción.

**4. Construcción de una Narrativa de Corrupción**

**"Rodríguez Moreno siempre fue chavista. De hecho trabajó en la campaña electoral del chavista Henri Falcón":**

- Se refiere a un supuesto pasado como chavista para socavar

VIDEO 3 (AGAINST MIGUEL HENRIQUE OTERO AND JORGE ALEJANDRO RODRIGUEZ)

Forensic Semiotic Report

Aim:

This report aims to perform a detailed forensic semiotic analysis of the content of a video, specifically the provided transcript. The analysis will focus on the use of language, symbols and implicit meanings in the transcribed text, considering the cultural and political context of Venezuela.

Semiotic Analysis

1. Delegitimization and Discredit

"Another of the false oppositors who

cualquier credibilidad como opositor, sugiriendo inconsistencia y oportunismo.

**"Rodríguez Moreno consiguió dinero que seguramente le dio su pana Rafael Ramírez para introducir una demanda contra CITGO en una corte de Estados Unidos":**

- Se sugiere que sus acciones legales están financiadas por medios corruptos, minimizando la legitimidad de la demanda.

**"La demanda lo que busca es dejarle unos cuantos millones de dólares a Rodríguez Moreno":**

- Enfatiza la idea de que su motivación es puramente económica, no moral ni ética.

**"Pretende quedarse, nada más y nada menos, que con el 30% de las ganancias":**

- Presenta a Rodríguez Moreno como codicioso y deshonesto.

**5. Contraste Moral**

**"Rodríguez Moreno nunca protestó cuando Chávez despidió injustamente**

conspire against CITGO":

The term "false oppositors " is a discursive strategy to delegitimize the political position of Jorge Alejandro Rodríguez Moreno. By labeling them as "fake", their authenticity is denied and ulterior and dishonest motives are attributed to them.

The verb "conspire" implies illicit and secret activities, which reinforces the image of betrayal and subversion.

"Regardless of the damage they may cause to the heritage of all Venezuelans":

This segment seeks to establish a moral dichotomy where opponents are presented as indifferent to the well-being of the nation, positioning them as enemies of the people.

2. Use of Metaphors and Rumors

"Rodríguez is a false deputy who is in

| | |
|---|---|
| **a 22.000 empleados de PDVSA. Rodríguez Moreno nunca reclamó a su pana el ministro Rafael Ramírez para que pagara a los trabajadores despedidos":**<br><br>• Subraya su aparente falta de principios y coherencia moral, contrastando sus acciones actuales con su inacción pasada.<br><br>**"Y ahora pretende que CITGO, en manos de la oposición, lo haga, sin tener recursos para ello":**<br><br>• Sugiere que su demanda es irrazonable y destinada al fracaso, presentándolo como un oportunista.<br><br>———————————<br><br>**Conclusión**<br><br>El análisis semiótico revela una estrategia discursiva de deslegitimación y demonización de Jorge Alejandro Rodríguez Moreno. Se utilizan metáforas despectivas, rumores y asociaciones con figuras controvertidas para construir una narrativa en la que Rodríguez Moreno es presentado como un falso opositor, corrupto y oportunista. Este tipo de | exile in Germany":<br><br>Repetition of delegitimization with "false deputy", reinforcing the idea of imposture and deception.<br><br>The mention of his exile in Germany introduces an element of suspicion about his activities and financial support.<br><br>"No one knows what he lives on or how he stays in that country. Evil tongues say":<br><br>Phrases that hint at mystery and distrust, using rumors ("bad tongues say") to question their integrity without offering concrete evidence.<br><br>3. Association with Discredited Figures<br><br>"Rodríguez Moreno is a good friend of Rafael Ramírez, the former president of PDVSA and former oil minister of Hugo Chávez, whom the Maduro regime |

| | |
|---|---|
| discurso está diseñado para influir en la percepción pública, justificar acciones en su contra y aumentar su vulnerabilidad y riesgo.<br><br><br>**VIDEO 4 (CONTRA IVAN FREITES, Y POR ASOCIACION, TAMBIEN CONTRA MIGUEL HENRIQUE OTERO Y JORGE ALEJANDRO RODRIGUEZ)** | accuses of having stolen three times as much as Tarek el Aizami":<br><br>Direct association with Rafael Ramírez, a controversial figure, to transfer negativity and suspicion onto Rodríguez Moreno.<br><br>Use of hyperbolic comparisons ("triple what Tarek el Aizami stole") to magnify the alleged corruption.<br><br>4. Construction of a Corruption Narrative<br><br>"Rodríguez Moreno was always a Chavista. In fact he worked in the electoral campaign of Chavista Henri Falcón":<br><br>Refers to an alleged condition of Chavista in the past, to undermine any credibility as an opponent, suggesting inconsistency and opportunism. |

