# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CV-20465-BLOOM/Elfenbein

**IVAN R. FREITES C.**, *et al.*,

       Plaintiffs,

v.

**HORACIO MEDINA**, *et al.*,

       Defendants.

_____/

## ORDER ON PLAINTIFFS' MOTIONS FOR SANCTIONS

**THIS CAUSE** is before the Court on five motions filed by *Pro se* Plaintiffs Ivan R. Freites C. ("Freites"), Miguel Enrique Otero C. ("Otero"), and Jorge Alejandro Rodriguez M. ("Rodriguez"): (1) Expedited Post-Judgment Motion for Sanctions, Grievance Committee Referral, and Formal Ruling on Disqualification ("First Sanctions Motion"), ECF No. [172]; (2) Expedited Post-Judgment Motion for Sanctions Due to Perjury ("Second Sanctions Motion"), ECF No. [225]; (3) Additional Post-Judgment Motion for Sanctions and Disqualification ("Third Sanctions Motion"), ECF No. [233]; (4) Additional Post-Judgment Motion for Additional Sanctions ("Fourth Sanctions Motion"), ECF No. [235]; and (5) Motion for Sanctions Pursuant to the Court's Inherent Authority and 28 U.S.C. § 1927 ("Fifth Sanctions Motion"), ECF No. [301]. The Honorable Beth Bloom referred the motions to me "for final disposition."[1] ECF No.

---

[1] The Court previously ruled on three other post-dismissal motions Judge Bloom referred. Specifically, the Court granted in part and denied in part Plaintiffs' Expedited Motion to Conduct Limited Discovery, ECF No. [187], and recommended that Judge Bloom deny Plaintiffs' Expedited Motion for Evidentiary Hearing and Relief from Final Judgment Pursuant to Federal Rule of Civil Procedure 60(b)(2)–(3), ECF No. [218], and Plaintiffs' Motion for Preliminary Injunctive Relief to Enjoin Improper Coordination Between Defense Counsel, ECF No. [269]. *See* ECF No. [305]; ECF No. [307]. The Court will rule on the remaining referred motion, *see* ECF No. [227], in due course.

[306]; *see also Hopkins v. JPMorgan Chase Bank, NA*, 618 F. App'x 959, 962 (11th Cir. 2015) (noting sanctions motion was non-dispositive); *Collar v. Abalux, Inc.*, No. 16-CV-20872, 2018 WL 7364572, at *10 (S.D. Fla. Dec. 17, 2018). For the reasons explained below, the motions, **ECF No. [172]; ECF No. [225]; ECF No. [233]; ECF No. [235];** and **ECF No. [301]**, are **DENIED**.

## I.      RELEVANT BACKGROUND

The Court has already described the factual background of this case on several occasions, *see* ECF No. [165] at 2–5; ECF No. [307] at 1–5, so it repeats only the necessary facts here. Plaintiffs are Venezuelan dissidents in exile who sued twenty Defendants for allegedly coordinating a "malicious campaign involving defamation, intimidation, obstruction of justice, witness tampering, and racketeering against" them. *See* ECF No. [52] at 15. Eventually, fourteen Defendants moved to dismiss the Amended Complaint, *see* ECF No. [96]; ECF No. [100], and Judge Bloom granted those motions, dismissing Plaintiffs' four federal claims with prejudice and their six state law claims without prejudice on May 16, 2025, *see* ECF No. [165]. Plaintiffs appealed the dismissal of the Amended Complaint to the Eleventh Circuit, *see* ECF No. [180], and the appeal remains pending, *see* ECF No. [238].

Before the dismissal, Plaintiff Freites moved to disqualify the law firm representing Defendant Horacio Medina, Diaz Reus LLP (formerly Diaz, Reus & Targ, LLP) ("DRT"), along with its attorneys Michael Diaz, Javier Coronado, and Marta Colomar (the "Motion to Disqualify DRT"). *See* ECF No. [30]. Freites based the Motion to Disqualify DRT on an asserted conflict of interest that arose because Rodriguez, who became a Plaintiff on March 19, 2025 (two weeks after Freites filed that motion), *see* ECF No. [52], alleged that he consulted with DRT in September/October 2023 about a separate lawsuit Plaintiffs eventually brought in Delaware federal

court "regarding worker [indemnification] claims against" the Venezuelan state-owned oil company Petroleos de Venezuela, S.A. ("PDVSA") and its U.S. subsidiary CITGO (the "Delaware Litigation"). *See* ECF No. [30] at 2–3; ECF No. [52] at 15. Supported by Rodriguez's affidavit, *see* ECF No. [30-1], Freites argued that the Delaware Litigation is "inseparably linked" with this lawsuit because both involve Medina's "coordinated effort" to "obstruct" the two lawsuits "through defamatory attacks, witness intimidation, and other extrajudicial conduct." *See* ECF No. [30] at 2. Freites also argued that the communications between Rodriguez and DRT in September/October 2023 involved "litigation strategies and claims that are central to this case," which gave DRT "insider knowledge" of Plaintiffs' "strategic playbook" that Medina could "exploit" to gain an unfair advantage. *See* ECF No. [30] at 3–10.

In early May 2025, Plaintiffs filed a motion to disqualify DRT attorney Gabor Gazso von Klingspor ("G. Gazso") based on their belief that he "was exposed to Rodriguez's confidential information" when he worked at a law firm led by his father Andres Gazso von Klingspor ("A. Gazso"), which Rodriguez consulted in September 2023 about bringing claims against PDVSA and CITGO ("Motion to Disqualify G. Gazso"). *See* ECF No. [144] at 2–6. In the Motion to Disqualify G. Gazso, Plaintiffs argued that DRT and Carlos Sardi, who is counsel for several other Defendants, tried to conceal G. Gazso's identity from them during conferrals in this lawsuit to prevent them from learning about his connection to A. Gazso. *See* ECF No. [144] at 8–10. Plaintiffs also argued that G. Gazso sat beside Sardi — an "associate" of Defendant Medina's "allies" — at a January 2025 hearing in a related matter before Chief Judge Cecilia M. Altonaga (the "Altonaga Case"), creating a "strong appearance of impropriety." *See* ECF No. [144] at 10–11. The Motion to Disqualify DRT and the Motion to Disqualify G. Gazso remained pending at the time the Amended Complaint was dismissed in May 2025, so both motions to disqualify

became moot.  *See* ECF No. [165] at 40.

Since the dismissal of the Amended Complaint in May 2025, Plaintiffs have filed dozens of documents, including many motions, with this Court.  To best facilitate the resolution of these motions, the Court held a status hearing on them and several other referred motions[2] on October 24, 2025 (the "Status Hearing").  *See* ECF No. [295].  During the Status Hearing, the Court heard from Plaintiffs and from defense counsel, which was comprised of three lawyers from DRT (Colomar, G. Gazso, and John Foster) and one lawyer (Sardi) from Sardi Law PLLC.  *See* ECF No. [295].  The bulk of the Status Hearing focused on whether this Court has jurisdiction to decide the referred motions because, as a general rule, a trial court's jurisdiction ends once the appellate court's jurisdiction begins.  *See generally* ECF No. [295].  During the Status Hearing, the Court ordered the Parties to submit supplemental briefs on "whether the Court has jurisdiction to decide a motion for disqualification of counsel while a case is on appeal."  *See* ECF No. [293]; ECF No. [295].  The Parties timely submitted those briefs.  *See* ECF No. [296]; ECF No. [297]; ECF No. [298].

After the Status Hearing, Plaintiffs continued to file post-dismissal motions, including the Fifth Sanctions Motion.  *See* ECF No. [301].  Because the Court determined that an evidentiary hearing was necessary "on one narrow issue" relevant to the resolution of the First Sanctions Motion, ECF No. [172], and the Fourth Sanctions Motion, ECF No. [235], it set a hearing for January 6, 2026 "to ascertain the facts connected to any communications between Rodriguez and" DRT "in September/October 2023, including the Zoom meeting that was scheduled to occur on

---

[2] Along with the five referred motions at issue here, the Court also heard from the Parties on the three referred motions described above in footnote 1 as well as Defendant Horacio Medina's Motion to Strike, ECF No. [217]; Plaintiffs' Motion to Consolidate their many post-dismissal Motions for Sanctions, ECF No. [234]; and Defendant Medina's Motion for Status Conference, ECF No. [266].  For the reasons stated on the record, *see* ECF No. [295] at 7–12, the Court **granted** the Motion to Strike and the Motion for Status Conference, *see* ECF No. [291]; ECF No. [292], but **denied** the Motion to Consolidate, *see* ECF No. [294].

October 2, 2023" (the "Evidentiary Hearing").  *See* ECF No. [305] at 1–2.  At the Evidentiary Hearing, which occurred on January 6 and 7, 2026 and lasted more than eleven hours, the Court heard testimony from Plaintiff Rodriguez; DRT partners Diaz, Colomar, and Coronado; DRT legal assistant Aylin Hovispo; DRT receptionist Belkys Guillen; and DRT associate attorney Isabela Hernandez-Peredo.  *See* ECF No. [332]; ECF No. [333].  The Court also admitted documentary evidence offered by both sides.  *See* ECF No. [334]; ECF No. [343].  All five post-dismissal Sanctions Motions, which ask the Court to sanction defense counsel in various ways, including by imposing monetary sanctions and disqualifying them from representing Defendants in this case, *see* ECF No. [172]; ECF No. [225]; ECF No. [233]; ECF No. [235]; ECF No. [301], are now ripe for review.  For ease of understanding, the Court describes the particulars of each motion within its Discussion below.  *See infra* Section III.

## II.    LEGAL STANDARDS

### A.  District Court's Jurisdiction While an Appeal is Pending

"As a general matter, the filing of a notice of appeal deprives the district court of jurisdiction over all issues involved in the appeal."  *Mahone v. Ray*, 326 F.3d 1176, 1179 (11th Cir. 2003); *see also Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58, (1982) ("The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.").  "However, it does not prevent the district court from taking action in furtherance of the appeal."  *Mahone*, 326 F.3d at 1179 (quotation marks omitted).  "Nor does it prevent the court from entertaining motions on matters collateral to those at issue on appeal."  *Id.*

In the related context of a Rule 41(a)(1) voluntary dismissal, which also deprives the district court of jurisdiction over a case, the Eleventh Circuit has explained that, even after they no

longer have jurisdiction, "district courts retain jurisdiction to consider at least five different types of collateral issues: costs, fees, contempt sanctions, Rule 11 sanctions, and motions to confirm arbitral awards." *Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1266 (11th Cir. 2021); *cf. Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 397–98 (1990). As the phrase "at least" makes clear, that list is not intended to be exhaustive. Indeed, the Eleventh Circuit has recognized "the district court maintains jurisdiction" over other kinds of issues as well, including whether "to order stays," to "modify injunctive relief," *see Doe, 1-13 ex rel. Doe Sr. 1-13 v. Bush*, 261 F.3d 1037, 1064–65 (11th Cir. 2001), or "to enjoin arbitration," *see Weaver v. Fla. Power & Light Co.*, 172 F.3d 771, 773 (11th Cir. 1999). The important consideration when deciding if a matter is collateral is whether it raises questions that are "separate and distinct from the issues raised by the direct appeal," *see id.*, such that resolving those questions does "not affect[] the questions presented on appeal," *see Bush*, 261 F.3d at 1064.

**B. Disqualification of Counsel Generally**

"Although they implicate ethical concerns, motions to disqualify are substantive motions affecting the rights of the parties." *Kleiman v. Wright*, 662 F. Supp. 3d 1247, 1252 (S.D. Fla. 2023) (quotation marks omitted). "When ruling on a motion to disqualify counsel, a court must be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel." *Vital Pharms., Inc. v. Alfieri*, 585 F. Supp. 3d 1347, 1349–50 (S.D. Fla. 2022) (quotation marks omitted). "Disqualification of counsel should be resorted to sparingly and should be ordered only where there exists a reasonable possibility that the impropriety already has occurred." *Id.* at 1350 (alteration adopted, quotation marks omitted); *see also Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941 n.4 (11th Cir. 1982) (noting that

"[d]isqualification is a harsh sanction").  "Because a party is presumptively entitled to the counsel of his choice, that right may be overridden only if compelling reasons exist."  *In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003) (quotation marks omitted).

Motions to disqualify "are governed by two sources of authority — federal common law and local rules of court."  *Kleiman*, 662 F. Supp. 3d at 1252.  In the Southern District of Florida, the Local Rules instruct that the Rules Regulating the Florida Bar govern the professional conduct of attorneys.  *See* S.D. Fla. L.R. 11.1(c).  To grant a motion to disqualify that is "based on an allegation of ethical violation, the court may not simply rely on a general inherent power to admit and suspend attorneys, without any limit on such power."  *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997).  Instead, the "court must clearly identify a specific Rule of Professional Conduct which is applicable to the relevant jurisdiction and must conclude that the attorney violated that rule."  *Id.*  That is because "accusations of unethical conduct are among the most serious of allegations that a court must consider," *id.* at 1562 (alterations adopted, quotation marks omitted), as "disciplinary action and consequent disqualification may expose counsel to further sanctions by the bar and portends adverse effects upon counsel's careers and public image," *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1200 n.14 (11th Cir. 1985).