| | |
|---|---|
| | "Rodríguez Moreno got money that his friend Rafael Ramírez probably gave him to file a lawsuit against CITGO in a United States court": |
| | It is suggested that his legal actions are funded by corrupt means, minimizing the legitimacy of the claim. |
| | "What the lawsuit seeks is to leave a few million dollars for Rodríguez Moreno": |
| | It emphasizes the idea that his motivation is purely economic, not moral or ethical. |
| | "He intends to keep, nothing more and nothing less, than 30% of the profits": |
| | It presents Rodríguez Moreno as greedy and dishonest. |
| | 5. Moral Contrast |
| | "Rodríguez Moreno never protested when Chávez unfairly fired 22,000 PDVSA |

| | employees. Rodríguez Moreno never asked his friend, Minister Rafael Ramírez, to pay the fired workers": |
| --- | --- |
| | It highlights his apparent lack of principles and moral coherence, contrasting his current actions with his past inaction. |
| | "And now he wants CITGO, in the hands of the opposition, to do it, without having the resources to do so": Text suggests that his demand is unreasonable and destined to fail, presenting him as an opportunist. |
| | Conclusion

The semiotic analysis reveals a discursive strategy of delegitimization and demonization of Jorge Alejandro Rodríguez Moreno. Derogatory metaphors, rumors, and associations with controversial figures are used to construct a narrative in which Rodríguez Moreno is |

| | presented as a false oppositionist, corrupt, and opportunist. This type of speech is designed to influence public perception, justify actions against him, and increase his vulnerability and risk. |
|---|---|
| | VIDEO 4 (AGAINST IVAN FREITES, AND BY ASSOCIATION, ALSO AGAINST MIGUEL HENRIQUE OTERO AND JORGE ALEJANDRO RODRIGUEZ) |

79

**2. On the Transcripts of Defamatory Videos and Links to Social Media Posts:**

      **The three videos are published on various social media accounts belonging to or under the control of Gustavo LAINETTE.:**



**PRIMER VIDEO**

**JOINT ATTACK AGAINST**

- **IVAN FREITES**
- **MIGUEL HENRIQUE OTERO**
- **JORGE ALEJANDRO RODRIGUEZ**

**VIDEO 1/4**

**Original location:**

https://x.com/resistenciaveof/status/1797698526102847899?t=yGz_osfq3TpMQhfP7rt13A&s=19

**Link to video for use by judicial authorities (saved by victims):**

https://youtu.be/zCV9SP7AS-Q?feature=shared

**Video transcript (original and automatic translation by Google):**

**Original:**

    [Título del video]

    Falsos opositores conspiran contra CITGO.

    [Sub-Título del video]

    Primera parte.

    Hay una campaña criminal contra PDVSA Holden y contra Citgo

Petroleum Corporation. La campaña la llevan a cabo funcionarios del régimen de Nicolás Maduro, que desean la quiebra de Citgo para que esa empresa se quede en manos de los rusos, y aunque parezca increíble, un pequeño grupo de supuestos opositores venezolanos, que desean que Citgo sea rematada por un tribunal en Estados Unidos para ganarse unos reales y hacerse millonarios.

Los supuestos opositores, que andan como samurros buscando la quiebra y el remate de Citgo son Miguel Enrique Otero Castillo, exeditor del Diario Nacional de Venezuela, quien pretende ganarse unos millones de dólares para salir del estado de quiebra, en que se encuentra después que Diosdado Cabello le quitó el periódico.

Iván Freytes, un sindicalista que huyó de Venezuela y que nunca enfrentó a las mafias de Rafael Ramírez y de Tareke Laisami en la industria petrolera. Y Jorge Alejandro Rodríguez Moreno, un falso diputado de la Asamblea Nacional de 2020, que nunca se juramentó como diputado y quien tiene estrechos vínculos con el expresidente de PDVSA, Rafael Ramírez.

Estos tres personajes se han unido en un solo combo y han desatado una oscura campaña criminal contra Citgo, y muy especialmente contra sus actuales directivos, buscando sus propios intereses personales y poniendo en riesgo a uno de los activos petróleros más valiosos y más importantes de Venezuela.