Relevant here, Florida Bar Rules dictate that "a lawyer must not represent a client if either "the representation of [one] client will be directly adverse to another client" or "there is a substantial risk that the representation of [one] or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer."  *See* R. Reg. Fla. Bar 4-1.7(a) (providing the rule for dealing with "conflict[s] of interest" and "representing adverse interests").  There is an exception to Rule 4-1.7(a), however, if the affected clients give "informed consent."  *See* R. Reg. Fla. Bar 4-1.7(a), (b); *Prudential Ins.*

*Co. of Am. v. Anodyne, Inc.*, 365 F. Supp. 2d 1232, 1236 (S.D. Fla. 2005) (noting that the "conflict is waivable"). Informed consent exists "if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a position adverse to another client when the lawyer represents both clients in the same proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing or clearly stated on the record at a hearing." *See* R. Reg. Fla. Bar 4-1.7(b).

Similar rules apply to both former and prospective clients.[3] As to former clients, Florida Bar Rules dictate that a "lawyer who has formerly represented a client in a matter must not afterwards: (a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent; (b) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client or when the information has become generally known; or (c) reveal information relating to the representation except as these rules would permit or require with respect to a client." *See* R. Reg. Fla. Bar 4-1.9. And as to prospective clients, "[e]ven when no client-lawyer relationship ensues, a lawyer who has learned information from a prospective client may not use or reveal that information, except as rule 4-1.9 would permit with respect to information of a former client." *See* R. Reg. Fla. Bar 4-1.18(b). A lawyer cannot "represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be used to the disadvantage of that person in the matter, except" where both the client and prospective client give written informed consent. *See* R. Reg.

---

[3] "A person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client." R. Reg. Fla. Bar 4-1.18(a).

Fla. Bar 4-1.18(c), (d)(1).

If "lawyers are associated in a firm, none of them may knowingly represent a client when any 1 of them practicing alone would be prohibited from doing so by rule 4-1.7 or 4-1.9 except as provided elsewhere in this rule, or unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm." *See* R. Reg. Fla. Bar 4-1.10(a). Indeed, "[w]hen a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by rules 4-1.6 and 4-1.9(b) and (c) that is material to the matter." *See* R. Reg. Fla. Bar 4-1.10(b). The same principle covers prospective clients. *See* R. Reg. Fla. Bar 4-1.18(c) ("If a lawyer is disqualified from representation under this rule, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in the matter, except as provided in subdivision (d)."); R. Reg. Fla. Bar 4-1.18(d)(1) (defining exceptions to include when "both the affected client and the prospective client have given informed consent, confirmed in writing"). But the informed consent exception applies to Rule 4-1.10 and Rule 4-1.18, just as it applies to Rule 4-1.7(a). *See* R. Reg. Fla. Bar 4-1.10(d) ("A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in rule 4-1.7."); R. Reg. Fla. Bar 4-1.18(d)(1).

Finally, Florida Bar Rules also explain lawyers' duties to the Court. In particular, they provide that a "lawyer shall not knowingly" make "a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." *See* R. Reg. Fla. Bar 4-3.3(a)(1). Nor can a lawyer "fail to disclose a material fact to a

tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client."
*See* R. Reg. Fla. Bar 4-3.3(a)(2). And the "duties stated in" Rule 4-3.3 "continue beyond the conclusion of the proceeding and apply even if compliance requires disclosure of information otherwise protected by rule 4-1.6." *See* R. Reg. Fla. Bar 4-3.3(d). A similar responsibility applies to a lawyer's conduct in general, as a "lawyer shall not . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." *See* R. Reg. Fla. Bar 4-8.4(c). Nor can a lawyer "engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including to knowingly, or through callous indifference, disparage, humiliate, or discriminate against litigants, jurors, witnesses, court personnel, or other lawyers on any basis, including, but not limited to, on account of race, ethnicity, gender, religion, national origin, disability, marital status, sexual orientation, age, socioeconomic status, employment, or physical characteristic." *See* R. Reg. Fla. Bar 4-8.4(d).

Where "a lawyer's conduct is allegedly unethical but does not threaten the orderly administration of justice" — by, for example, engaging in "in-court misconduct or deliberate challenges to the court's authority" — "violating an ethical rule is a necessary but not always sufficient condition for disqualification." *Kleiman*, 662 F. Supp. 3d at 1253 & n.2; *Anodyne*, 365 F. Supp. 2d at 1236 (noting that "disqualification is never automatic" (quotation marks omitted)). "[E]ven if an ethical rule has been violated, the Court must look to 'various factors, such as the nature of the ethical violation; the prejudice to the parties; the effectiveness of counsel in light of the violations; the public's perception of the profession; and whether or not the attempt to disqualify an attorney is used as a tactical device or a means of harassment.'" *Kleiman*, 662 F. Supp. 3d at 1253 (quoting *Anodyne*, 365 F. Supp. 2d at 1237); *see also Anodyne*, 365 F. Supp. 2d at 1237 ("Rather than reflexively requiring disqualification for an ethical infraction, the better

approach is to employ a balancing test.").

"The party moving to disqualify counsel bears the burden of proving the grounds for disqualification." *In re BellSouth*, 334 F.3d at 961. Courts in this Circuit "will not deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct." *In re Finkelstein*, 901 F.2d 1560, 1565 (11th Cir. 1990) (quotation marks omitted). And the drafters of the Florida Bar Rules have noted that, while "opposing counsel may properly raise the question" of whether a lawyer's representation is proper if "the conflict is such as clearly to call in question the fair or efficient administration of justice," any such objection by an opposing party "should be viewed with caution" because "it can be misused as a technique of harassment." *See* R. Reg. Fla. Bar 4-1.7 cmt. (noting, in subsection titled "Conflict charged by an opposing party," also that "[r]esolving questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation" but that "[i]n litigation, a court may raise the question when there is reason to infer that the lawyer has neglected the responsibility").

### C.  Sanctions, Including Disqualification, Under the Court's Inherent Authority

"Courts have the inherent authority to control the proceedings before them, which includes the authority to impose reasonable and appropriate sanctions." *See Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) (quotation marks omitted). "[T]he powers stemming from the Court's inherent authority are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Barash v. Kates*, 585 F. Supp. 2d 1347, 1364 (S.D. Fla. 2006) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). A court's "inherent authority to impose sanctions is not displaced merely because particular statutes or rules may

likewise provide a basis for the imposition of sanctions," as "other statutes or rules 'are not substitutes for the inherent power.'" *See id.* at 1365 (quoting *Chambers*, 501 U.S. at 46). Indeed, a court's "inherent authority is 'both broader and narrower' than other rules and statutes, in that while other rules or statutes may reach only certain individuals or conduct, 'the inherent power extends to a full range of litigation abuses'" and, thus, "'fill[s] in the interstices.'" *See id.* at 1365 (quoting *Chambers*, 501 U.S. at 46).

"The purpose of the inherent power is both to vindicate judicial authority without resorting to contempt of court sanctions and to make the non-violating party whole." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th Cir. 2017); *see also Kleiner*, 751 F.2d at 1209 ("Courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal."). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. "A primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44–45. "This power is not a remedy for protracted litigation; it is for rectifying disobedience, regardless of whether such disobedience interfered with the conduct of the trial. Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." *Purchasing Power*, 851 F.3d at 1225 (citation omitted).

"[I]nherent powers, which are incidental to a federal court, include the power to control and discipline attorneys appearing before it." *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995); *see also Kleiner*, 751 F.2d at 1209 ("The inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." (citation omitted)). "A trial judge possesses the inherent power to discipline

counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt" because the "court's power to impose appropriate sanctions on attorneys practicing before it springs from a different source than does the power to punish for criminal contempt." *See Kleiner*, 751 F.2d at 1209 (footnote omitted). The sanctions a trial court can impose under its "inherent power to discipline intentional attorney misconduct" include "assessment of attorneys' fees and costs, disqualification of counsel, and monetary penalties payable to the clerk of the court." *Id.* (citations omitted). "A court's inherent power to disqualify an attorney or otherwise sanction a party or attorney is rooted in concern for the integrity of the judiciary and the public's perception thereof." *In re BellSouth*, 334 F.3d at 951.

"A court also has the power to conduct an independent investigation to determine whether it has been the victim of fraud." *Martin*, 307 F.3d at 1335. "To exercise its inherent power a court must find that the party acted in bad faith." *Id.* "A party demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order." *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006) (alteration adopted, citation omitted). "[I]n the absence of direct evidence of subjective bad faith, this standard can be met if an attorney's conduct is so egregious that it could only be committed in bad faith." *Purchasing Power*, 851 F.3d at 1224–25. "This is not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith." *Id.* at 1225.

### D.  Sanctions Under the Local Rules and the Rules of Civil Procedure

Outside of its inherent authority, the Court can sanction lawyers if a court rule authorizes it. *See Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2007) (recognizing that sanctions can be based on a statute or rule of civil procedure in addition to the court's inherent authority); *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993) (analyzing

13

sanctions under Rule 37); *Barash*, 585 F. Supp. 2d at 1363 (analyzing sanctions under Rule 11).

Under Rule 11, for example, "the court may impose an appropriate sanction on any attorney, law

firm, or party that violated the rule or is responsible for the violation."  Fed. R. Civ. P. 11(c)(1).

A sanction imposed under Rule 11 "must be limited to what suffices to deter repetition of the

conduct or comparable conduct by others similarly situated" and "may include nonmonetary

directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective

deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees

and other expenses directly resulting from the violation."  Fed. R. Civ. P. 11(c)(4); *see also* Fed.

R. Civ. P. 11(c)(5) (prohibiting money sanctions in two situations). A lawyer violates Rule 11 if

he files a document for an "improper purpose," that contains unsupported factual contentions, or

that includes unwarranted factual denials or legal contentions.[4]  *See* Fed. R. Civ. P. 11(b).

Likewise, under Rule 37, the court can sanction a party who "fails to provide information

or identify a witness as required by Rule 26(a) or (e)," *see* Fed. R. Civ. P. 37(c)(1); "fails to admit

what is requested under Rule 36" if "the requesting party later proves a document to be genuine or

the matter true," *see* Fed. R. Civ. P. 37(c)(2); or "fails to serve its answers, objections, or written

response" to properly served "interrogatories under Rule 33" or "request[s] for inspection under

---

[4] In full, Rule 11(b) provides:

> By presenting to the court a pleading, written motion, or other paper—whether by signing,
> filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to
> the best of the person's knowledge, information, and belief, formed after an inquiry reasonable
> under the circumstances: (1) it is not being presented for any improper purpose, such as to
> harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) the claims,
> defenses, and other legal contentions are warranted by existing law or by a nonfrivolous
> argument for extending, modifying, or reversing existing law or for establishing new law; (3)
> the factual contentions have evidentiary support or, if specifically so identified, will likely
> have evidentiary support after a reasonable opportunity for further investigation or discovery;
> and (4) the denials of factual contentions are warranted on the evidence or, if specifically so
> identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b).

CASE NO. 25-CV-20465-BLOOM/Elfenbein

Rule 34," *see* Fed. R. Civ. P. 37(d)(1)(A)(ii).  Sanctions under Rule 37(c) and (d) can include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," *see* Fed. R. Civ. P. 37(b)(2)(A)(i), (c)(1), (d)(3), and "requir[ing] the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust," *see* Fed. R. Civ. P. 37(c)(1)(A), (d)(3).

Finally, under Local Rule 7.1(a)(3), the court can sanction a party for failing to comply with this District's requirement that parties "confer (orally or in writing), or make reasonable effort to confer (orally or in writing)" in "a good faith effort to resolve by agreement the issues to be raised in" a motion.  *See* S.D. Fla. L.R. 7.1(a)(3).  Sanctions under Local Rule 7.1(a)(3) "may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee."  *See* S.D. Fla. L.R. 7.1(a)(3).

## III.    DISCUSSION

As noted above, this Order addresses Plaintiffs' five post-dismissal Sanctions Motions. Before evaluating the merits of those motions, however, the Court must address its own authority to decide them.  *See, e.g.*, *Univ. of S. Alabama v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999) ("[A] federal court is obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking.").  The reason the Court's subject-matter jurisdiction is in question here is because the Amended Complaint has been dismissed and Plaintiffs have appealed that dismissal.  But while a notice of appeal deprives a district court of jurisdiction over all issues involved in the appeal, it does not prevent the court from entertaining motions on matters collateral to those at issue on appeal.  *See Mahone*, 326 F.3d at 1179.

Motions for sanctions appear on the illustrative list of collateral issues the Eleventh Circuit compiled in *Absolute Activist*. *See* 998 F.3d at 1266 (including requests for "contempt sanctions" and "Rule 11 sanctions"). While *Absolute Activist* did not involve a question about the district court's jurisdiction during the pendency of an appeal, it did analyze the district court's jurisdiction in the closely related context of a Rule 41 dismissal, which also deprives the district court of subject-matter jurisdiction over a case. *See id.* The Eleventh Circuit has also made clear that the important consideration when deciding if a matter is collateral is whether it raises questions that are separate and distinct from the issues raised by the direct appeal, *see Weaver*, 172 F.3d at 773, such that resolving those questions does not affect the questions presented on appeal, *see Bush*, 261 F.3d at 1064.