A Otero, Freytes y Rodríguez Moreno, los tenemos inventariados y plenamente identificados. Sabemos que es lo que están buscando y los vamos a desenmascarar ante la opinión pública nacional e internacional como lo que son, unos farzantes, fariseos y falsos opositores que sólo desean que Citgo muera para ganarse unos reales y seguir viviendo en el exterior a costilla del dolor y el sufrimiento de todos los venezolanos.

**Automatic translation by Google:**

[Video Title]
False oppositors conspire against CITGO.

[Sub-title of the video]
First part.

There is a criminal campaign against PDVSA Holden and against Citgo Petroleum Corporation. The campaign is carried out by officials of the Nicolás Maduro regime, who want the bankruptcy of Citgo so that that company remains in the hands of the Russians, and although it may seem incredible, a small group of supposed Venezuelan oppositors, who want Citgo to be auctioned off. by a court in the United States to earn some reais and become millionaires.

The supposed oppositors, who go around like samurros seeking the bankruptcy and auction of Citgo, are Miguel Enrique Otero Castillo, former editor of the National Newspaper of Venezuela, who intends to earn a few million dollars to get out of the state of bankruptcy, in which he finds himself after Diosdado Cabello took the newspaper from him.

Iván Freytes, a trade unionist who fled Venezuela and who never faced the mafias of Rafael Ramírez and Tareke Laisami in the oil industry. And Jorge Alejandro Rodríguez Moreno, a false deputy of the 2020 National Assembly, who was never sworn in as a deputy and who has close ties to the former president of PDVSA, Rafael Ramírez.

These three characters have joined together in a single combo and have unleashed a dark criminal campaign against Citgo, and especially against its current directors, seeking their own personal interests and putting at risk one of the most valuable and important oil assets in Venezuela. .

We have inventoried and fully identified Otero, Freytes and Rodríguez Moreno. We know what they are looking for and we are going to unmask them before national and international public opinion for what they are,

fakers, Pharisees and false oppositors who only want Citgo to die so they can earn some real money and continue living abroad at the expense of the pain and suffering of all Venezuelans.

Screenshot of the Official Account of the Venezuelan Resistance Movement in X (formerly Twitter):



**SECOND VIDEO**

**SPECIFIC ATTACK AGAINST**

- **MIGUEL HENRIQUE OTERO**

**VIDEO 2/4**

VIDEO 2

**Original location:**

https://x.com/resistenciaveof/status/1798774985475101170?t=WOBhYtJHUf03lj6baLUtjQ&s=19

**Link to video for use by judicial authorities (saved by victims):**

https://youtu.be/bBTLsESvqIo?si=HGi3JDxxrQwpGvrA

**Video transcript (original and automatic translation by Google):**

**Original:**

[Título del video]
Falsos opositores conspiran contra Citgo.

[Sub-Título del video]
Segunda parte.

[Transcripcion del contenido del video]
Uno de los falsos opositores que están conspirando contra CITGO se

llama Miguel Henrique Otero Castillo. Otero fue diputado en el Congreso de la República por el Partido Copéi.

En la Cuarta República, sobre todo en los gobiernos copeyanos de Luis Herrera y Rafael Caldera, Otero aprovechó para hacerse de una gran fortuna. Pero en 1998, Otero se convirtió en aliado de Hugo Chávez.

El Diario El Nacional, propiedad de Otero, se convirtió en el principal vocero del golpista y asesino Hugo Chávez. Chávez premió a Otero con dos ministerios, su esposa, Carmen Ramia de Otero, fue designada ministra y directora de la Oficina Central de Información, y su pana, el periodista Alfredo Peña, quien era director del nacional, fue designado ministro de la Secretaria de la Presidencia.

Otero creyó que con Chávez iba a seguir haciendo dinero, pero pronto se dio cuenta de que el chavismo actúa como el diablo, que le paga muy mal a quien le sirve. En el año 2022, Otero se quedó sin el Diario El Nacional.

Diosdado Cabello se lo quitó con una demanda y una sentencia del Tribunal Supremo de Justicia. Otero se fue a España, pelando bolas. Se divorció de Carmen Ramia y se casó con una chavista. Ahora está al frente de una campaña mediática contra Citgo y sus directivos para ver si se gana unos millones que le permitan seguir viviendo en Madrid como un rico.

**Automatic translation by Google:**

[Video Title]
False oppositors conspire against Citgo.

[Sub-title of the video]

86

Second part.

[Transcription of video content]
One of the false oppositors who are conspiring against CITGO is called Miguel Henrique Otero Castillo. Otero was a deputy in the Congress of the Republic for the Copéi Party.