Plaintiffs' five Sanctions Motions ask the Court for a range of relief that includes everything from disqualifying defense counsel and referring them to the Court's grievance committee to ordering defense counsel to remove material from their websites and pay the expenses Plaintiffs incurred to bring the motions. *See* ECF No. [172]; ECF No. [225]; ECF No. [233]; ECF No. [235]; ECF No. [301]. Plaintiffs base their requests on a variety of conduct, including defense counsel's alleged conflicts of interest, their failure to disclose relevant information about potential conflicts, and their purportedly false and misleading statements to the Court in filings and during hearings. *See* ECF No. [172]; ECF No. [225]; ECF No. [233]; ECF No. [235]; ECF No. [301]. None of that relief, and none of the conduct upon which Plaintiffs base their asserted right to that relief, was a foundation for, or even a consideration in, Judge Bloom's order dismissing the Amended Complaint. *See* ECF No. [165]. For those reasons, Plaintiffs' five Sanctions Motions raise issues that are separate and distinct from the issues Plaintiffs have appealed, and resolving them will not affect the questions presented on appeal. *See Weaver*, 172

F.3d at 773; *Bush*, 261 F.3d at 1064.  That is the very definition of collateral, so the Court concludes that it retains jurisdiction to resolve Plaintiffs' five post-dismissal Sanctions Motions while the appeal of the dismissal is pending.  *See Weaver*, 172 F.3d at 773; *Bush*, 261 F.3d at 1064.

## A. First Sanctions Motion – ECF No. [172]

### 1. The Parties' Arguments

In the First Sanctions Motion, Plaintiffs ask the Court to refer DRT, along with its attorneys Diaz, Coronado, Colomar, and G. Gazso, to this District's "Ad Hoc Committee on Attorney Admissions, Peer Review, and Attorney Grievance" for "investigation and appropriate disciplinary action" based on their alleged violations of Rule 4-1.7, Rule 4-1.9, and Rule 4-1.10.  *See* ECF No. [172] at 2, 8–12, 19–20.  They ask the Court to impose sanctions against DRT and those attorneys "for conflict-of-interest misconduct and related litigation abuse" — specifically, for representing Defendant Medina in this lawsuit without Rodriguez's "informed consent" when Medina's interests are "directly adverse" to Rodriguez's interests and DRT formed an attorney-client relationship with Rodriguez by obtaining "confidential and privileged information" about the purportedly related Delaware Litigation during an October 2023 Zoom meeting.  *See* ECF No. [172] at 3–4, 8–12.  DRT then "worsened this conflict" by assigning G. Gazso to the case because he has interned for Judge Bloom and because, though he did not work for DRT in October 2023, he had access to Rodriguez's confidential information through his father A. Gazso's professional association with Rodriguez.  *See* ECF No. [172] at 4–5, 12–13.  Plaintiffs argue DRT also violated its Rule 4-3.3 duty of candor to the Court by failing to disclose (or "strategic[ally] conceal[ing]") its relationship with Rodriguez, G. Gazso's internship, and the fact that PDVSA Ad Hoc has an interest in this lawsuit.  *See* ECF No. [172] at 4–5, 13–16.

For those reasons, Plaintiffs contend DRT should have been disqualified but were not

because their disqualification motions, ECF No. [30] and ECF No. [144], were not resolved before Judge Bloom dismissed the case on its merits.  *See* ECF No. [172] at 6–7.  They ask this Court to issue a "post-judgment ruling on disqualification" that "DRT had a disqualifying conflict and should have been barred from representing Defendants" to "clarify the impropriety, support appellate review, and mitigate prejudice."  *See* ECF No. [172] at 15–20.  Finally, they argue the Court should sanction DRT under Rule 11, Rule 37, and Local Rule 7.1 for violating its conferral and discovery obligations, including by requiring it to "provide a full accounting of all communications" with, and any other involvement in this lawsuit by, PDVSA Ad Hoc.  *See* ECF No. [172] at 10, 15, 20–21.

In its Response, DRT contends that it has "never represented Rodriguez in any capacity" and that, while "two DRT attorneys had a Zoom call with Rodriguez in 2023, that call did not concern" this lawsuit. *See* ECF No. [175] at 3. Instead, "it involved an unrelated potential matter in Switzerland, and the DRT attorneys never agreed to represent Rodriguez," so DRT did not obtain any privileged or confidential information that would conflict it out of representing Medina. *See* ECF No. [175] at 3–5.  Similarly, it argues G. Gazso did not obtain Rodriguez's privileged information through his father because A. Gazso submitted a sworn declaration averring that he "has never met Rodriguez" and that "the alleged communications between" him and Rodriguez "never took place."  *See* ECF No. [175] at 4.  It argues that no formal ruling on Plaintiffs' earlier disqualification motions is required because Judge Bloom "expressly ruled on the pending motions" in the dismissal, "finding them moot."  *See* ECF No. [175] at 5.  And it argues it did not violate its conferral and discovery obligations because it "did respond to Plaintiffs' numerous communications" about "whether PDVSA Ad Hoc had any involvement in its representation of" Medina, just not "in the manner Plaintiffs desired, as the information sought was irrelevant and

beyond the scope of permissible discovery." *See* ECF No. [175] at 5–6.

In their Reply, Plaintiffs argue DRT is misrepresenting "the nature of its prior consultation" with Rodriguez because Rodriguez's email request for the October 2023 Zoom meeting "clearly and explicitly requested a consultation regarding" U.S. federal court litigation related to PDVSA and "workers rights." *See* ECF No. [185] at 5. They argue they have evidence showing that A. Gazso and Rodriguez have, in fact, communicated, including phone call and "other IT records," which means DRT submitted a "demonstrably false affidavit" to the Court. *See* ECF No. [185] at 4–5; ECF No. [182]. And they argue G. Gazso's presence in the gallery at the January 2025 hearing in the Altonaga Case "clearly warrants scrutiny under Rules 4-1.9 and 4-1.10" despite it being a public proceeding. *See* ECF No. [185] at 6.

### 2. Evidentiary Hearing

As noted above, the Court held the Evidentiary Hearing on January 6 and 7 "to ascertain the facts connected to any communications between Rodriguez and" DRT "in September/October 2023, including the Zoom meeting that was scheduled to occur on October 2, 2023." *See* ECF No. [305] at 1–2. Because the evidence collected at the Evidentiary Hearing impacts the resolution of the First Sanctions Motion, the Court provides more detail about the testimony and admitted exhibits in this section. During the Evidentiary Hearing, the Parties presented the testimony from Rodriguez and from DRT employees Diaz, Colomar, Coronado, Hovispo, Guillen, and Hernandez-Peredo. *See* ECF No. [332]; ECF No. [333]. Because Plaintiffs invoked the rule of sequestration as to any witness who was not also counsel of record, *see* Fed. R. Evid. 615; ECF No. [316] at 5–6, Hovispo, Guillen, and Hernandez-Peredo waited outside the courtroom until it was their turn to testify, *see* Evid. Hr'g Tr. vol. 1, 9, Jan. 6, 2026, while Diaz, Colomar, and Coronado remained in

the courtroom, *see* ECF No. [330].[5]

### i. Rodriguez's Testimony

On direct examination, which proceeded by narrative because he is *pro se*, Rodriguez testified that he emailed Diaz on September 20, 2023 to discuss starting litigation against PDVSA and CITGO in Delaware federal court. *See* Evid. Hr'g Tr. vol. 1, 21. After speaking to Diaz at least once on the phone about litigation finances, Rodriguez attended the Zoom meeting on October 2, 2023. *See id.* at 21, 54. Rodriguez recalled that the meeting started "basically on time," after a three- or four-minute delay caused by a DRT employee's lateness in joining. *See id.* at 21. Once the meeting began, Rodriguez explained that he and Freites "were moving forward" with the Delaware Litigation and also shared information about "another ongoing issue," which Rodriguez characterized as Medina's "defamation campaign." *See id.* at 21–22. Rodriguez told DRT about his "strategy with regard to the" Delaware Litigation, "the things that were going on with regard to Medina and the defamation campaign," and how that defamation campaign "would impact the" Delaware Litigation. *See id.* at 26.

During his direct examination, Rodriguez offered into evidence a chain of emails between him and Diaz, on which Colomar, Coronado, Hernandez-Peredo, Freites, and a then-DRT employee named Jorge Schmidt were eventually copied, that the Court admitted as Plaintiffs' Exhibit 1.[6] *See id.* at 35; ECF No. [30-1] at 32–37. The portion of the email chain from 2022 and

---

[5] The Court granted Plaintiffs' request for witness sequestration but denied their oral motion for reconsideration of their Expedited Motion to Compel Zoom Logs, *see* ECF No. [328]; Evid. Hr'g Tr. vol. 1, 31, which the Court had previously denied because the records sought were unauthorized discovery, the Motion was untimely, the subpoena's compliance period was unreasonable, and Plaintiffs did not timely identify the records on their Exhibit List, *see* ECF No. [329]. Due to the unreasonable compliance period, the Court also denied Plaintiffs' oral motion for a negative inference based on Defendants' alleged withholding of the requested Zoom call logs. *See* Evid. Hr'g Tr. vol. 1, 18.

[6] Defendants offered a shorter version of the email chain that included only the 2022 and 2023 messages, which the Court admitted as Defendants' Exhibit A. *See* ECF No. [334-1]; Evid. Hr'g Tr. vol. 1, 147–50.

2023 has the subject line "Re: Representation in Zurich/workers indemnization from CITGO and PDVSA – International law commercial, workers rights, civil rights and human rights" and includes Rodriguez's initial September 20, 2023 message to Diaz. *See* ECF No. [30-1] at 33–34. In the body of the September 20 message, Rodriguez requests an "initial consultation" about "a case related to" PDVSA, "referring to litigation in Federal Court in the US" that sought "the collection of unpaid workers compensation for several thousands of workers" estimated to be worth "several billion" U.S. dollars. *See* ECF No. [30-1] at 34. It includes a numbered list of five items Rodriguez hoped to accomplish during the consultation, including providing "a more comprehensive overview of the case," understanding DRT's "approach to similar cases or issues," discussing "potential legal remedies and strategies," addressing "any questions or concerns" DRT had, and clarifying "the next steps and potential timelines." *See* ECF No. [30-1] at 34. And it lays out Rodriguez's belief that the consultation would "be subject to client-attorney privilege, non-binding with respect to engagement of parties, and without any associated fees or costs unless specifically agreed upon in writing." *See* ECF No. [30-1] at 34.

On cross-examination, Rodriguez clarified that the earlier emails in the chain are between only him and Diaz and that Diaz later added other recipients to the October 2, 2023 message. *See* Evid. Hr'g Tr. vol. 1, 43. Rodriguez admitted that the initial message to Diaz on September 20 did not mention Medina, defamation, Delaware, or Racketeer Influenced and Corrupt Organizations (RICO) Act claims, which Plaintiffs asserted in the Amended Complaint. *See id.* at 44–45; ECF No. [52] at 12. He also admitted that Diaz had made clear in a responsive September 20 message that DRT could not and would not consider taking Rodriguez's proposed case on a contingency fee basis. *See* Evid. Hr'g Tr. vol. 1, 45; ECF No. [30-1] at 33.

When asked about the October 2 Zoom meeting, Rodriguez testified that he knew Diaz

attended it because he spoke to Diaz during the meeting. *See* Evid. Hr'g Tr. vol. 1, 46. As to who else attended, Rodriguez admitted he "presum[ed] that the persons copied in the email exchange," including Coronado, attended "the Zoom call" because they were "summoned by" their "boss" Diaz "to be there." *See id.* at 46–47. Rodriguez also admitted he could not say for certain who attended the meeting because he did not "know who is talking" and it was "not relevant" to him "who was doing the talking at that moment." *See id.* at 47. He remembered there was "a woman who spoke," but he "cannot know who." *See id.* at 48. He reiterated: "The only one I know is Michael Diaz." *See id.* Rodriguez admitted he did not "sign an engagement agreement or letter with" DRT, receive any written legal opinion from DRT, or provide any additional "summaries or documents" to DRT after the meeting, though he did send "a note." *See id.* at 62–63. Nor did DRT appear on his behalf in any legal action after the meeting. *See id.* at 63.