In the Fourth Republic, especially in the Copeyan governments of Luis Herrera and Rafael Caldera, Otero took the opportunity to make a great fortune. But in 1998, Otero became an ally of Hugo Chávez.

The Diario El Nacional, owned by Otero, became the main spokesperson for the coup plotter and murderer Hugo Chávez. Chávez awarded Otero with two ministries, his wife, Carmen Ramia de Otero, was appointed minister and director of the Central Information Office, and his friend, journalist Alfredo Peña, who was director of the national, was appointed minister of the Secretariat of Information. The presidency.

Otero believed that with Chávez he was going to continue making money, but he soon realized that Chavismo acts like the devil, that it pays very poorly to those who serve it. In 2022, Otero was left without Diario El Nacional.

Diosdado Cabello took it away with a lawsuit and a ruling from the Supreme Court of Justice. Otero went to Spain, peeling balls. He divorced Carmen Ramia and married a Chavista. Now he is leading a media campaign against Citgo and its managers to see if he can earn a few million that will allow him to continue living in Madrid as a rich man.

**THIRD VIDEO**

**ATTACK FOCUSED ON**

- **JORGE ALEJANDRO RODRIGUEZ**

**VIDEO 3/4**

VIDEO 3

**Original location:**

https://www.instagram.com/resistenciaveoficial/?locale=id

**Link to video for use by judicial authorities (saved by victims):**

**Video transcript (original):**

> [Video Title]
> False oppositors conspire against Citgo.
>
> [Sub-title of the video]
> Third part.
>
> [Transcription of video content]
>
> Another of the false oppositors who conspire against CITGO regardless of
> the damage they may cause to the assets of all Venezuelans is called

Jorge Alejandro Rodríguez Moreno.

Rodríguez is a false deputy who is in exile in Germany. Nobody knows what they live on or how they support themselves in that country. Evil tongues say that Rodríguez Moreno is a good friend of Rafael Ramírez, the former president of PSA and former oil minister of Hugo Chávez, whom the Maduro regime accuses of having stolen triple what Tarek el Aizami stole.

Rodríguez Moreno was always a Chavista. In fact, he worked in the electoral campaign of Chavista Henri Falcón. Rodríguez Moreno got money that his friend Rafael Ramírez allegedly gave him to file a lawsuit against Sitgo in a United States court.

What the lawsuit seeks is to leave a few million dollars to Rodríguez Moreno. Who intends to keep, nothing more and nothing less, than 30% of the profits and that trial finally takes place and if the court finally agrees with them, something that is very difficult.

Rodríguez Moreno never protested when Chávez unfairly fired 22,000 PDVSA employees. Rodríguez Moreno never asked his friend, Minister Rafael Ramírez, to pay the dismissed workers.

And now he wants CITGO, in the hands of the opposition, to do it, without having the resources to do so.

**FOURTH VIDEO**

**ATTACK FOCUSED ON**

- **IVAN FREITES**

**VIDEO 4/4**

VIDEO 3

**Original location:**

> https://x.com/resistenciaveof/status/1800735616034042293?s=48&t=4uilX
> CCQhkxhbtyPamPOXw

**Link to video for use by judicial authorities (saved by victims):**

**Video transcript (Automatic Google Translation):**

> [Video Title]
> False oppositors conspire against Citgo.
>
> [Sub-title of the video]
> Fourth part.
>
>
> [Transcription of video content]
>
> Another of the false oppositors who conspire against CITGO is called Iván
> Freites, a trade unionist exiled in the United States. Freites is a frustrated

90

union member, because he was never able to preside over the National Federation of Oil Workers.

Freites is a native of Falcón, where the Paraguaná refining complex is located, where the Cardón and Amuay refineries are located, one of the most important in the country. The Cardón and Amuay refineries are in terrible condition because of Maduro, but Freites does not take care of that, Freites wants to help CITGO.

Other refineries that are also in terrible condition are those of Bajo Grande in Zulia, that of Palito in Carabobo and that of Puerto la Cruz in Anzoategui. But Freites doesn't say anything about that because Freites is only interested in CITGO.

 Since he now lives in the United States, where he went into exile years ago, what Iván Freites wants is to be given a management position at CITGO, and since they have not given him the position he wants, Freites joined the combo that seeks bankruptcy and CITGO's auction. There are rumors that Freites is also behind the lawsuit that was filed against CITGO. Freites also wants to earn his good slice of dollars no matter what happens to the assets of all Venezuelans.