After having his recollection refreshed, *see id.* at 50, Rodriguez admitted he swore under penalty of perjury in an affidavit that the Zoom "meeting was attended by Michael Diaz, Javier Coronado, Marta Colomar, Jorge Schmidt, and Isabela Hernandez-Peredo." *See id.* at 51; ECF No. [30-1] at 7. Rodriguez also admitted he swore in his affidavit that "attorneys Michael Diaz, Javier Coronado, Ayleen Hovispo and Marta Colomar, each of whom represent Medina, previously engaged in" privileged discussions with him. *See* Evid. Hr'g Tr. vol. 1, 52; ECF No. [30-1] at 3. And Rodriguez admitted his affidavit statements did not "include any caveats [or] any disclaimers" to alert a reader that Rodriguez had only "presumed" those people attended the October 2 Zoom meeting or engaged in privileged discussions with him because they were "taken from the email." *See* Evid. Hr'g Tr. vol. 1, 51–53. As to the substance of the October 2 Zoom meeting, Rodriguez reiterated that he talked with Diaz about legal strategies and a cease-and-desist letter he and Freites sent to Medina on September 29, 2023 about the defamation campaign. *See*

*id.* at 21–22, 53.

Rodriguez denied "saying all of those things just to try disqualify" DRT, and he acknowledged that his testimony had to be truthful and that he was not permitted to lie to the Court. *See id.* at 54–56. After initially denying that any court had previously determined that he had committed fraud, Rodriguez later admitted that Chief Judge Altonaga, in the Altonaga Case, had found that the plaintiffs, including Rodriguez, had "committed fraud upon the court." *See id.* at 56–57. But Rodriguez clarified that the fraud finding was against "the plaintiffs, in general," not against him specifically. *See id.* at 57–58. Rodriguez did not offer any redirect examination testimony. *See id.* at 65–66.

The Court did, however, allow Roriguez to recall himself as a witness after Diaz and Colomar testified because they both noted the October 2 Zoom call "was delayed because there was someone" Rodriguez "wanted to participate in the call" and Rodriguez did not have notice of that position before their testimony. *See* Evid. Hr'g Tr. vol. 2, 115, Jan. 7, 2026. After being recalled, Rodriguez testified that he "did not have any recall of a long delay" until Colomar "refreshed" his "mind when she said that" he "was waiting for someone." *See id.* at 115–16. When he thought about who that person could be, he realized it was Freites. *See id.* at 117. He also testified that he had sent "an identical email to four large firms" around September 20 because he "was actively looking for representation" and that the "defamation by Medina had not occurred at that point," as he became aware of it between September 25 and September 27. *See id.* at 116–18. On recall questioning by the Court, Rodriguez confirmed that Freites is the person he was trying to add to the October 2 Zoom call but could did not remember how long Freites's inability to join the Zoom delayed its commencement. *See id.* at 119.

###### ii. Diaz's Testimony

On direct examination, Diaz testified that he does not recall Rodriguez "at all" but that he learned from information he received during this case that DRT had, more than a decade before, represented a company in which Rodriguez was a member. *See id.* at 67. He explained that, before the Evidentiary Hearing, he "asked the office to verify any communications in whatever form with" Rodriguez. *See id.* at 77–78. He also explained that there were not "any substantial communications between" him and Rodriguez and that he had not shared anything that was communicated between them with anyone outside of DRT. *See id.* at 82. He noted DRT has "a rule" that its lawyers cannot conduct client intake interviews "alone," so he copies other lawyers when asking for an interview to ensure that "at least" one can join him. *See id.* at 84.

About the October 2 Zoom meeting, Diaz testified that he did not "remember who" from DRT joined but that he had "since that time" come to "understand" it was Colomar. *See id.* at 86. He did not recall exactly when the meeting began, but he remembered he got frustrated because Rodriguez delayed the meeting "trying to bring someone else into the call" and having technical trouble doing so. *See id.* at 87–88. He explained that "there was no one from PDVSA Ad Hoc on" the Zoom call because DRT "didn't even represent them at that time" and "didn't even know who" Medina was then. *See id.* at 88.

On cross examination, Diaz testified that he and Rodriguez spoke about "a BBC article" that Rodriguez had read from 2021 that "talked about" DRT "recovering assets on behalf of the Department of Justice that" it "worked in collaboration with, that had to do with Venezuela, and PDVSA." *See id.* at 90. Because of that article, Rodriguez "wanted to potentially introduce" DRT "to someone with respect to a claim in an asset recovery case in Europe." *See id.* They did not talk about "a potential defamation case," Medina, Freites, Otero, or "any of the claims" in the

Amended Complaint.  *See id.* at 90–91.  Diaz testified that, after the meeting, Rodriguez was not DRT's client; DRT had not opened "a file" on, sent a "retainer agreement to," or received payment from Rodriguez; he had never provided Rodriguez any direct legal advice; and he never spoke to Rodriguez again.  *See id.* at 91–93.

Diaz testified that he had "absolutely not" "used any information of what happened during" the Zoom call "in any capacity in defending Mr. Medina in this case."  *See id.* at 93.  He explained that the only records DRT had found "involving communications between" DRT and Rodriguez were the October 2 Zoom meeting and the email chain requesting it, despite that Diaz "was explicit in an email to" Rodriguez asking for "a summary of" Rodriguez's "case" or "claim" so that Diaz could "look at it."  *See id.* at 93–94.  Rodriguez sent "nothing about the summary of the claims, nothing about the parties involved, none of it."  *See id.* at 94.

On redirect examination, Diaz admitted that the email requesting the October 2 Zoom meeting does not contain the word "recovery" or the word "assets."  *See id.* at 95–96.  But he explained that, even so, on the actual Zoom call they discussed an earlier Connecticut case DRT had handled involving the PDVSA "pension fund" and an attempt to recover money that had been stolen from it through a "Ponzi scheme," which Diaz considered an "asset recovery type of case."  *See id.* at 96–97.  Diaz also admitted the email did not contain the word "contingency," but he explained that he inferred from Rodriguez's worry about being charged for the Zoom call and from Rodriguez's 2022 email about another matter that Rodriguez was looking for a contingency fee arrangement.  *See id.* at 97–100.  Diaz testified he first learned about Rodriguez's "defamation-related things, issues, causes of actions against Mr. Medina" when Rodriguez emailed DRT in 2025 suggesting they had a conflict of interest.  *See id.* at 101.

25

### iii.   Colomar's Testimony

On direct examination, Colomar testified that she attended the October 2 Zoom meeting with Rodriguez and Diaz. *See id.* at 125. She recalled that she was in DRT's video room for about 30 minutes, but there "was a little bit of delay" in starting the meeting "because no one was on at the beginning, and then someone else was going to connect" on Rodriguez's side. *See id.* at 125, 135. Once it began, the Zoom call included "small talk" and the "conversation itself was over very fast." *See id.* at 135, 142. She acknowledged that it was "usual" to have people attend Zoom meetings from locations outside of DRT's offices but testified that it was not possible anyone other than her, Diaz, and Rodriguez connected to the October 2 Zoom call because she "was seeing the screen" and no one else was there. *See id.* at 137–39.

As for the substance of the meeting, Colomar remembered Rodriguez and Diaz "discussed workers, something happened in Venezuela with some workers of PDVSA" and Rodriguez "wanted a way of getting them paid." *See id.* at 126. Diaz then "discussed his experience" being "involved in a case related to pensions in Venezuela, that was litigated in the United States, and that was pretty much it." *See id.* When asked what she remembered about asset recovery, she recalled that Rodriguez "wanted to recover assets for these workers," to "find assets somewhere to get them paid." *See id.* Colomar acknowledged that Rodriguez's email request for the meeting mentions litigation in the U.S., but she explained that in the actual Zoom call they discussed that Rodriguez was based in Zurich and "wanted to do something in Europe." *See id.* at 127. They did not discuss the September 29 letter Rodriguez and Freites sent to Medina, which Rodriguez "never sent" to DRT, nor did they discuss Medina, who Colomar did not know of in October 2023. *See id.* at 131.

On cross-examination, Colomar testified that Coronado, Schmidt, Hernandez-Peredo, and

Hovispo did not attend the October 2 Zoom meeting and that no one from DRT other than her and Diaz participated.  *See id.* at 146.  She reiterated that she, Rodriguez, and Diaz did not discuss "any case involving" Medina, "any potential case" involving Medina, any "defamation campaigns started by" Medina, or anything "related to a defamation claim" at all, nor did they discuss any of the claims in the Amended Complaint or obstruction of justice.  *See id.* at 147, 152.  She testified that, despite the topics included in Rodriguez's September 20 email requesting the meeting, they did not discuss "any litigation in U.S. federal court" or any pending or forthcoming legal actions in the U.S.  *See id.* at 151–52.  She noted Rodriguez's September 20 email did not attach any documents and did not mention Medina or filing a lawsuit about defamation, RICO claims, or obstruction of justice.  *See id.* at 152.

Colomar confirmed that, after the meeting, Rodriguez was not DRT's client; DRT had not opened "a file" on, sent a "retainer agreement to," or received payment from Rodriguez; and she had never provided Rodriguez any legal advice or agreed to represent him in any legal matter.  *See id.* at 158–59.  She testified that she had not "used any of what was discussed during the Zoom call" in representing Medina and elaborated that doing so "would be impossible" because nothing Rodriguez shared during the Zoom call "related to anything about the current case against Mr. Medina."  *See id.* at 160.  She agreed that Rodriguez had "described the discussions of this Zoom call differently" than she had, and she thought the reason for the difference is that Rodriguez filed the motion to disqualify DRT "as a retaliation for" DRT's "Rule 11 motion."  *See id.*

She noted that DRT "found two things" when, prompted by the Motion to Disqualify DRT, "the firm conducted an internal search for any records related to" Rodriguez and the October 2 Zoom meeting: the email chain that had been thoroughly discussed and a "time entry."  *See id.* at 142, 147–48.  DRT's "custodian of records" conducted a "thorough search for any emails, any

phone logs, any time entries, any paper files, any retainers, anything that had to do" with Rodriguez in DRT's systems, and those were the only two records related to Rodriguez's asserted bases for disqualifying DRT. *See id.* at 148–49. Colomar verified that she had made the time entry, which related to "business development on October 2" with Rodriguez, "at or near the time of" the meeting, as is DRT's practice. *See id.* at 154–55. The Court admitted Colomar's October 2 time entry as Exhibit AH. *See id.* at 156–57. As to the contents of the time entry, it noted Colomar had a "telephone call with potential client Alejandro Rodriguez regarding potential claims against PDVSA." *See id.* at 157. The time entry did not mention Medina, defamation, RICO, or obstruction of justice. *See id.* And it indicated Colomar spent 0.6 hours on the October 2 meeting, which equates to approximately 36 minutes. *See id.* at 158.

On redirect examination, Colomar confirmed that her affidavit statements about the October 2 meeting do not mention asset recovery. *See* Evid. Hr'g Tr. vol. 2, 86. She was also adamant, and repeated many times in response to Rodriguez's questions, that she "did not forget what happened" in the October 2 Zoom meeting. *See* Evid. Hr'g Tr. vol. 1, 163. In fact, the Court reminded Rodriguez that Colomar "unequivocally" testified "she remembers exactly what happened at the meeting" when Rodriguez tried to refresh her recollection with a document. *See id.* at 164.

Answering questions from the Court, Colomar explained that DRT does not typically take contingency fee cases and had done so only three or four times in the sixteen years she had worked there, all in personal injury scenarios. *See* Evid. Hr'g Tr. vol. 2, 92–93. She defined asset recovery as "finding assets anywhere in the world that the claimants can seize or obtain" to "get paid for their claims," and she explained that DRT "work[s] a lot" on cases seeking to recover assets "abroad." *See id.* at 93. She noted that DRT had helped Venezuelan claimants recover assets in

28

Switzerland in 2020 or 2021 and that, while she did not talk to Rodriguez at the October 2 Zoom meeting because she was "just there as a witness," he and Diaz discussed what would be the fastest way to get the workers paid, including possibly through assets they knew were in Switzerland.  *See id.* at 94–96.  Colomar did not recall Rodriguez explicitly saying what forum he wanted to bring his potential lawsuit in, but she inferred that it "was likely something in Europe" based on "the location of the assets."  *See id.* at 96–97.

### iv.  Other Testimony

Each of the remaining four witnesses — Coronado, Hovispo, Guillen, and Hernandez-Peredo — testified that they did not attend the October 2 Zoom meeting.  *See* Evid. Hr'g Tr. vol. 1, 104; Evid. Hr'g Tr. vol. 2, 29, 51, 66, 75.  Hovispo, who is a legal assistant at DRT, and Guillen, who is a receptionist at DRT and handles Diaz's personal appointments, also testified that they did not schedule or manage the October 2 Zoom meeting.  *See* Evid. Hr'g Tr. vol. 2, 29, 43–44, 51–52.

Coronado testified that he conducted "an internal review of whether" Rodriguez's allegation that DRT had a conflict of interest in representing Medina was "supported by internal records or documents," both by searching DRT's systems and client files himself and by relying on DRT's "IT company provider" and DRT's "administrative staff."  *See* Evid. Hr'g Tr. vol. 1, 119–20.  Coronado also reviewed his own phone records, but the "only two records on file" were "the email exchange" between Rodriguez and Diaz "where other people are copied around" September and October 2023 and the "diary entry activity report by attorney administrative partner" Colomar, which in Coronado's opinion did "not substantiate the disqualification allegations."  *See id.* at 120.

**v.  Closing Arguments**

In his closing argument, Rodriguez focused mostly on the fact that DRT could have saved the Court and the Parties from having the Evidentiary Hearing if it would have produced the log of the October 2 Zoom call to show who attended.  *See id.* at 122–24.  In its closing, DRT asked the Court to deny the First Sanctions Motion and the Fourth Sanctions Motion because the evidence showed that the communications between Rodriguez and DRT in September/October 2023 "were narrow" in that they involved only the email chain and the October 2 Zoom call.  *See id.* at 124–26.  DRT noted the email chain did not refer to any claims in the Amended Complaint, and it argued that, in the October 2 Zoom meeting, it did not "receive any confidential information from" Rodriguez, "never provided any legal services to" him, and "never agreed to represent" him "in any legal matter."  *See id.* at 125–26, 129.

DRT highlighted the fact that Rodriguez swore in his affidavit that Diaz, Colomar, Coronado, Schimdt, Hernandez-Peredo, and Hovispo attended the Zoom call but then testified that he had merely inferred their attendance because they were copied on the email chain.  *See id.* at 126.  DRT also pointed out that Rodriguez himself "on a number of occasions" during his testimony did not "recall what happened during the meeting," despite his certainty in his affidavit about who was there and what they discussed.  *See id.* at 127–28.  On the other hand, Diaz and Colomar had testified — credibly and consistent with each other and the rest of the evidence — that the October 2 Zoom call was about only "some potential avenues that could be pursued in an unidentified matter in Europe."  *See id.* at 127.  And it reminded the Court that Rodriguez was among a group of plaintiffs that Chief Judge Altonaga found had committed fraud on the court in the Altonaga Case.  *See id.* at 128.

Finally, DRT argued Plaintiffs had failed to carry their burden to show that disqualifying

DRT was warranted because they had not shown DRT violated any rule of professional conduct. *See id.* at 128–29. Nor had Plaintiffs demonstrated that the October 2 Zoom meeting had established an attorney-client relationship between Rodriguez and DRT. *See id.* at 129. And they had not shown any "compelling reasons requiring" the "extraordinary remedy of disqualifying the entire firm and the attorneys that have appeared in this matter." *See id.* at 130.

On rebuttal, Rodriguez argued it would be "incredible" to believe that he did not raise the defamation claims against Medina during the October 2 Zoom call because he had filed the Delaware Litigation only three weeks earlier and had become aware of the defamation just days before, so those things were more urgent to him than the PDVSA workers claim. *See id.* at 131–32.

### 3. Credibility Determination

As described above, Plaintiffs ask the Court to impose a wide range of sanctions on DRT and its attorneys, including disqualifying them from representing Defendant Medina in this action, based primarily on a conflict of interest they assert arose out of the information Rodriguez shared with DRT during the October 2 Zoom meeting. *See generally* ECF No. [172]. The Court held the Evidentiary Hearing specifically to determine what information was shared at that meeting and with whom. *See* ECF No. [305]. During the Evidentiary Hearing, Rodriguez's recollection of the meeting's discussion was markedly different than the recollections of Diaz and Colomar, so before the Court can decide whether sanctions are warranted here, it must first determine whose recollection is most credible. For at least four reasons, the Court finds most credible the recollection of Colomar, whose testimony mostly aligns with Diaz's testimony and best aligns with the non-testimonial evidence in the record.

First, while Rodriguez, Diaz, and Colomar all recalled there being a delay before the Zoom

call began, both Diaz and Colomar recalled that the delay resulted from two things: for the first three or four minutes after the start time, no one was on the Zoom call, and then, for some additional amount of time, the group was waiting for someone Rodriguez wanted to join. *See* Evid. Hr'g Tr. vol. 1, 21, 87–88, 125, 135. Rodriguez, on the other hand, did not recall the second delay until Colomar's testimony refreshed his recollection that he had wanted Freites to join. *See* Evid. Hr'g Tr. vol. 2, 115–19. Second, Colomar testified without hesitation that she remembered what happened at the meeting, and the only detail she had trouble recalling was the precise kind of injury the PDVSA workers had suffered to support the claims Rodriguez wanted to bring on their behalf. *See* Evid. Hr'g Tr. vol. 1, 162–64. Rodriguez, however, had difficulty remembering even which publication was included in the email chain he had in front of him at the Evidentiary Hearing, saying when Colomar corrected him: "memory is frail."[7] *See* Evid. Hr'g Tr. vol. 2, 102.

Third, and importantly, Diaz's and Colomar's testimonies were consistent with their affidavit statements about who attended the meeting and what they discussed during it. Each of them testified that only they and Rodriguez were on the Zoom call, *see* Evid. Hr'g Tr. vol. 1, 86, 125, 137–39, and that the conversation focused on finding assets in Europe that they could recover to pay the harmed Venezuelan PDVSA workers, *see id.* at 90, 126–27. In contrast, Rodriguez's testimony strayed from his affidavit statements in a concerning way. While in his affidavit he unambiguously swore under penalty of perjury that Diaz, Coronado, Colomar, Schmidt, and Hernandez-Peredo attended the meeting, *see id.* at 51; ECF No. [30-1] at 7, during the Evidentiary Hearing he admitted that he had only "presumed" those people attended the October 2 Zoom meeting because they were copied on the email containing the Zoom link, *see* Evid. Hr'g Tr. vol.

---

[7] The Court notes that, on numerous occasions during the Evidentiary Hearing, Rodriguez asked for the Court's assistance in reading back the question to the witness even though he had just asked the question seconds earlier. *See* Evid. Hr'g Tr. vol. 2, 14, 26, and 73.

1, 46–53.  Similarly, Rodriguez swore in his affidavit that Diaz, Coronado, Hovispo, and Colomar had "previously engaged in" privileged discussions with him, *see id.* at 52; ECF No. [30-1] at 3, when that belief was also merely a presumption based on the email recipients, *see* Evid. Hr'g Tr. vol. 1, 46–53.  Indeed, the unrebutted evidence at the Evidentiary Hearing was that Coronado, Schmidt, and Hernandez-Peredo did not participate in the October 2 Zoom call.  *See* Evid. Hr'g Tr. vol. 1, 104; Evid. Hr'g Tr. vol. 2, 29, 51, 66, 75.  Rodriguez admitted his affidavit did not include any caveats or disclaimers to indicate that his statements were presumptions, *see id.*, making them false statements under oath and his testimony a recantation of his earlier sworn statements.

Further, looking at the email requesting the Zoom meeting, it makes no mention whatsoever of the claims raised in the Amended Complaint.  Consistent with Colomar's testimony about the Zoom call, the email seeks a consultation "related to workers['] indemnization from" PDVSA involving "[i]nternational commercial, workers['] rights, civil rights and human rights," specifically seeking "the collection of unpaid workers['] compensation for several thousands of workers in an amount estimated in several billion USD."  *See* ECF No. [30-1] at 34.  By contrast, Rodriguez testified that, on the Zoom call, he shared information about Medina's "defamation campaign," but his email is very specific about the nature of the consultation and it makes no mention of Medina, defamation, or RICO claims.[8]  *See* ECF No. [30-1] at 34.

For all those reasons, though the Court does not think Rodriguez intentionally lied or misrepresented facts, the Court finds he is an unreliable historian with an imprecise memory of the October 2 Zoom meeting.  Indeed, Rodriguez took great liberties by providing the Court with an

---

[8] While the email references potential litigation in federal court, Colomar explained, upon questioning from the Court, that the venue for the litigation was not discussed in the actual Zoom call so she simply inferred the venue would likely be in Europe based on "the location of the assets."  Evid. Hr'g Tr. vol. 2 at 96–97.

affidavit under oath in which he affirmatively identified people who attended the meeting or had privileged discussions with him when the reality is that he did not accurately remember the meeting participants.   Instead of being truthful about his assumptions, which may have weakened his position somewhat but would have ultimately made him more credible, Rodriguez was willing to make grand accusations without a specific memory of the meeting's attendees.   As a result, the Court cannot credit his testimony about the meeting's participants as reliable.

Likewise, the Court cannot credit Rodriguez's memory of what was discussed at the meeting.   While on this point Rodriguez's affidavit and testimony were consistent — both explain Rodriguez's recollection that the discussions involved the PDVSA workers issue and Medina's defamation, *see id.* at 21–26; ECF No. [30-1] at 7 — that recollection deviates from the documentary evidence in the record.   As explained above, Rodriguez's initial email to Diaz on September 20 lays out in detail what Rodriguez wanted to discuss during the October 2 Zoom call, and nowhere in that message does Rodriguez mention Medina or any RICO or defamation claims. *See* ECF No. [334-1] at 3.   While Rodriguez explained in his testimony that he was not aware of the defamation until between five and seven days after he sent the September 20 email, *see* Evid. Hr'g Tr. vol. 2, 116–18, which would explain why he did not include it in that message, that explanation is not enough to quell the Court's concerns with Rodriguez's memory of the October 2 meeting.

Overall, the gaps in Rodriguez's memory about the meeting are too great for Court to credit his testimony about it.   Until nearly the end of the Evidentiary Hearing, Rodriguez did not even remember that he tried to have another individual join the Zoom call. *See id.* at 115–19.   And as already explained, Rodriguez has demonstrated that he is willing to let assumptions fill in his memory gaps.   Accordingly, the Court credits the testimony of Colomar and Diaz about who

attended the October 2 Zoom meeting and what they discussed during it.

### 4. Analysis

Having established who attended the October 2 Zoom meeting and what they discussed, the Court can now evaluate the merits of the First Sanctions Motion. As explained above, the Florida Bar Rules prohibit lawyers (and their law firms) from representing a client with interests that are "materially adverse" to those of a former or prospective client unless the former or prospective client gives informed consent. *See* R. Reg. Fla. Bar 4-1.9(a); R. Reg. Fla. Bar 4-1.18(c), (d)(1). Similarly, Florida Bar Rules prohibit lawyers (and their law firms) from using any information relating to the representation of a former client or that was gained from a prospective client "to the disadvantage of" the former or prospective client, except when the information has become generally known or the Rules otherwise would permit or require it. *See* R. Reg. Fla. Bar 4-1.9(b); R. Reg. Fla. Bar 4-1.18(b).

Here, Plaintiffs have not established that Rodriguez is a former client of DRT. Indeed, Rodriguez admitted at the Evidentiary Hearing that he did not "sign an engagement agreement or letter with" DRT, receive any written legal opinion from DRT, or provide any additional "summaries or documents" to DRT after the meeting and that DRT did not appear in any legal action on his behalf following the meeting. *See* Evid. Hr'g Tr. vol. 1, 62–63. Similarly, Diaz and Colomar testified that, after the meeting, Rodriguez did not become DRT's client; DRT did not open "a file" on, send a "retainer agreement to," or receive payment from Rodriguez; they never provided any direct legal advice to Rodriguez; and they never spoke to Rodriguez again. *Id.* at 91–93, 158–59. Thus, although Plaintiffs cite to Rule 4-1.9 as the basis of the violation to support their request for sanctions, the Court concludes that this is not the relevant rule for purposes of the analysis in the First Sanctions Motion. Rather, the Court will focus its analysis on Rule 4-1.18,

which regulates an attorney's relationship with a prospective client, as that is what Rodriguez was at the time of the Zoom call— a prospective client.

It is undisputed that Plaintiffs' interests, including Rodriguez's, are materially adverse to Defendant Medina's interests in this lawsuit and that Rodriguez never gave informed consent to DRT in connection with its representation of Medina.  Therefore, the precise question the Court must answer is whether the October 2 Zoom meeting discussions gave DRT information that it could use to Rodriguez's disadvantage.  The Court concludes Plaintiffs have failed to carry their burden of establishing that DRT received any such information.  *See In re BellSouth*, 334 F.3d at 961.

Crediting the Evidentiary Hearing testimony of Colomar and Diaz, the information Rodriguez shared during the October 2 Zoom call was related to Venezuelan PDVSA workers who were injured because they were deprived of proper compensation.  *See* Evid. Hr'g Tr. vol. 1, 90, 126–27.  Colomar testified that Diaz's contributions to the meeting focused on the best and fastest way to get those PDVSA workers paid, which included finding assets in Europe (more particularly Switzerland, where Rodriguez lives) that could be recovered to compensate them.  *See id.* at 126–27; Evid. Hr'g Tr. vol. 2, 94–96.  That testimony aligns with Rodriguez's September 20 email to Diaz requesting the meeting, which explains that Rodriguez's prospective lawsuit "relates to the collection of unpaid workers compensation for several thousands of" PDVSA and CITGO "workers in an amount estimated" to be "several billion" U.S. dollars.  *See* ECF No. [334] at 3.

Nothing about that information — in Rodriguez's words, "matters related to PDVSA-CITGO," *see id.* — is relevant or related to the claims Plaintiffs assert in the Amended Complaint, which focus on Defendants' alleged defamation against them.  *See* ECF No. [52] at 55–119; ECF No. [307] at 1–3.  The Amended Complaint also details an alleged RICO conspiracy with the

common purpose to defame, intimidate, and silence Plaintiffs so as to obstruct justice and retaliate against Plaintiffs' legal activities (particularly the Delaware Litigation) and with predicate acts of witness tampering, obstruction of justice, and money laundering. *See* ECF No. [52] at 55–119; ECF No. [307] at 1–3. Those allegations and claims also have no connection to the PDVSA workers' compensation claims that were the focus of Rodriguez's September 20 email and the October 2 Zoom meeting.

Because the information Rodriguez shared in the September 20 email and the October 2 Zoom meeting is unrelated to the claims Plaintiffs advanced in this lawsuit, DRT could not have used that information to Rodriguez's disadvantage. *See* R. Reg. Fla. Bar 4-1.18(b). And because DRT could not have used the information to Rodriguez's disadvantage, DRT has not violated any rule of professional conduct by representing Defendant Medina in this lawsuit. *See* R. Reg. Fla. Bar 4-1.9(b); R. Reg. Fla. Bar 4-1.18(b); R. Reg. Fla. Bar 4-3.3.

Nor did DRT violate any rule of professional conduct by assigning G. Gazso to work on this case. As to Plaintiffs' argument that G. Gazso had access to Rodriguez's confidential information through his father A. Gazso's professional association with Rodriguez, *see* ECF No. [172] at 4–5, 12–13, the record does not support such a conclusion. In an affidavit filed in support of DRT's response to the First Sanctions Motion, A. Gazso avers that he has "never met or spoken with" Rodriguez, "let alone discussed with him claims involving" Medina. *See* ECF No. [175-1] at 2. He also avers that, while G. Gazso did work for his law firm between 2016 and 2022, he did so "as a law clerk, not as an attorney." *See* ECF No. [175-1] at 2. And he avers that, because he "never communicated" with Rodriguez, G. Gazso "could not have had access to any information concerning him." *See* ECF No. [175-1] at 2. For his part, G. Gazso confirms each of those statements in his own affidavit. *See* ECF No. [175-2]. He avers that he "never received or was

exposed to any confidential information related to" Rodriguez while working at his father's law firm and that he "first became aware of" Rodriguez "in or around October 2024, when DRT began monitoring" the Altonaga Case "in anticipation of potential claims against DRT's client" Medina. *See* ECF No. [175-2] at 2.

In his own affidavit in Reply, Rodriguez avers that A. Gazso's affidavit statement about never having communicated with him is "not accurate" because he "started telephonic communication" with A. Gazso in "June 2020" to discuss "potential legal claims" against Medina, PDVSA, and CITGO. *See* ECF No. [182] at 2. Rodriguez avers that he "can provide" a "record log of starting communications" to A. Gazso, which he maintains for his "personal and business affairs." *See* ECF No. [182] at 1–2; ECF No. [225-1] at 53–57. He also avers that G. Gazso's affidavit statement about having no knowledge of him before October 2024 "is not credible" given their "families' long-standing connections," including a decades-long close relationship between Rodriguez and G. Gazso's grandparents. *See* ECF No. [182] at 2–3. Rodriguez avers that he got A. Gazso's phone number from members of the extended Gazso family, which he asserts is more proof that it is "highly improbable" that G. Gazso "was unaware" of Rodriguez or his "circumstances." *See* ECF No. [182] at 3.

During the October 24, 2025 Status Hearing, Rodriguez gave more detail about the "call log" that he argues proves he and A. Gazso communicated in June 2020. *See* ECF No. [295] at 29; ECF No. [225-1] at 53–57. The call log, which was "machine-generated" from Rodriguez's "Skype account," shows a single call placed on June 24, 2020 to a phone number that an internet search suggests belongs to A. Gazso, but gives no other details. *See* ECF No. [225-1] at 53–57. The call log entry does not, for example, indicate whether the call was answered and, if so, how long the call lasted. *See* ECF No. [225-1] at 55. When the Court highlighted these critical

omissions at the Status Hearing, Rodriguez agreed that he does not possess any records that could supplement the call log.[9]  *See* ECF No. [295] at 29–32.

Taking all the evidence together, the Court finds that Plaintiffs have not carried their burden to establish that G. Gazso received or was exposed to Rodriguez's confidential information through his father A. Gazso. Both Gazsos unequivocally aver that A. Gazso has never communicated with Rodriguez, and the Skype call log Rodriguez offers does not contradict those averments.  The call log does not definitively establish that the call actually connected and that a conversation occurred, let alone that any conversation involved Rodriguez's confidential information, much less any confidential information about defamatory statements that Defendants allegedly made in August and September of 2023, which was more than three years after this alleged conversation with A Gazso.  At most, the call log shows that Rodriguez called a phone number that may be associated with A. Gazso, but even that conclusion is tenuous because the "validation" Rodriguez provides is an unverified entry from a non-official website called "FastPeopleSearch.com." *See* ECF No. [225-1] at 57.

As for Rodriguez's assertion that it is improbable G. Gazso did not know of him before October 2024 because of their longstanding family connection, the Court has no problem accepting that G. Gazso was not aware of a friend of his grandparents whom he may have met when he was a child.  And regardless, any such childhood meeting has no bearing on whether G. Gazso received

---

[9] The Court did not allow any additional discovery on this matter because, even if the Court assumes that Rodriguez placed a phone call to this phone number in June 2020 and that the phone number belonged to A. Gazso, Plaintiffs could not possibly establish that Rodriguez shared privileged information with A. Gazso during that call about the claims in the Amended Complaint.  This is because Defendants did not make the allegedly defamatory statements at issue in the Amended Complaint until August of 2023 and in the months that followed — more than three years after any such phone call.  Further, the Court notes that, in his affidavit, *see* ECF No. [182] at 2, Rodriguez avers that he communicated with A. Gazso on "multiple occasions" and that they had multiple "calls," but he only provided proof of this singular phone call in June of 2020.

Rodriguez's confidential information and, therefore, should be disqualified — along with the entire law firm — from representing Medina. Because Plaintiffs have not established that G. Gazso received any confidential information about Rodriguez from his father A. Gazso, neither he nor DRT could have used the information to Rodriguez's disadvantage. Accordingly, the Court finds Plaintiffs have not shown G. Gazso or DRT violated any rule of professional conduct by representing Defendant Medina in this lawsuit.[10] *See* R. Reg. Fla. Bar 4-1.9(b); R. Reg. Fla. Bar 4-1.10(a)–(b); R. Reg. Fla. Bar 4-1.18(b); R. Reg. Fla. Bar 4-3.3.

Finally, as to Plaintiffs' argument that the Court should sanction DRT under Rule 11, Rule 37, and Local Rule 7.1 for violating its conferral and discovery obligations, *see* ECF No. [172] at 10, 15, 20–21, the Court finds nothing in the record to support a conclusion that DRT did not confer with Plaintiffs as required or that it failed engage in discovery. As DRT explains, it

---

[10] As to Plaintiffs' arguments that G. Gazso had a duty to disclose his summer internship with Judge Bloom and acted suspiciously by attending the January 2025 hearing in the Altonaga Case, the Court finds them to be without merit. As G. Gazso explained during the Status Conference, the internship is included on his publicly available LinkedIn profile and his DRT "website page." *See* ECF No. [295] at 77–78. In any event, G. Gazso's participation in an internship program *years before this lawsuit was filed* does not support a conclusion that Judge Bloom is biased in his favor. *See Brown v. Brock*, 169 F. App'x 579, 583 (11th Cir. 2006) (explaining that "an ethical danger exists only if the law clerk knows the judge's thoughts about a specific matter and the law clerk subsequently represents one of the parties to the matter before the judge."); *Scopelliti v. City of Tampa*, No: 14–CV–949–MSS–TGW, 2015 WL 13427797, at *1–2 (M.D. Fla. Nov. 20, 2015); *Reed v. Chamblee*, No. 22-CV-1059-TJC-PDB, 2024 WL 69570, at *2 n.4 (M.D. Fla. Jan. 5, 2024). As this case was filed long after G. Gazso's internship concluded, there was no occasion for Judge Bloom to have shared her impressions about this matter with him. Similarly, G. Gazso's attendance at a court proceeding that is open to the public does not create a "strong appearance of impropriety," especially given his explanation that he attended because DRT anticipated Plaintiffs would be bringing claims against Medina. *See* ECF No. [175-2] at 2.

As to Plaintiffs' argument that DRT violated its duty of candor to the Court by failing to disclose or strategically concealing the fact that PDVSA Ad Hoc has an interest in this lawsuit, *see* ECF No. [172] at 4–5, 13–16, the Court finds nothing in the record to support such a conclusion. Although Plaintiffs argue that DRT's use of the email address "pdvsaadhoc@diazreus.com" is a "*smoking gun* indicating that PDVSA Ad Hoc personnel were actively involved in the defense's strategy and communications," *see* ECF No. [172] at 4–5, that is a grand overstatement, and Plaintiffs offer nothing to substantiate their speculation. And as DRT explains, the "email address pdvsaadhoc@diazreus.com is not, and has never been, an address belonging to PDVSA Ad Hoc. It is a distribution list that directs messages to DRT personnel" including Coronado, Diaz, Colomar, G. Gazso, Hovispo, and Hernandez-Peredo. *See* ECF No. [175-3] at 9.

responded to Plaintiffs' "numerous communications" about "whether PDVSA Ad Hoc had any involvement in its representation of" Medina, just not "in the manner Plaintiffs desired, as the information sought was irrelevant and beyond the scope of permissible discovery." *See* ECF No. [175] at 5–6. The Court finds nothing wrong with DRT's actions in conferral and discovery.

For all those reasons, the Court concludes that DRT and its lawyers did not violate any rule of professional conduct by representing Medina in this lawsuit, so sanctions are not warranted on that basis. Likewise, the Court concludes that sanctions are not warranted under any federal or local procedural rule, such as Rule 11, Rule 37, or Local Rule 7.1. Finally, the Court declines to exercise its inherent authority to sanction DRT or its lawyers because Plaintiffs have not shown that DRT committed any misconduct or disobedience that requires the Court to act to vindicate its judicial authority, *see Kleiner*, 751 F.2d at 1209; *Purchasing Power*, 851 F.3d at 1225, let alone any misconduct or disobedience rooted in bad faith, *Martin*, 307 F.3d at 1335. Accordingly, the First Sanctions Motion, **ECF No. [172]**, is **DENIED**.

### B. Second Sanctions Motion – ECF No. [225]

In the Second Sanctions Motion, Plaintiffs again ask the Court to refer DRT to this District's Grievance Committee, along with imposing "severe monetary and non-monetary sanctions" against it for "bad-faith conduct and fraud on the Court," issuing "a post-judgment finding that DRT's representation of Defendant Medina was improper due to its disqualifying conflicts of interest," and ordering DRT to "retract and correct" statements in an article on its website that characterize the Delaware Litigation as a "misuse of legal proceedings to advance unfounded allegations" involving PDVSA Ad Hoc. *See* ECF No. [225] at 7, 13. In support of their requested relief, Plaintiffs mostly point the Court to the same allegations of wrongdoing the Court already assessed in its resolution of the First Sanctions Motion. Specifically, Plaintiffs once

more argue: (1) DRT and G. Gazso have conflicts of interests that make their representation of Medina improper; (2) DRT's submission of A. Gazso's "false affidavit" is a fraud on the Court; (3) DRT omitted from its discovery disclosures the PDVSA Ad Hoc Board's involvement in this lawsuit; and (4) G. Gazso had a duty to disclose his internship with Judge Bloom. *See* ECF No. [225] at 2–6.

New to this motion, Plaintiffs argue that DRT failed to confer with Plaintiffs in good faith when they sought to discuss the Skype call log they assert shows A. Gazso's affidavit is untruthful. *See* ECF No. [225] at 10. Plaintiffs also argue that DRT posted on its law firm website an article about Judge Bloom's May 2025 dismissal of the Amended Complaint in which it admitted PDVSA "was a central party of interest" and "publicly maligned" Plaintiffs by characterizing their lawsuit as a "misuse of legal proceedings to advance unfounded allegations" involving PDVSA Ad Hoc. *See* ECF No. [225] at 7. Plaintiffs argue the Court can sanction DRT under its inherent authority because DRT's actions amount to "bad-faith conduct," *see* ECF No. [225] at 7–9, and can sanction DRT's failure to confer under Local Rule 7.1(a)(3) as well, *see* ECF No. [225] at 9–10.

The Court has already extensively explained why Plaintiffs' arguments about DRT and G. Gazso's purported conflicts of interests, A. Gazso's affidavit, PDVSA's purported involvement in this lawsuit, and G. Gazso's internship fail, *see supra* Section III.A, so it will not reiterate those explanations here. For the reasons discussed above, the Court denies Plaintiffs' requests for sanctions on those bases.

As to Plaintiffs' new arguments about DRT's failure to confer about the Skype call log and DRT's website article about the dismissal of the Amended Complaint, the Court finds them to be without merit. Starting with the conferral, Plaintiffs assert that they "sent a written request to confer via email" to DRT on August 6, 2025 based on what they saw as a "material factual dispute

created" by A. Gazso's affidavit.  *See* ECF No. [225] at 19.  Plaintiffs "stated their intention to file a motion requesting an evidentiary hearing to resolve this factual conflict and expressly asked if Defendants would consent to the relief sought."  *See* ECF No. [225] at 19.  DRT essentially acknowledges that it did not respond to that conferral request before Plaintiffs filed the Second Sanctions Motion on August 15, 2025, but it argues "sanctions under Rule 7.1(a)(3) are inappropriate whenever the conferral would not have resolved the issues presented in the motion." *See* ECF No. [236] at 16–17.  The Court agrees with DRT.

Although the Court does not condone DRT's failure to confer on Plaintiffs' request, the Court notes that the failure to confer does not require the Court to impose sanctions on DRT, as the language of Local Rule 7.1(a)(3) is "permissive," not mandatory.  *See Koppey v. Liberty Mut. Fire Ins. Co.*, No. 20-CV-23581, 2020 WL 13389220, at *2 (S.D. Fla. Dec. 31, 2020); S.D. Fla. L.R. 7.1(a)(3) ("Failure to comply with the requirements of this Local Rule *may* be cause for the Court to . . . impose on counsel an appropriate sanction, which may include an order to pay the amount of the reasonable expenses incurred because of the violation, including a reasonable attorney's fee." (emphasis added)).  Second, courts in this District have denied requests for similar relief under Local Rule 7.1(a)(3) when "conferral would not have resolved the issues presented in the Motion."  *See Koppey*, 2020 WL 13389220, at *2 (denying request to deny a motion based solely on the failure to confer).  The Court finds that approach most appropriate here, as the relief Plaintiffs sought was, in their own words, DRT's agreement to an evidentiary hearing.  *See* ECF No. [225] at 19.

As DRT points out, Plaintiffs have requested an evidentiary hearing in most, if not all, of their motions to this Court.  *See* ECF No. [236] at 17.  And DRT's client, Defendant Medina, has "consistently opposed" that relief in the past, *see* ECF No. [236] at 17 & n.8 (citing ECF No. [175];

ECF No. [196]; ECF No. [221]), and opposes it again here, *see* ECF No. [236] at 17, 19–20.  As a result, the Court concludes that conferral about the request for an evidentiary hearing within the Second Sanctions Motion would not have resulted in an agreement between Plaintiffs, Medina, and DRT that an evidentiary hearing was necessary.  The Court also notes that it would not have granted an evidentiary hearing on the Second Sanctions Motion even if the Parties had jointly requested one, as its earlier orders make clear.  *See* ECF No. [286] (clarifying that the Status Hearing was not an evidentiary hearing); ECF No. [305] at 1–2 (granting in part and denying in part Plaintiffs' requests for an evidentiary hearing).  For all those reasons, the Court declines to impose sanctions under Local Rule 7.1(a)(3).  *See Koppey*, 2020 WL 13389220, at *2.

Moving to DRT's website article about the dismissal of the Amended Complaint, the Court concludes that it does not demonstrate bad faith, which is the key to unlocking the Court's inherent authority to sanction. *See Martin*, 307 F.3d at 1335.  From the Court's review, the article appears to be a five-sentence-long advertising press release posted on DRT's website.  *See* ECF No. [225-1] at 50–51.  The first four sentences contain only statements of fact about the parties and claims involved in this lawsuit and about Judge Bloom's order dismissing it.  *See* ECF No. [225-1] at 50–51.  Plaintiffs take issue with the fifth sentence: "This outcome reinforces that U.S. courts will not permit the misuse of legal proceedings to advance unfounded allegations involving PDVSA Ad Hoc and members of the Venezuelan opposition."  *See* ECF No. [225-1] at 50–51.

While the Court understands Plaintiffs dislike the connotation of the word "unfounded," the fact of the matter is, Judge Bloom did indeed find that their allegations in the Amended Complaint were insufficient to state a claim for relief.  *See* ECF No. [165].  That, essentially, is the dictionary definition of "unfounded."  *See Unfounded*, https://www.merriam-webster.com/dictionary/unfounded (lacking a sound basis: groundless, unwarranted).  Slightly stronger is

Plaintiffs' issue with the word "misuse," implying something improper about Plaintiffs' filing of this lawsuit, which is a finding Judge Bloom did not make. *See* ECF No. [165]. Even so, the article does not go so far as to malign Plaintiffs' personally, as it does not directly accuse them of impropriety or even say that this lawsuit in particular was a misuse of the judicial process. *See* ECF No. [225-1] at 50–51. And importantly, the article did not delay or disrupt the litigation or hamper the enforcement of a court order, which is how the Eleventh Circuit has described bad faith. *See In re Sunshine Jr. Stores*, 456 F.3d at 1304.

Sanctions under the Court's inherent authority are a potent remedy that "must be exercised with restraint and discretion." *See Chambers*, 501 U.S. at 44. They apply when lawyers have been disobedient to the point of abusing judicial process such that the Court's judicial authority must be vindicated. *See id.* at 44–45; *Purchasing Power*, 851 F.3d at 1225. For those reasons, the Court sanctions lawyers only if their "conduct is so egregious that it could only be committed in bad faith," which is "not the same as simple recklessness." *See Purchasing Power*, 851 F.3d at 1224–25. DRT's press release, while certainly not a neutral retelling of this lawsuit's outcome, is not so egregious that it rises to the level of sanctionable bad faith conduct. *See Chambers*, 501 U.S. at 44–45; *Purchasing Power*, 851 F.3d at 1225; *Martin*, 307 F.3d at 1335; *Kleiner*, 751 F.2d at 1209. Accordingly, because none of its grounds meet the threshold for the sanctions Plaintiffs request, the Second Sanctions Motion, **ECF No. [225]**, is **DENIED**.

### C. Third Sanctions Motion – ECF No. [233]

In the Third Sanctions Motion, Plaintiffs repeat their request for the Court to sanction DRT and G. Gazso by disqualifying them from representing Medina in this lawsuit and by requiring them to pay Plaintiffs' costs and expenses in filing the motion. *See* ECF No. [233] at 12. This time, however, Plaintiffs also ask that the same sanctions be imposed against Sardi and Sardi Law.

*See* ECF No. [233] at 12.  Plaintiffs base their requests on what they assert is "a series of undisclosed, coordinated actions" by DRT and Sardi Law that amounts to "misconduct."  *See* ECF No. [233] at 4.

Specifically, Plaintiffs argue DRT and Sardi Law began coordinating their efforts during the Altonaga Case and were secretly representing many of the defendants in that matter while those defendants claimed to be *pro se*, which prevented Rodriguez from challenging DRT's participation based on the same purported conflicts of interest that have been extensively described in this Order. *See* ECF No. [233] at 4–7.  Plaintiffs argue the coordinated representation continues in this lawsuit, which taints Sardi and Sardi law with DRT's conflicts and "demonstrates a sustained and concerted effort to deceive the Court and opposing parties."  *See* ECF No. [233] at 5.  This is especially true, Plaintiffs argue, because Sardi asserted in a conferral email that he had never met Coronado or G. Gazso before his involvement in this case, despite having sat next to G. Gazso during the January hearing in the Altonaga Case, and refused to "provide his full professional identification."  *See* ECF No. [233] at 7–8.

To begin, the Court adopts its analysis from the First Sanctions Motion and the Second Sanctions Motion, which found that DRT and G. Gazso are not conflicted out of representing Medina.  *See supra* Sections III.A–B.  Based on those findings, even assuming DRT clandestinely cooperated with Sardi Law in the Altonaga Case and in this one, neither DRT nor G. Gazso could have infected Sardi and Sardi Law with any kind of imputed conflict.  For that reason, Plaintiffs' request for sanctions against DRT, G. Gazso, Sardi Law, and Sardi based on any purportedly disqualifying conflict is denied.

Moving to the new components of the Third Sanctions Motion, which object to DRT coordinating its defense with Sardi and Sardi Law, the Court has already resolved this issue, too,

in an earlier order. *See* ECF No. [307] at 24–27; ECF No. [338]. As they are known to do, Plaintiffs filed an entirely separate motion based on the same allegedly improper coordination between DRT and Sardi Law. *See* ECF No. [269]. Indeed, in Plaintiffs' Motion for Preliminary Injunctive Relief to Enjoin Improper Coordination Between Defense Counsel, ECF No. [269], Plaintiffs asked the Court to enjoin DRT and Sardi Law from coordinating strategies, sharing information, and taking the same legal positions because DRT's purported conflict gave both law firms an unfair informational advantage that should have disqualified them from representing Medina (the "Motion for Injunction"). *See* ECF No. [269] at 1–3, 6–9; ECF No. [307] at 24.

In its Report and Recommendation ("R&R") on the Motion for Injunction, the Court explained that there is nothing inappropriate about defense counsel coordination and that, in fact, it is normal practice when counsel share a joint interest in defending against a plaintiff's claims. *See* ECF No. [307] at 25. For that reason, the Court recommended that Judge Bloom deny Plaintiffs' Motion for Injunction, *see* ECF No. [307] at 25–27, and Judge Bloom adopted that recommendation, *see* ECF No. [338] at 3. Based on those rulings, the Court concludes that there is no basis to conclude that DRT and Sardi Law have engaged in a sustained and concerted effort to deceive the Court or Plaintiffs. So Plaintiffs' request for sanctions against DRT, G. Gazso, Sardi Law, and Sardi based on coordination of counsel is denied.

Finally, as to Plaintiffs' contention that DRT and Sardi Law have deceived the Court by secretly representing *pro se* defendants in the Altonaga Case, that is not a matter for resolution for this Court. If Plaintiffs can demonstrate that such undisclosed representation occurred, they should raise that issue to Chief Judge Altonaga in the context of the Altonaga Case. And as to Plaintiffs' contention that Sardi deceived them when he said he had not met Coronado or G. Gazso "prior to [his] involvement in this case" because he sat with G. Gazso during the January 2025 hearing in

CASE NO. 25-CV-20465-BLOOM/Elfenbein

the Altonaga Case, *see* ECF No. [233] at 7, Sardi explained at the Status Hearing that he "did not know" that G. Gazso "was there," "did not notice him," and had "no clue of who he was until this case," *see* ECF No. [295] at 52–53. The Court accepts that representation, made in a court proceeding, by an officer of the Court.

But even assuming the statement were untrue, that is not the kind of conduct Rule 11, which is the authority Plaintiffs provide for its sanctions request on this issue, exists to police. As the text of Rule 11 demonstrates, it applies to "representations to the court" in "a pleading, written motion, or other paper," not to conferral emails between counsel. *See* Fed. R. Civ. P. 11(b). While the Court never condones misrepresentations made by counsel, regardless of where they are made, Rule 11 does not authorize sanctions for misrepresentations between counsel and opposing parties. Plaintiffs' request for sanctions against Sardi based on his statements about Coronado and G. Gazso is, therefore, denied. Accordingly, the Third Sanctions Motion, **ECF No. [233]**, is **DENIED**.

### D.  Fourth Sanctions Motion – ECF No. [235]

In the Fourth Sanctions Motion, Plaintiffs ask the Court to "exercise its inherent authority to impose sanctions on Defendants and their counsel for a pattern of bad-faith conduct that is calculated to bring contempt upon the administration of justice." *See* ECF No. [235] at 21. This pattern of bad-faith conduct includes "the submission of perjured testimony" — specifically, a declaration in which Coronado avers that, while investigating Rodriguez's allegations that DRT had acquired confidential information from him in the October 2 Zoom meeting, Coronado contacted Schmidt to ascertain whether Schmidt had ever communicated with Rodriguez "concerning a defamation case involving someone named Horacio Medina" and that Schmidt "advised" through a February 2025 WhatsApp message "that he has not had any such

48

communications." *See* ECF No. [235] at 17–21; ECF No. [59-14] at 2–3, 48. The pattern of bad-faith conduct also includes the "vexatious multiplication of proceedings through the stonewalling of Plaintiffs' good faith attempts to correct the record," *see* ECF No. [235] at 21, which refers to the four-month delay in receiving Schmidt's confirmation, *see* ECF No. [235] at 7–12.

Plaintiffs contend Coronado's declaration is perjurious because Schmidt is copied on the email chain requesting the October 2 Zoom meeting. *See* ECF No. [235] at 19. As they did with Coronado, Hernandez-Peredo, and Hovispo, *see supra* Section III.A, Plaintiffs assert that Schmidt's inclusion on the email chain definitively establishes that Schmidt "was not only aware of but was also directly and intentionally included in communications" about Rodriguez and his potential claims, which is "sufficient to prove that" Schmidt lied when he said he "had no communications with" Rodriguez. *See* ECF No. [235] at 17. Similarly, because Coronado was also copied on the email chain, Plaintiffs argue Coronado knew Schmidt's WhatsApp message was untrue but relied on that "false information" in his declaration anyway. *See* ECF No. [235] at 17–19.

As the Court has now explained many times, the evidence at the Evidentiary Hearing made clear that the only people involved in the October 2 Zoom meeting were Rodriguez, Diaz, and Colomar and that the discussion at the Zoom meeting did not include discussions about defamation or Medina. *See supra* Section III.A.2–3. So any assertion based on that Zoom meeting that Schmidt and Coronado were untruthful has already been rejected. More particular to this exact allegation, Schmidt's confirmation that he "didn't have any communication about" a "defamation case involving someone named Horacio Medina," *see* ECF No. [59-14] at 48, is entirely in line with the Court's conclusion about what the Zoom meeting discussion entailed, *see supra* Section III.A.2–3.

The Court has also expansively explained that Diaz's decision to copy some of his employees on the email chain to ensure that at least one person could join the Zoom call as a witness does not establish that all copied employees actually communicated with Rodriguez. *See supra* Section III.A.2–3. Similarly, and unsurprisingly to anyone who receives a large number of work emails, the Evidentiary Hearing testimony established that those employees did not interpret being copied on an email message by Diaz to be a direct communication to them. *See* Evid. Hr'g Tr., vol. 2, 32. For all those reasons, the Court does not view either Schmidt's WhatsApp message confirming that he had never communicated with Rodriguez or Coronado's declaration alerting the Court to Schmidt's response as untruthful, which means that those statements do not support Plaintiffs' argument that Defendants and their counsel engaged in a pattern of bad-faith conduct. The Court, therefore, declines to exercise its inherent authority to impose sanctions on them on that basis. *See Chambers*, 501 U.S. at 44–45; *Purchasing Power*, 851 F.3d at 1225; *Martin*, 307 F.3d at 1335; *Kleiner*, 751 F.2d at 1209.

As for Plaintiffs' contention that the four months between their request for Schmidt to verify the accuracy of the WhatsApp message and Schmidt's verification was "stonewalling," *see* ECF No. [235] at 7–12, 21, Plaintiffs do not provide any evidence to support that the delay was intentional. Coronado's declaration explains that Schmidt "no longer works for" DRT, *see* ECF No. [59-14] at 3, which would explain why Coronado had to use WhatsApp to reach him. Plaintiffs argue that they asked Coronado for Schmidt's phone number so that they could contact him directly about the WhatsApp message and that Coronado refused to give it, *see* ECF No. [235] at 8, but the Court finds nothing inappropriate about declining to provide a former employee's personal phone number to an opposing party. That is not stonewalling; it is security. And regardless of when Schmidt provided the verification, the fact of the matter is that Schmidt

confirmed that the WhatsApp conversation that Coronado attached to his affidavit was not a fabrication and that it accurately captures the exchange between him and Coronado on February 24, 2025. Thus, notwithstanding any delay, the outcome is no different as Schmidt confirmed the accuracy of the information in Coronado's affidavit. For all those reasons, the Court does not view the four months between Plaintiffs' request for Schmidt to verify the WhatsApp message and Schmidt's verification as stonewalling by defense counsel or as support for Plaintiffs' argument that Defendants and their counsel engaged in a pattern of bad-faith conduct. The Court therefore also declines to exercise its inherent authority to impose sanctions on them on that basis. *See Chambers*, 501 U.S. at 44–45; *Purchasing Power*, 851 F.3d at 1225; *Martin*, 307 F.3d at 1335; *Kleiner*, 751 F.2d at 1209. Accordingly, the Fourth Sanctions Motion, **ECF No. [235]**, is **DENIED**.

### E.  Fifth Sanctions Motion – ECF No. [301]

In the Fifth Sanctions Motion, Plaintiffs ask the Court to sanction Colomar, G. Gazso, Foster, and Sardi by referring them to this District's Grievance Committee and by ordering them to pay Plaintiffs' costs and expenses related to the motion because they violated their duty of candor to the Court during the Status Hearing. *See* ECF No. [301] at 17–18. Plaintiffs also ask the Court to order the "immediate redaction from the public record of all references to the private medical information of Plaintiff Otero's spouse." *See* ECF No. [301] at 18. Plaintiffs assert that the Court can take these actions under its inherent authority, 28 U.S.C. § 1927,[11] this Court's Local Rule 11.1(c), and Florida Bar Rules 4-3.3 and 4-8.4(c)–(d). *See* ECF No. [301] at 16–17.

Plaintiffs contend Colomar violated that duty by asserting that Plaintiff Otero does not

---

[11] In full, 28 U.S.C. § 1927 provides: "Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *See* 28 U.S.C. § 1927.

speak English when he, in fact, holds several degrees from Cambridge University and by deliberately trivializing the seriousness of Otero's wife's heart condition when she described Mrs. Otero as merely ill.  *See* ECF No. [301] at 10–11.  Plaintiffs contend G. Gazso violated that duty by arguing that the October 2 Zoom meeting was not substantially related to this lawsuit because part of the subject line referenced representation in Zurich and by arguing that he had not concealed his internship with Judge Bloom because it was included on his public LinkedIn profile.  *See* ECF No. [301] at 8–10.  Plaintiffs contend Foster violated that duty by referring to the email chain as a single email.  *See* ECF No. [301] at 7–8.  And Plaintiffs contend Sardi violated that duty by misleading the Court into thinking it had denied Plaintiffs' request to redact Mrs. Otero's medical information when the Court's order on the motion containing it was silent on that point, by claiming he had referred to Mrs. Otero in a filing only generally and without revealing her name when the substance of his filing made clear that he was referring to her, and by making a bad-faith misapplication of the law applicable to deposing opposing counsel.  *See* ECF No. [301] at 4–7.

As an initial matter, the Court notes that each of Plaintiffs' examples of how Colomar, G. Gazso, Foster, and Sardi violated their duty of candor is based on a granular (and mostly non-dispositive) problem with an argument they made during a court proceeding.  In this way, Plaintiffs' argument aligns with their overall approach throughout this litigation, which is often formalistic to the point of nit-picking, shifting the focus from the resolution of large-scale legal and factual issues to a battle over semantics.  While the Court acknowledges that some of the lawyers' statements may in fact have been incomplete or even inaccurate, the Fifth Sanctions Motion is a good example of why it has taken the Court more than fifty pages to resolve only a handful of actual legal issues.  That is its own version of wasting judicial resources, if not vexatious multiplication of the litigation.

Moving to the merits of the motion, the Court concludes that none of the conduct Plaintiffs highlight rises to the level of bad-faith conduct sufficient to support the imposition of sanctions under the Court's inherent authority.  Although Otero's Cambridge degrees suggest that he speaks English, the Court has not heard Otero speak in English during any of the many proceedings he has attended. So the Court does not fault Colomar for her assumption that he cannot. Similarly, Colomar's choice to refer to Mrs. Otero as ill instead of describing the full extent of her medical problems is likely not a deliberate trivialization of the seriousness of her condition; it could, in fact, be an attempt to respect Plaintiffs' request that Mrs. Otero's medical information not be disclosed.  While Plaintiffs may assume the worst about defense counsel, their assumptions are not proof of bad faith intent.

Plaintiffs fault G. Gazso for arguing that the October 2 Zoom meeting was not substantially related to this lawsuit based in part on a snippet of the email chain's subject line that referred to Zurich and for arguing that his internship's appearance in his public LinkedIn profile supports a conclusion that he did not conceal it.  But pointing to the pieces of evidence that support a client's position is exactly what a lawyer is supposed to do; G. Gazso did not lie to the Court by drawing the Court's attention to a part of the email chain that weakens Plaintiffs' argument.  Nor did G. Gazso breach any duty of candor by not affirmatively disclosing his internship, as the Court has already thoroughly explained. *See supra* Section III.A.  Similarly, the Court does not view Foster's decision to label the email chain as a single email as dishonest; the phrase "single email" is broad enough to encompass an email chain, particularly where — as in this case — the Court, the lawyers, and Plaintiffs have consistently referred to and dealt with the email chain as a complete entity.

Finally, Sardi did not lie when he reminded the Court that it had denied the motion that

contained Plaintiffs' request to redact Mrs. Otero's medical information.  The Court did deny that motion in full.  *See* ECF No. [286]. The Court's silence on the redaction issue does not mean that issue remains live for resolution.  As the Court made clear during the Status Hearing, that motion "is all done."  *See* ECF No. [295] at 56.  Nor did Sardi falsely claim to have kept Mrs. Otero's identity confidential.  His filing did not identify her, other than to say she was Otero's wife. *See* ECF No. [281].  The Court fails to see how Sardi could respond to Plaintiffs' motion, which was based on a medical issue affecting a Plaintiffs' spouse, *see* ECF No. [275], without at least that level of identification.  Finally, Sardi did not misapply the law when he argued at the Status Hearing that it would be "highly improper" to have an opponent "take the deposition of an attorney who is actively defending a defendant in a case."  *See* ECF No. [295] at 69.  That is a fair, if general, representation of the law on this issue, and Plaintiffs can rest assured that the Court understands the nuance pertaining to counsel of record who become central fact witnesses.  And most importantly, none of these instances in fact confused or misled the Court during the Status Hearing, so there was no prejudice to Plaintiffs or harm to the dignity of the tribunal.  *See Kleiner*, 751 F.2d at 1209.

Once again, the Court concludes that defense counsel's conduct is not so egregious that it rises to the level of sanctionable bad faith conduct.  *See Chambers*, 501 U.S. at 44–45; *Purchasing Power*, 851 F.3d at 1225; *Martin*, 307 F.3d at 1335; *Kleiner*, 751 F.2d at 1209.  Nor does the conduct warrant sanctions under the other sources of law Plaintiffs suggest, as it did not multiply the proceedings "unreasonably and vexatiously," *see* 28 U.S.C. § 1927; was not a knowing false statement of fact or law, *see* R. Reg. Fla. Bar 4-3.3(a)(1); and did not involve dishonesty, fraud, deceit, misrepresentation, or practice that is prejudicial to the administration of justice, *see* R. Reg. Fla. Bar 4-8.4(c)–(d).  Accordingly, because none of its grounds meet the threshold for the

CASE NO. 25-CV-20465-BLOOM/Elfenbein

sanctions Plaintiffs request, the Fifth Sanctions Motion, **ECF No. [301]**, is **DENIED**.

### F. DRT's Request for Sanctions

In its responses to the Fourth and Fifth Sanctions Motions, DRT makes its own request for sanctions against Plaintiffs. *See* ECF No. [251] at 10–12; ECF No. [303] at 17–19. Sardi does the same in his response to the Fifth Sanctions Motion. *See* ECF No. [304] at 5–6. DRT and Sardi base these requests on Plaintiffs' persistent filings — which they view as improper and intended only to increase legal costs, "burden the Court's resources, and demonstrate their disregard for the Court's authority" — and on Plaintiffs' "consistent pattern of ignoring this Court's rules and procedures," which has resulted in the Court striking or denying "numerous filings on that basis." *See* ECF No. [251] at 10–12; ECF No. [303] at 17–19; ECF No. [304] at 5–6. They ask the Court to "impose a narrow injunction against Plaintiffs, preventing further filings without leave of the Court." *See* ECF No. [251] at 10–12; ECF No. [303] at 17–19; ECF No. [304] at 5–6.

While the Court does not disagree that Plaintiffs have been prolific filers, keeping this case going for nearly eight months after Judge Bloom dismissed the Amended Complaint and Plaintiffs appealed that dismissal to the Eleventh Circuit, the Court declines to exercise its authority to impose a pre-filing injunction at this juncture. *See Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1317–18 (11th Cir. 2021); *cf. Traylor v. City of Atlanta*, 805 F.2d 1420, 1421 (11th Cir. 1986) (explaining that a district court has considerable discretion in restricting the filing of patently frivolous lawsuits). As the Court explained in an earlier R&R, while Plaintiffs have not been successful on most of their motions to date, some of those motions have not been patently frivolous. *See* ECf No. [307] at 27–31. But let this be Plaintiffs' *final warning*: if they continue to file motions and other documents at the same pace and those motion continue to be denied, the Court will give serious consideration to Defendants' next request for a pre-filing injunction. For

CASE NO. 25-CV-20465-BLOOM/Elfenbein

now, though, DRT and Sardi's request for sanctions against Plaintiffs is **DENIED**.

## IV.    CONCLUSION

For the reasons explained above, the motions, **ECF No. [172]; ECF No. [225]; ECF No. [233]; ECF No. [235];** and **ECF No. [301]**, are **DENIED**.[12]   Similarly, DRT and Sardi's request for sanctions against Plaintiffs, *see* **ECF No. [251] at 10–12; ECF No. [303] at 17–19;** and **ECF No. [304] at 5–6**, is **DENIED**.

**DONE and ORDERED** in Chambers in Miami, Florida on January 20, 2026.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:     All Counsel of Record

**Ivan R. Freites C.**
c/o Villasana
4370 NW 107th Ave, Apt. 102
Doral, FL 33178
*PRO SE*

**Miguel Enrique Otero C.**
Plaintiff.v.Medina@proton.me
*PRO SE*

**Jorge Alejandro Rodriguez M.**
Plaintiff.2.v.Medina@proton.me
*PRO SE*

---

[12] For clarity, the Court notes that this denial applies to all of Plaintiffs' requests for post-judgment discovery and evidentiary hearings, unless noted otherwise in its prior order, *see* ECF No. [172] at 2, 19; ECF No. [225] at 12–13; ECF No. [233] at 12; ECF No. [235] at 21–22; ECF No. [301] at 18, ECF No. [305], and which, because of the Court's resolution of the merits issues above, are moot.